IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

LUKE RICHARDSON,

Index No.
ECF CASE

PLAINTIFF,

vs.

COMPLAINT
[JURY TRIAL
DEMANDED]

THE CITY OF NEW YORK, a municipal entity,
FORMER NYPD CHIEF OF PATROL JOSEPH
ESPOSITO, NYPD ASSISTANT CHIEF THOMAS
P. PURTELL, NYPD DEPUTY CHIEF STEVEN
ANGER, NYPD DEPUTY CHIEF JAMES
MCNAMARA, NYPD CAPTAIN MARK IOCCO,
NYPD OFFICER "JOHN DOE" SHIELD NO. 10074,
NYPD OFFICER "JOHN DOE" SHIELD NO. 4054,
NYPD OFFICER "JOHN DOE" SHIELD NO. 3680,
NYPD OFFICER "JOHN DOE" SHIELD NO. 14434,
NYPD OFFICER "JOHN DOE" SHIELD NO. 8533,
NYPD OFFICER "JOHN DOE" SHIELD NO. 1361,
NYPD "JOHN DOE" SQUAD 1 SERGEANT, NYPD
OFFICER "JOHN DOE" SHIELD NO. 1470, NYPD
OFFICER "JOHN DOE" SHIELD NO. 1647, NYPD
OFFICER "JOHN DOE" SQUAD 1 OFFICER 1, NYPD
OFFICER "JOHN DOE" SQUAD 1 OFFICER 2, NYPD
OFFICER "JOHN DOE" SQUAD 1 OFFICER 3, NYPD
JOHN DOE" SQUAD 2 SERGEANT, NYPD OFFICER
"JOHN DOE" SHIELD NO. 4132, NYPD OFFICER
"JOHN DOE" SHIELD NO. 9189, NYPD OFFICER
"JOHN DOE" SHIELD NO. 31604, NYPD OFFICER
"JOHN DOE" SUNGLASSES, NYPD OFFICER "JOHN
DOE" SQUAD 2 OFFICER, NYPD OFFICER "JOHN
DOE" SQUADS LIEUTENANT, NYPD OFFICER
"JOHN DOE" SECOND CAPTAIN, NYPD OFFICER
"JOHN DOE" THIRD SERGEANT, NYPD "JOHN DOE"
ASSISTANT OFFICER TO THIRD SERGEANT, NYPD
"JOHN DOE" CAP WEARING OFFICER

DEFENDANTS.

---

Plaintiff LUKE RICHARDSON, by his attorneys, STECKLOW COHEN & THOMPSON, complaining of the defendants, respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

1.     Plaintiff LUKE RICHARDSON brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.     The Plaintiff LUKE RICHARDSON was standing on the sidewalk approximately in front of 28 Broadway the morning of September 17, 2012, commemorating with friends the one-year anniversary of the occupation of Zuccotti Park, an event which signified the beginning of an ongoing resurgence in American activism and civic engagement.  A large number New York City Police officers were present.  While Plaintiff's back was turned, Defendant POLICE OFFICERS advanced southbound, ramming Plaintiff and other bystanders with their batons. Plaintiff and others expressed dissatisfaction with the violent actions of Defendant POLICE OFFICERS. Despite issuing no order to disperse, Defendant POLICE OFFICERS then arrested Plaintiff, alleging violations without factual basis in retaliation for Plaintiff's protected activity.

## II. JURISDICTION

3.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

4.     Plaintiff LUKE RICHARDSON further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all State law claims and causes of

action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III. VENUE

**5.** Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## IV. JURY DEMAND

**6.** Plaintiff LUKE RICHARDSON respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

**7.** Plaintiff LUKE RICHARDSON ("the Plaintiff") is a resident of the State of New York.

**8.** Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

**9.** Defendant THE CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, THE CITY OF NEW YORK.

**10.** At all times relevant herein, Defendant FORMER CHIEF OF PATROL JOSEPH ESPOSITO ("CHIEF ESPOSITO") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

11. Defendant NYPD ASSISTANT CHIEF THOMAS P. PURTELL ("CHIEF PURTELL") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

12. Defendant NEW YORK CITY POLICE DEPUTY CHIEF STEVEN ANGER ("CHIEF ANGER") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

13. Defendant NYPD DEPUTY CHIEF JAMES MCNAMARA ("CHIEF MCNAMARA") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

14. Defendant NYPD CAPTAIN MARK IOCCO ("CAPTAIN IOCCO"), was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

15. Defendant NYPD "JOHN DOE" SQUAD 1 SERGEANT ("SQUAD 1 SERGEANT") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

16. Defendant NYPD OFFICER "JOHN DOE" SHIELD NO. 10074 ("OFFICER NO. 10074") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 10074. An image of this officer is annexed hereto as Exhibit A.

17. Defendant NYPD OFFICER "JOHN DOE" SHIELD NO. 4054 ("OFFICER NO. 4054") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On the date of this

4

incident, this officer's badge number was 4054. An image of this officer is annexed hereto as Exhibit B.

18. Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE" SHIELD NO. 3680 ("OFFICER NO. 3680") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 3680. An image of this officer is annexed hereto as Exhibit C.

19. Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE" SHIELD NO. 1470 ("OFFICER NO. 1470") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. Upon information and belief, on the date of this incident, this officer's badge number was 1470. An image of this officer is annexed hereto as Exhibit D.

20. Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE" SHIELD NO. 1647 ("OFFICER NO. 1647") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. Upon information and belief, on the date of this incident, this officer's badge number was 1647. An image of this officer is annexed hereto as Exhibit E.

21. Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE" SQUAD 1 OFFICER 1 ("SQUAD 1 OFFICER 1") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.. An image of this officer is annexed hereto as Exhibit F.

22. Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE" SQUAD 1 OFFICER 2 ("SQUAD 1 OFFICER 2") was a duly sworn police officer of said

department and was acting under the supervision of said department and according to his official duties.. An image of this officer is annexed hereto as Exhibit G.

23. Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE" SQUAD 1 OFFICER 1 ("SQUAD 1 OFFICER 3") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.. An image of this officer is annexed hereto as Exhibit H.

24. Defendant NYPD "JOHN DOE" SQUAD 2 SERGEANT "SQUAD 2 SERGEANT"), was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 3558. An image of this officer is annexed hereto as Exhibit I.

25. Defendant NYPD OFFICER "JOHN DOE" SHIELD NO. 14434 ("OFFICER NO. 14434") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 14434. An image of this officer is annexed hereto as Exhibit J.

26. Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE" SHIELD NO. 8533 ("OFFICER NO. 8533") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 8533. An image of this officer is annexed hereto as Exhibit K.

27. Defendant NYPD OFFICER "JANE DOE" SHIELD NO. 4132 ("OFFICER NO. 4132") was a duly sworn police officer of said department and was acting under the

supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 4132. An image of this officer is annexed hereto as Exhibit L.

28. Defendant NYPD OFFICER "JOHN DOE" SHIELD NO. 9189 ("OFFICER NO. 9189") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 9189. An image of this officer is annexed hereto as Exhibit M.

29. Defendant NYPD OFFICER "JOHN DOE" SHIELD NO. 31604 ("OFFICER NO. 31604") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 31604. An image of this officer is annexed hereto as Exhibit N.

30. Defendant NYPD OFFICER "JOHN DOE" SQUAD 2 SUNGLASSES OFFICER ("SQUAD 2 SUNGLASSES OFFICER") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. An image of this officer is annexed hereto as Exhibit O.

31. Defendant NYPD OFFICER "JANE DOE" SQUAD 2 OFFICER ("SQUAD 2 OFFICER") was a duly sworn police officer of said department and was acting under the supervision of said department and according to her official duties. An image of this officer is annexed hereto as Exhibit P.

32. Defendant NYPD "JOHN DOE" SQUADS LIEUTENANT ("SQUADS LIEUTENANT") was a duly sworn police officer of said department and was acting under

the supervision of said department and according to his official duties. An image of this officer is annexed hereto as Exhibit Q.

33. Upon information and belief, many of the "John Doe" officers identified above were assigned to the "School Safety Division" of the NYPD.

34. Defendant NYPD "JOHN DOE" SECOND CAPTAIN ("SECOND CAPTAIN") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. An image of this officer is annexed hereto as Exhibit R.

35. Defendant NYPD "JOHN DOE" THIRD SERGEANT ("THIRD SERGEANT") was a duly sworn police officer of said department and was acting under the supervision of said department and according to her official duties. An image of this officer is annexed hereto as Exhibit S.

36. Defendant NYPD "JOHN DOE" ASSISTANT OFFICER TO THIRD SERGEANT ("ASSISTANT OFFICER") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. Upon information and belief, this officer's badge number may have been 384. An image of this officer is annexed hereto as Exhibit T.

37. Defendant NYPD "JOHN DOE" CAP-WEARING OFFICER 1 ("CAP-WEARING OFFICER 1") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. An image of this officer is annexed hereto as Exhibit U.

38. Defendant NYPD OFFICER "JOHN DOE" SHIELD NO. 1361 ("OFFICER NO. 1361") was a duly sworn police officer of said department and was acting under the

supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 31604. An image of this officer is annexed hereto as Exhibit V.

**39.**

**40.** All of the foregoing officers (collectively, the "Defendant POLICE OFFICERS") either personally or through hose whom they supervised, were acting under color of state law and/or pursuant to the customs, usages and/or practices of the State or City of New York.

**41.** That at all times relevant to this action, the Defendant "John Doe" POLICE OFFICERS, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

**42.** Plaintiff LUKE RICHARDSON will amend this complaint to identify each of the "John Doe" police officers by their true names, as their identities can be established to a reasonable certainty.

**43.** Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK, and were acting under the supervision of said department and according to their official duties.

<u>VI. FACTS COMMON TO ALL CLAIMS</u>

**44.** The Plaintiff, Luke Richardson, was a participant in the Occupy Wall Street ("OWS") movement.

**45.** OWS is a movement that, among other things, protests the institutionalized inequality in this country that funnels almost all the nation's political power, wealth and

resources to a tiny fraction of people and their corporations, and denies the vast majority of ordinary Americans their fair share.

**46.**     In particular, OWS sought to bring attention to the unfair way in which ordinary people were allowed to suffer terrible hardship due to mortgage debt, student loan debt, or lack of affordable healthcare, as politicians and businessmen blamed these people for "irresponsibility," while huge banks were rescued from any consequences of their own decision-making by government bailouts funded by those same ordinary people's taxes.

**47.**     For example, upon information and belief, in 2008, a total of 861,664 families lost their homes to foreclosure. There were more than 3.1 million foreclosure filings issued during 2008, which means that one of every 54 households received a foreclosure notice that year.  In 2009, banks sent 3.9 million foreclosure notices to homeowners in default.

**48.**     The government came to the aid of the banks – who caused the crisis with fraudulent lending and asset valuation practices -- not the ordinary people.

**49.**     Upon information and belief, Bank of America received $45,000,000,000 from the federal government.

**50.**     Upon information and belief, Citigroup received $45,000,000,000 from the federal government.

**51.**     Upon information and belief, JPMorgan Chase received $25,000,000,000 from the federal government.

**52.**     Upon information and belief, Wells Fargo – one of the worst actors among the financial institutions who caused the crisis – received $25,000,000,000 from the federal government.

53.     Meanwhile, upon information and belief, by the end of 2009 only about 31,000 of the 4 million homeowners in the Obama administration's foreclosure prevention plan -- less than 5 percent – had obtained any relief. Millions more who did not qualify for that program simply lost their homes.

54.     And, upon information and belief, the banks that received these bailouts gave their executives – the architects of the national crisis — a record $140 billion in in bonuses in 2009.

55.     Unfairness like this is part of what OWS was created to change.

56.     Because the bad actors who victimized ordinary Americans while they took bonuses from taxpayer money were centered in Wall Street, OWS focused its attention on Wall Street.

57.     On September 17, 2011, the first OWS march in the Wall Street area resulted in protestors occupying Zuccotti Park. For almost 2 months, these protestors remained in Zuccotti Park.

58.     The media found it difficult to ignore the occupation of Zuccotti Park, and the OWS movement was successful in raising awareness of these issues.

59.     However, the NYPD continually arrested members of OWS for peaceful protest activity.

60.     On November 15, 2011, the City of New York launched a 1:00 AM paramilitary raid on the protest camp at Zuccotti Park and ejected all its occupants.

61.     Because OWS was no longer a daily presence at Zuccotti Park, it became harder for OWS to keep the media's attention focused on its issues of economic and political fairness.

**62.** However, the OWS movement continued.

**63.** On September 17th, 2012, the first anniversary of the first OWS march, people who followed OWS gathered in various parts of the City, including in the financial district, where so many of the banks that caused the financial collapse of of 2007 were located.

**64.** On the morning of September 17th, the Plaintiff chose to go to the financial district to celebrate Occupy Wall Street's one-year anniversary.

**65.** Plaintiff understood the statute of limitations for securities fraud to be 5 years.

**66.** Thus, Plaintiff believed Occupy Wall Street's one-year anniversary was potentially his last chance to be counted among those calling for the prosecution of financial institutions for perceived crimes leading up to the financial collapse of 2007.

**67.** At or around 10 AM Plaintiff was standing on the sidewalk at or near 28 Broadway making plans with his friends from OWS he had reunited with.

**68.** The defendant officers were deployed in and around the area that the plaintiff met with his friends.

**69.** Upon information and belief, squads of police officers were deployed under the command of defendant SQUADS LIEUTENANT.

**70.** Upon information and belief, under the command of SQUADS LIEUTENANT were SQUAD 1 SERGEANT, SQUAD 2 SERGEANT and THIRD SERGEANT.

**71.** Upon information and belief, under the command of defendant SQUAD 1 SERGEANT were the following police officer defendants: OFFICER NO. 10074,

OFFICER NO. 4054, OFFICER NO. 3680, OFFICER NO. 1470, OFFICER NO. 1647, SQUAD 1 OFFICER 1, SQUAD 1 OFFICER 2, and SQUAD 1 OFFICER 3.

**72.** Upon information and belief, under the command of defendant SQUAD 2 SERGEANT were the following police officer defendants: OFFICER NO. 14434, OFFICER NO. 8533, OFFICER NO. 4132, OFFICER NO. 9189, OFFICER NO. 31604, SQUAD 2 SUNGLASSES OFFICER, and SQUAD 2 OFFICER.

**73.** Upon information and belief, defendant THIRD SERGEANT commanded defendant ASSISTANT OFFICER.

**74.** Upon information and belief, Defendant CAPTAIN IOCCO commanded SQUADS LIEUTENANT, SQUAD 1 SERGEANT, SQUAD 2 SERGEANT and THIRD SERGEANT, and all the police officers commanded by those defendants.

**75.** Upon information and belief, Defendant CAPTAIN IOCCO also commanded defendant CAP-WEARING OFFICER 1.

**76.** Upon information and belief, acting together with CAPTAIN IOCCO was defendant SECOND CAPTAIN.

**77.** Upon information and belief, the foregoing defendants were under the command of defendants CHIEF PURTELL, CHIEF ANGER, and CHIEF MCNAMARA (hereinafter, "the CHIEF DEFENDANTS").

<u>CHIEF PURTELL, CHIEF MCNAMARA AND CHIEF ANGER</u>
<u>FAILED TO ADEQUATELY SUPERVISE</u>
<u>THE OTHER DEFENDANT POLICE OFFICERS</u>

**78.** On September 17, 2012, the CHIEF DEFENDANTS were the members of the NYPD who were the highest unformed ranking police supervisors assuming command.

**79.** As the Incident Commander of the Occupy Wall Street event on September 17, 2012, the CHIEF DEFENDANTS were responsible for the overall management of the policing activities concerning the event, including command of the other Defendant POLICE OFFICERS.

**80.** As described within Section 213-11 of the NYPD Patrol Guide, *Policing Special Events/Crowd Control,* as the Incident Commander of the OWS event on September 17, 2012, the CHIEF DEFENDANTS were responsible for the command, control and coordination of all incident operations.

**81.** Upon information and belief, the actions of the other defendants herein were under the direct control and coordination, in planning, through presence, and through radio contact, by the CHIEF DEFENDANTS.

**82.** Without verbal or visual warning, Defendant POLICE OFFICERS struck Plaintiff from behind, grasping their batons between both hands and shoving Plaintiff in the back.

**83.** This caused Plaintiff to become startled.

**84.** Plaintiff turned around and discovered a wall of Defendant POLICE OFFICERS with batons drawn.

**85.** Defendant CAPTAIN IOCCO grabbed plaintiff by the strap of his messenger bag and dragged him through a crowd of Defendant POLICE OFFICERS.

**86.** CAPTAIN IOCCO then transferred custody of Plaintiff to OFFICER NO. 10074, Defendant SQUAD 2 SERGEANT.

**87.** The Defendant POLICE OFFICERS including Defendant CAPTAIN IOCCO, Defendant OFFICER NO. 10074 and SQUAD 2 SERGEANT caused Plaintiff to be arrested.

**88.** Other Defendant POLICE OFFICERS directly participated in the plaintiff's arrest by grabbing him and/or pushing him, including OFFICER NO. 4132, OFFICER NO. 8533, OFFICER NO. 3680, and SECOND CAPTAIN.

**89.** Other Defendant POLICE OFFICERS named herein who were present, and were close enough to intervene in the plaintiff's arrest, and who failed to do so, were the other Defendant POLICE OFFICERS with the exceptions of CHIEF OF PATROL ESPOSITO, CHIEF PURTELL, CHIEF MCNAMARA, AND CHIEF ANGER.

**90.** Defendant OFFICER NO. 10074 and/or SQUAD 2 SERGEANT placed plastic flex-cuffs tightly around Plaintiff's wrists, causing pain then numbness to Plaintiff's hands and wrists.

**91.** Defendants OFFICER NO. 10074 and SQUAD 2 SERGEANT led Plaintiff onto a police bus with other prisoners.

**92.** Plaintiff suffered nerve damage in his hands and wrists from a previous incident involving flex-cuffs.

**93.** Plaintiff requested of Defendant OFFICER NO. 10074 that his flex-cuffs be loosened, notifying him of current pain then numbness and of Plaintiff's prior injury.

**94.** Defendant OFFICER NO. 10074 agreed to loosen Plaintiff's flex-cuffs.

**95.** Defendant OFFICER NO. 10074 proceeded to load more people onto the police bus with Plaintiff.

**96.** Plaintiff's flex-cuffs were not loosened until they were removed at the precinct, over one hour after Defendant OFFICER NO. 10074 and/or SQUAD 2 SERGEANT placed them tightly around Plaintiff's wrists.

**97.** The alleged charge for which the Plaintiff was arrested was disorderly conduct.

**98.** Plaintiff did not engage in disorderly conduct, or any other violation or crime.

**99.** Upon information and belief, Defendant CAPTAIN IOCCO ordered the arrest of Plaintiff knowing that the Plaintiff did not commit any violation or offense.

**100.** Defendant CAPTAIN IOCCO chose not to intervene to prevent the Plaintiff's arrest, despite having the ability and the opportunity to do so.

**101.** Following Plaintiff's unlawful arrest, the Defendant POLICE OFFICERS transported Plaintiff to One Police Plaza.

**102.** There the Defendant POLICE OFFICERS detained Plaintiff for approximately 13 hours.

**103.** Upon release from jail, Plaintiff did discover a photograph of his arrest was used on the front page of CNN.com, next to a picture of Mitt Romney.

**104.** The New York County District Attorney's office declined to prosecute the charges against Plaintiff, thus the charges were dismissed.

FIRST CLAIM FOR RELIEF

DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

**105.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**106.** All of the aforementioned acts of the Defendant POLICE OFFICERS, their agents, servants and employees, were carried out under the color of state law.

**107.** All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, and Fourteenth Amendments to the Constitution of the United States of America, in violation of 42 U.S.C. § 1983.

**108.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

**109.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

**110.** The Defendant POLICE OFFICERS collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**111.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty, and other special damages.

**112.** As a result of the Defendant POLICE OFFICERS ' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

## SECOND CLAIM FOR RELIEF

## FALSE ARREST

**113.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**114.** Plaintiff was arrested by the Defendant POLICE OFFICERS without probable cause, without a warrant, and without the plaintiff's consent.

**115.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty, and other special damages.

**116.** As a result of the Defendant POLICE OFFICERS ' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

## THIRD CLAIM FOR RELIEF

## EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

**117.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**118.** Plaintiff was subjected to excessive and unjustified force in violation of his rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983 by the Defendant POLICE OFFICERS.

**119.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty, and other special damages.

**120.** As a result of the Defendant POLICE OFFICERS ' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

FOURTH CLAIM FOR RELIEF

FAILURE TO INTERVENE

**121.** Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**122.** The Defendant POLICE OFFICERS had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights.

**123.** As alleged above, the Defendant POLICE OFFICERS chose not to intervene on Plaintiff 's behalf to prevent the violation of his constitutional rights despite having had realistic opportunities to do so.

**124.** The Defendant POLICE OFFICERS chose not to intervene on Plaintiff 's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

**125.** As a result of the aforementioned conduct of the Defendant POLICE OFFICERS, Plaintiff's constitutional rights were violated.

**126.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty, and other special damages.

**127.** As a result Defendant POLICE OFFICERS' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

<u>FIFTH CLAIM FOR RELIEF</u>

<u>AGAINST THE CITY OF NEW YORK UNDER MONELL</u>

**128.** Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**129.** Between September 17, 2011 and September 17, 2012 – in Manhattan alone – 2,644 members of OWS were arrested.

**130.** Of these 2,644 arrests, only 409 resulted in a plea or conviction for any charge.

**131.** In other words, these arrests led to conviction only 15% of the time.

**132.** Of these 2,644 arrests, the District Attorney refused to even attempt a conviction in 202 cases, or 7.5% of the time.

**133.** The rest of the cases – the vast majority – were dismissed.

**134.** The overwhelming majority of these arrests were for disorderly conduct – a non-criminal violation akin to jaywalking.

**135.** Yet, the majority of the protestors who were arrested were taken into police custody, whether for hours or for days, rather than simply being given a ticket.

**136.** As the record of dismissal of the cases against OWS protestors shows, the majority of the people arrested had not done anything wrong.

**137.** Instead of taking necessary steps to curb the number of unlawful arrests of OWS protestors during the year leading up to the plaintiff's arrest, the NYPD made no policy changes during the year that it made the 2,644 arrests.

**138.** The NYPD made no effort to find out why so many OWS arrests were not prosecuted by the District Attorneys office, or why so many cases were dismissed.

**139.** The NYPD, in fact, did not care whether its arrests were valid arrests that resulted in convictions or not.

**140.** As a result, over the first year of the OWS movement, from September 17, 2011 to September 17, 2012, the number of unlawful arrests of OWS protestors numbered in the thousands.

**141.** One reason that the police arrested so many innocent OWS participants was because the police were not trained in the law that protects protestors from arrest for minor violations like "blocking the sidewalk."

**142.** Under New York State and federal law, it is well established that a person cannot be arrested for "mere inconveniencing of pedestrians."

**143.** Yet, many police officers whose job it was to police the OWS protests believed the opposite, that if a protestor caused any inconvenience to other pedestrians, they could be lawfully arrested.

**144.** Many officers believed that if a person did anything that caused another pedestrian to divert their course to walk around them, that person could be lawfully arrested.

**145.** Under New York State and federal law, it is well established that even if protestors block the entire sidewalk, causing pedestrians to step into the street, this is not enough to justify arrest.

**146.** Yet, many police officers whose job it was to police the OWS protests believed the opposite, and arrested people for lawful conduct.

**147.** Under federal law, it is well established that when a person is engaged in political or expressive speech activity, the First Amendment of the Constitution requires

that the government, including the police, to give fair warning to protestors that they must disperse before arresting them.

**148.** Yet, many police officers whose job it was to police the OWS protests believed the opposite, and arrested people without giving fair warning.

**149.** Under New York State law, it is well established that there is no probable cause for the arrest of a person for disorderly conduct, if their conduct does not cause, or threaten to cause, a substantial impact on the public at large, such as a breach of the peace.

**150.** Yet, many police officers whose job it was to police the OWS protests believed the opposite, and arrested people who neither caused nor threatened to cause a substantial impact on the public at large, such as a breach of the peace.

**151.** Under New York State and federal law, it is well established that probable cause to make an arrest does not arise merely because of a person's presence within a group of people, even if some people in that group are committing offenses. A person may only be subject to arrest if there is individualized probable cause to believe that the individual who will be arrested committed an offense.

**152.** Yet, many police officers whose job it was to police the OWS protests believed the opposite, and arrested people merely because of their presence within a group of people, some of whom were committing an offense.

**153.** Unfortunately, under the direction of the NYPD chain of command, this incorrect understanding of the law was applied to OWS protestors, causing hundreds or thousands of unlawful arrests.

**154.** Many officers had their only training on these issues during the brief (six months) time they spent in the police academy.

**155.** OWS protests were policed not merely by patrol officers, but by high-ranking officers such as the CHIEF DEFENDANTS and CHIEF OF DEPARTMENT ESPOSITO.

**156.** These high-ranking officers had the ability (and the duty) to see that their officers were incorrectly understanding and applying the law.

**157.** These high ranking officers had the ability (and the duty) to set policies that would prevent their officers from making unlawful arrests because of their failure to understand the law.

**158.** These high ranking officers had the ability (and the duty) to ensure that their officer had training that would prevent their officers from making unlawful arrests because of their failure to understand the law.

**159.** Upon information and belief, the majority of OWS arrests which occurred in New York County occurred within the confines of Patrol Borough Manhattan South.

**160.** The Commander of Patrol Borough Manhattan South, at all relevant times, was defendant CHIEF PURTELL.

**161.** In 2011 and 2012, defendant CHIEF PURTELL was an employee of the NYPD who was identified by the NYPD as having "substantial policy discretion."

**162.** In other words, defendant CHIEF PURTELL was an policy maker for the NYPD and defendant THE CITY OF NEW YORK.

**163.** Defendant CHIEF PURTELL was one person who determined that the NYPD and the CITY OF NEW YORK would not take action to prevent further unlawful arrests of OWS protestors within Patrol Borough Manhattan South.

**164.** Defendant CHIEF PURTELL was one person who determined which officers of the NYPD would be assigned to the September 17, 2012 OWS anniversary events.

**165.** Upon information and belief, Defendant CHIEF PURTELL took no steps to ensure that the officers, including the DEFENDANT POLICE OFFICERS, who were assigned to the September 17, 2012 OWS anniversary events consisted of officers who were properly trained and had a proper understanding of the law governing lawful arrests at such events.

**166.** Upon information and belief, Defendant CHIEF PURTELL took no steps to ensure that the officers, including the Defendant POLICE OFFICERS, who were assigned to the September 17, 2012 OWS anniversary events performed their duties on that day with a proper understanding of the law governing lawful arrests at such events.

**167.** Upon information and belief, defendant CHIEF OF PATROL ESPOSITO was second in command of the NYPD, below Commissioner Ray Kelly.

**168.** In 2011 and 2012, defendant CHIEF OF PATROL ESPOSITO was an employee of the NYPD who was identified by the NYPD as having "substantial policy discretion."

**169.** In other words, defendant CHIEF OF PATROL ESPOSITO was a policy maker for the NYPD and Defendant THE CITY OF NEW YORK.

**170.** Upon information and belief, CHIEF OF PATROL ESPOSITO was aware of the fact that large numbers of the police officers assigned to police OWS events were not properly trained, and did not have a proper understanding of the law governing lawful arrests at such events.

24

**171.**     However, upon information and belief, CHIEF OF PATROL ESPOSITO took no steps to ensure that the police officers assigned to police OWS events were properly trained, or that they acted with a proper understanding of the law governing lawful arrests at such events.

**172.**     Throughout the period of time from September 17, 2011 and through September 17, 2012, both CHIEF OF PATROL ESPOSITO and CHIEF PURTELL were aware of information that placed them on clear notice that officers under their command were pursuing arrest practices that violated the Constitutional rights of OWS protestors.

**173.**     Upon information and belief, throughout the period of time from September 17, 2011 and through September 17, 2012, both CHIEF OF PATROL ESPOSITO and CHIEF PURTELL did nothing to impose, develop or modify any policies or practices that would prevent further unlawful arrests.

**174.**     Upon information and belief, the CITY OF NEW YORK, CHIEF OF PATROL ESPOSITO, and CHIEF PURTELL did not train officers assigned to OWS events in how to make lawful arrests, and how to avoid unlawful arrests.

**175.**     Upon information and belief, the CITY OF NEW YORK, CHIEF OF PATROL ESPOSITO, and CHIEF PURTELL did not train officers assigned to OWS did not assign officers who had proper training to police such arrests.

**176.**     One officer who was given substantial responsibility in supervising the policing of Occupy Wall Street was Deputy Inspector Winski.

**177.**     Deputy Inspector Winski was responsible for training "hundreds of officers" concerning how to perform their duties in policing OWS events.

**178.**   Deputy Inspector Winski, however, believed that the fact that individuals are engaged in First Amendment-protected activity has no effect on the manner win which Penal Law 240.20 against them.

**179.**   For example, Deputy Inspector Winski believed that even fleeting obstruction of traffic by individuals engaged in First Amendment protected activity is a lawful basis for a charge of disorderly conduct.

**180.**   Deputy Inspector Winski did not have the understanding that there was a mens rea requirement in the disorderly conduct statute.

**181.**   Deputy Inspector Winski believed the only training necessary for police officers assigned to police political protests and to enforce Penal Law 240.20 in a protest context was "that they should personally observe the violation."

**182.**   Deputy Inspector Winski, who played a primary role in supervising the policing of Occupy Wall Street, and in training "hundreds of officers" in the appropriate application of laws such as disorderly conduct to OWS events, regularly failed to read and review Legal Bureau Bulletins.

**183.**   Defendant Chief Steven Anger believed that only mere inconvenience was required to arrest someone for disorderly conduct, such that a person who causes another pedestrian to walk around them is "obstructing" the sidewalk and "inconveniencing" people sufficiently to justify the charge of disorderly conduct.

**184.**   Upon information and belief, the CITY OF NEW YORK, CHIEF OF PATROL ESPOSITO, and CHIEF PURTELL adopted a practice in which members of the NYPD beginning a tour or detail that would involve policing an OWS event were given no

instructions at the beginning of such tour or detail concerning how to make lawful arrests, and how to avoid unlawful arrests.

185. To the contrary, The CITY OF NEW YORK, CHIEF OF PATROL ESPOSITO, and CHIEF PURTELL adopted a practice in which lower-ranking members of the NYPD policing an OWS event were often instructed to make arrests that violated these aforementioned clearly established principles of law.

186. As a result of the foregoing failures, the Defendant POLICE OFFICERS failed to provide the plaintiff any warning prior to his arrest, in violation of clearly established law.

187. As a result of the foregoing failures, the Defendant POLICE OFFICERS arrested the plaintiff while he was on a sidewalk, when his presence on the sidewalk either caused no inconvenience to pedestrians, or did no more than "merely inconvenience such pedestrians, such that his arrest was in violation of clearly established law.

188. As a result of the foregoing failures, the Defendant POLICE OFFICERS arrested the plaintiff while he was on a sidewalk, and when his actions did not threaten a breach of the peace or a substantial impact on the public at large.

189. As a result of the foregoing failures, the Defendant POLICE OFFICERS arrested the plaintiff simply because he was among a group of OWS protestors, and not for any offense actually committed by him.

190. The NYPD also committed further systematic and willful violations of the rights of OWS protestors.

**191.** Throughout the same period from September 17, 2011 to September 17, 2012, the police illegally kept track of individuals whom they believed to be leaders of OWS, and targeted these individuals for arrest.

**192.** As a result, some people were arrested multiple times.

**193.** They were arrested multiple times not because they committed multiple offenses, but because they were identified as leaders.

**194.** Upon information and belief, the plaintiff in this case was known to police as a member of OWS, and perceived by them to be a leader of OWS, and was arrested because of that perception.

**195.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty, and other special damages.

**196.** As a result Defendant POLICE OFFICERS' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

    [a] Invoke pendent party and pendent claim jurisdiction.
    [b] Award appropriate compensatory and punitive damages.
    [c] Empanel a jury.
    [d] Award attorney's fees and costs.
    [e] Award such other and further relief as the Court deems to be in the
        interest of justice.

DATED:    New York, New York
          July 21, 2015

Respectfully submitted,

David A. Thompson [dt3991]
STECKLOW & THOMPSON
ATTORNEYS FOR PLAINTIFF
217 Centre Street, 6th Floor
New York, New York 10013
Phone:        (212) 566-8000
Fax:          (212) 202-4952
DTHOMPSON@WYLIELAW.COM