IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

LUKE RICHARDSON,

                Index No. 15-cv-05775-PKC
                ECF CASE

          PLAINTIFF,

      vs.                   FIRST AMENDED
                       COMPLAINT
                       [JURY TRIAL
                       DEMANDED]

THE CITY OF NEW YORK, a municipal entity,
FORMER NYPD COMMISIONER RAY KELLY,
FORMER MAYOR MICHAEL BLOOMBERG,
FORMER NYPD CHIEF OF PATROL JOSEPH
ESPOSITO, NYPD ASSISTANT CHIEF THOMAS
P. PURTELL, NYPD DEPUTY CHIEF STEVEN
ANGER, NYPD DEPUTY CHIEF JAMES
MCNAMARA, NYPD CAPTAIN MARK IOCCO,
NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074),
NYPD OFFICER NELSON FRIAS (SHIELD NO. 4054),
NYPD OFFICER HALIMA SMITH (SHIELD NO. 3680),
NYPD OFFICER EVERETT REYES (SHIELD NO. 14434),
NYPD OFFICER DAVID SCOTT (SHIELD NO. 8533),
NYPD OFFICER CHARLES CAREY (SHIELD NO. 1361),
NYPD "JOHN DOE" SQUAD 1 SERGEANT, NYPD
OFFICER RAYMUNDO FLETE (SHIELD NO. 14271),
NYPD OFFICER VALLISON ISAAC (SHIELD NO. 1647),
NYPD OFFICER "JOHN DOE" SQUAD 1 OFFICER 1,
NYPD OFFICER  "JOHN DOE" SQUAD 1 OFFICER 2,
NYPD OFFICER "JOHN DOE" SQUAD 1 OFFICER 3,
SERGEANT CARLETON SUDDLER, NYPD  OFFICER
REGINA VAILES (SHIELD NO. 4132),
NYPD OFFICER LUVEN GILBERT-FIGUEROA
(SHIELD NO. 9189), NYPD OFFICER VITO CAMPANELLI
(SHIELD NO. 31604), NYPD OFFICER CHAO LI
(SHIELD NO. 28060), NYPD OFFICER "JOHN
DOE" SQUAD 2 OFFICER, NYPD OFFICER "JOHN
DOE" SQUADS LIEUTENANT, NYPD OFFICER
"JOHN DOE" SECOND CAPTAIN, NYPD OFFICER
"JOHN DOE" THIRD SERGEANT, DET. SOLOMON
CHINNERY, NYPD "JOHN DOE" CAP WEARING
OFFICER,

               DEFENDANTS.

---

Plaintiff LUKE RICHARDSON, by his attorneys, STECKLOW COHEN & THOMPSON, complaining of the defendants, respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

**1.** Plaintiff LUKE RICHARDSON brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

**2.** The Plaintiff LUKE RICHARDSON was standing on the sidewalk approximately in front of 28 Broadway the morning of September 17, 2012, commemorating with other people affiliated with Occupy Wall Street on the one-year anniversary of the occupation of Zuccotti Park, an event which signified the beginning of an ongoing resurgence in American activism and civic engagement.  A large number New York City Police officers were present.  While Plaintiff's back was turned, Defendant POLICE OFFICERS advanced southbound, ramming Plaintiff and other bystanders with their batons. Plaintiff and others expressed dissatisfaction with the violent actions of Defendant POLICE OFFICERS. Despite issuing no order to disperse, Defendant POLICE OFFICERS then arrested Plaintiff, alleging violations without factual basis in retaliation for Plaintiff's protected activity.

## II. JURISDICTION

**3.** This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is

conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

4.      Plaintiff LUKE RICHARDSON further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

III. VENUE

5.      Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

IV. JURY DEMAND

6.      Plaintiff LUKE RICHARDSON respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

V. THE PARTIES

7.      Plaintiff LUKE RICHARDSON ("the Plaintiff") is a resident of the State of New York.

8.      Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

9.      Defendant THE CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, THE CITY OF NEW YORK.

10.     Defendant FORMER MAYOR MICHAEL BLOOMBERG ("THE MAYOR"), at all relevant times herein, was the Mayor of the City of New York and took a direct interest in overseeing the policing of Occupy Wall Street.  At all times relevant to the conduct of the NYPD, he was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and responsible for the appointment, training, supervision, and conduct of the highest ranking NYPD personnel.  As Mayor of the City of New York, Michael Bloomberg was a policy-maker with respect to the decisions on training and supervision of police officers in relation to Occupy Wall Street and expressive speech activity protected by the First Amendment to the United States Constitution. Michael Bloomberg is sued in his individual and official capacities-. Mayor Bloomberg was in charge of the police on the September 17, 2012 detail.

11.     At all times relevant herein, Defendant Former COMMISSIONER RAY KELLY ("COMMISSIONER KELLY") was a duly sworn police officer of the NYPD and acted under the supervision of the NYPD and according to his official duties. At all times relevant to the conduct of the NYPD, he was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and responsible for the appointment, training, supervision, and conduct of all of the NYPD members of service including the highest ranking NYPD personnel.

12.     At all times relevant herein, Defendant FORMER CHIEF OF PATROL DEPARTMENT JOSEPH ESPOSITO ("CHIEF ESPOSITO") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  At all times relevant to the conduct of the NYPD, he was the second highest ranking member of the NYPD, responsible for the policy, practice,

supervision, implementation, and conduct of virtually all NYPD matters and responsible for the appointment, training, supervision, and conduct of virtually all of the NYPD members of service including the highest ranking NYPD personnel.

13.   Defendant NYPD ASSISTANT CHIEF THOMAS P. PURTELL ("CHIEF PURTELL") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  On September 17, 2012, Chief Purtell was the incident commander of the NYPD policing of Occupy Wall Street activities.  Chief Purtell was the borough commander of Manhattan, responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD members of service including high ranking NYPD personnel.

14.   Defendant NEW YORK CITY POLICE DEPUTY CHIEF STEVEN ANGER ("CHIEF ANGER") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  On September 17, 2012, Chief Anger was one of two aides to the incident commander of the NYPD policing of Occupy Wall Street activities.  Chief Anger was an assistant to the borough commander of Manhattan, responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD members of service including high ranking NYPD personnel.  Chief Anger is sued in his individual and official capacities.

15.   Defendant NYPD DEPUTY CHIEF JAMES MCNAMARA ("CHIEF MCNAMARA") was a duly sworn police officer of said department and was acting under

the supervision of said department and according to his official duties.  On September 17, 2012, Chief McNamara was one of two aides to the incident commander of the NYPD policing of Occupy Wall Street activities.  Chief McNamara was responsible for the policy, practice, supervision, implementation, and conduct of many NYPD matters and responsible for the appointment, training, supervision, and conduct of many of the NYPD members of service including high ranking NYPD personnel.

16.     THE MAYOR, COMMISSIONER KELLY, CHIEF ESPOSITO, CHIEF PURTELL, CHIEF ANGER, and CHIEF MCNAMARA may be referred to collectively herein as "THE EXECUTIVE DEFENDANTS."  CHIEF ESPOSITO, CHIEF PURTELL, CHIEF ANGER, and CHIEF MCNAMARA may be referred to collectively herein as 'THE CHIEF DEFENDANTS."

17.     Defendant NYPD CAPTAIN MARK IOCCO ("CAPTAIN IOCCO"), was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

18.     Defendant NYPD "JOHN DOE" SQUAD 1 SERGEANT ("SQUAD 1 SERGEANT") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

19.     Defendant NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074) was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  On the date of this incident, this officer's badge number was 10074.  An image of this officer is annexed hereto as Exhibit A.

20.     Defendant NYPD OFFICER NELSON FRIAS (SHIELD NO. 4054), was a duly sworn police officer of said department and was acting under the supervision of said

department and according to his official duties.  On the date of this incident, this officer's badge number was 4054.  An image of this officer is annexed hereto as Exhibit B.

21.     Defendant NYPD OFFICER HALIMA SMITH (SHIELD NO. 3680)  was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  On the date of this incident, this officer's badge number was 3680.  An image of this officer is annexed hereto as Exhibit C.

22.     Defendant NYPD OFFICER RAYMUNDO FLETE (SHIELD NO. 14271) was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  Upon information and belief, on the date of this incident, this officer's badge number was 14271.  An image of this officer is annexed hereto as Exhibit D.

23.     Defendant NYPD OFFICER VALLISON ISAAC (SHIELD NO. 1647) was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  Upon information and belief, on the date of this incident, this officer's badge number was 1647.  An image of this officer is annexed hereto as Exhibit E.

24.     Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE" SQUAD 1 OFFICER 1 ("SQUAD 1 OFFICER 1") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties..  An image of this officer is annexed hereto as Exhibit F.

25.     Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE" SQUAD 1 OFFICER 2 ("SQUAD 1 OFFICER 2") was a duly sworn police officer of said

department and was acting under the supervision of said department and according to his official duties..  An image of this officer is annexed hereto as Exhibit G.

26.     Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE" SQUAD 1 OFFICER 1 ("SQUAD 1 OFFICER 3") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties..  An image of this officer is annexed hereto as Exhibit H.

27.     Defendant SERGEANT CARLETON SUDDLER, was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  On the date of this incident, this officer's badge number was 3558.  This officer led the group of officers referred to herein as Squad 2.  An image of this officer is annexed hereto as Exhibit I.

28.     Defendant NYPD OFFICER EVERETT REYES (SHIELD NO. 14434) was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  On the date of this incident, this officer's badge number was 14434.  An image of this officer is annexed hereto as Exhibit J.

29.     Defendant NYPD OFFICER DAVID SCOTT (SHIELD NO. 8533) was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  On the date of this incident, this officer's badge number was 8533.  An image of this officer is annexed hereto as Exhibit K.

30.     NYPD  OFFICER REGINA VAILES (SHIELD NO. 4132) was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  On the date of this incident, this officer's badge number was 4132.  An image of this officer is annexed hereto as Exhibit L.

**31.** Defendant NYPD OFFICER LUVEN GILBERT-FIGUEROA (SHIELD NO. 9189) was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 9189. An image of this officer is annexed hereto as Exhibit M.

**32.** Defendant NYPD OFFICER VITO CAMPANELLI (SHIELD NO. 31604) was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. On the date of this incident, this officer's badge number was 31604. An image of this officer is annexed hereto as Exhibit N.

**33.** Defendant NYPD OFFICER CHAO LI (SHIELD NO. 28060) was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. An image of this officer is annexed hereto as Exhibit O.

**34.** Defendant NYPD OFFICER "JANE DOE" SQUAD 2 OFFICER ("SQUAD 2 OFFICER") was a duly sworn police officer of said department and was acting under the supervision of said department and according to her official duties. An image of this officer is annexed hereto as Exhibit P.

**35.** Defendant NYPD "JOHN DOE" SQUADS LIEUTENANT ("SQUADS LIEUTENANT") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. An image of this officer is annexed hereto as Exhibit Q.

36.     Upon information and belief, many of the "John Doe" officers identified above were assigned to the "School Safety Division" of the NYPD.

37.     Defendant NYPD "JOHN DOE" SECOND CAPTAIN ("SECOND CAPTAIN") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  An image of this officer is annexed hereto as Exhibit R.

38.     Defendant NYPD "JOHN DOE" THIRD SERGEANT ("THIRD SERGEANT") was a duly sworn police officer of said department and was acting under the supervision of said department and according to her official duties.  An image of this officer is annexed hereto as Exhibit S.

39.     Defendant DET. SOLOMON CHINNERY was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  Upon information and belief, this officer's badge number was 384. An image of this officer is annexed hereto as Exhibit T.

40.     Defendant NYPD "JOHN DOE" CAP-WEARING OFFICER 1 ("CAP-WEARING OFFICER 1")  was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties. An image of this officer is annexed hereto as Exhibit U.

41.     Defendant NYPD OFFICER CHARLES CAREY (SHIELD NO. 1361) was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.  On the date of this incident, this officer's badge number was 1361.

42.     All of the foregoing officers (collectively, the "Defendant POLICE OFFICERS") either personally or through those whom they supervised, were acting under color of state law and/or pursuant to the customs, usages and/or practices of the State or City of New York.

43.     That at all times relevant to this action, the Defendant "John Doe" POLICE OFFICERS, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

44.     Plaintiff LUKE RICHARDSON will amend this complaint to identify each of the "John Doe" police officers by their true names, as their identities can be established to a reasonable certainty.

45.     Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK, and were acting under the supervision of said department and according to their official duties.  Each of the defendants are sued in their individual and official capacities.

## VI. FACTS COMMON TO ALL CLAIMS

46.     The Plaintiff, Luke Richardson, was a participant in the Occupy Wall Street ("OWS") movement.

47.     OWS is a movement that, among other things, protests the institutionalized inequality in this country that funnels almost all the nation's political power, wealth and resources to a tiny fraction of people and their corporations, and denies the vast majority of ordinary Americans their fair share.

48.     In particular, OWS sought to bring attention to the unfair way in which ordinary people were allowed to suffer terrible hardship due to mortgage debt, student loan debt, or lack of affordable healthcare, while at the same time politicians and businessmen blamed these people for "irresponsibility," and huge banks were rescued from any consequences of their own decision-making by government bailouts funded by those same ordinary people's taxes.

49.     For example, upon information and belief, in 2008, a total of 861,664 families lost their homes to foreclosure. There were more than 3.1 million foreclosure filings issued during 2008, which means that one of every 54 households received a foreclosure notice that year.  In 2009, banks sent 3.9 million foreclosure notices to homeowners in default.

50.     The government came to the aid of the banks – who caused the crisis with fraudulent lending and asset valuation practices -- not the ordinary people.

51.     Upon information and belief, Bank of America received $45,000,000,000 from the federal government.

52.     Upon information and belief, Citigroup received $45,000,000,000 from the federal government.

53.     Upon information and belief, JPMorgan Chase received $25,000,000,000 from the federal government.

54.     Upon information and belief, Wells Fargo – one of the worst actors among the financial institutions who caused the crisis – received $25,000,000,000 from the federal government.

55.     Meanwhile, upon information and belief, by the end of 2009 only about 31,000 of the 4 million homeowners in the Obama administration's foreclosure prevention plan -- less than 5 percent – had obtained any relief.  Millions more who did not qualify for that program simply lost their homes.

56.     And, upon information and belief, the banks that received these bailouts gave their executives – the architects of the national crisis –-  a record $140 billion in bonuses in 2009.

57.     Unfairness like this is part of what OWS was created to change.

58.     Because the bad actors who victimized ordinary Americans while they took bonuses from taxpayer money were centered in Wall Street, OWS focused its attention on Wall Street.

59.     On September 17, 2011, the first OWS march in the Wall Street area resulted in protestors occupying Zuccotti Park.  For almost 2 months, these protestors remained in Zuccotti Park.

60.     The media found it difficult to ignore the occupation of Zuccotti Park, and the OWS movement was successful in raising awareness of these issues.

61.     However, the NYPD continually arrested members of OWS for peaceful protest activity.

62.     On November 15, 2011, the City of New York launched a 1:00 AM paramilitary raid on the protest camp at Zuccotti Park and ejected all its occupants.

63.     Because OWS was no longer a daily presence at Zuccotti Park, it became harder for OWS to keep the media's attention focused on its issues of economic and political fairness.

64.    However, the OWS movement continued.

65.    On September 17, 2012, the first anniversary of the first OWS march, people who followed OWS gathered in various parts of the City, including in the financial district, where so many of the banks that caused the financial collapse of of 2007 were located.

66.    On the morning of September 17th, the Plaintiff chose to go to the financial district to celebrate Occupy Wall Street's one-year anniversary.

67.    Plaintiff understood the statute of limitations for securities fraud to be 5 years.

68.    Thus, Plaintiff believed Occupy Wall Street's one-year anniversary was potentially his last chance to be counted among those calling for the prosecution of financial institutions and their executives for their crimes which caused the financial collapse of 2007-2008.

69.    At or around 10 AM Plaintiff was standing on the sidewalk at or near 28 Broadway making plans for protest actions with others from OWS he had reunited with.

69.DEPLOYMENT OF POLICE ON SEPTEMBER 17, 2012

70.    The defendant officers were deployed in and around the area that the plaintiff met with these others.

71.    Upon information and belief, squads of police officers were deployed under the command of defendant SQUADS LIEUTENANT.

72.    Upon information and belief, under the command of SQUADS LIEUTENANT were SQUAD 1 SERGEANT, SERGEANT CARLETON SUDDLER (Squad 2) and THIRD SERGEANT.

**73.**     Upon information and belief, under the command of defendant SQUAD 1 SERGEANT were the following police officer defendants: NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074), NYPD OFFICER NELSON FRIAS (SHIELD NO. 4054), NYPD OFFICER HALIMA SMITH (SHIELD NO. 3680), OFFICER RAYMUNDO FLETE (SHIELD NO. 14271), NYPD OFFICER VALLISON ISAAC (SHIELD NO. 1647), SQUAD 1 OFFICER 1, SQUAD 1 OFFICER 2, and SQUAD 1 OFFICER 3.

**74.**     Upon information and belief, in Squad 2 under the command of defendant SERGEANT CARLETON SUDDLER were the following police officer defendants NYPD OFFICER EVERETT REYES (SHIELD NO. 14434), NYPD OFFICER DAVID SCOTT (SHIELD NO. 8533), NYPD OFFICER REGINA VAILES (SHIELD NO. 4132), NYPD OFFICER LUVEN GILBERT-FIGUEROA (SHIELD NO. 9189), NYPD OFFICER VITO CAMPANELLI (SHIELD NO. 31604), NYPD OFFICER CHAO LI (SHIELD NO. 28060), and SQUAD 2 OFFICER.

**75.**     Upon information and belief, defendant THIRD SERGEANT commanded defendant DET. SOLOMON CHINNERY.

**76.**     Upon information and belief, Defendant CAPTAIN IOCCO commanded SQUADS LIEUTENANT, SQUAD 1 SERGEANT, SERGEANT CARLETON SUDDLER (SQUAD 2) and THIRD SERGEANT, and all the police officers commanded by those defendants.

**77.**     Upon information and belief, Defendant CAPTAIN IOCCO also commanded defendant CAP-WEARING OFFICER 1.

78.     Upon information and belief, acting together with CAPTAIN IOCCO was defendant SECOND CAPTAIN.

79.     Upon information and belief, the foregoing defendants were under the command of defendants CHIEF PURTELL, CHIEF ANGER, and CHIEF MCNAMARA (hereinafter, "the CHIEF DEFENDANTS").

80.     However, Chief McNamara testified that Mayor Bloomberg was in charge of the September 17, 2012 detail.

81.     Upon information and belief, Defendant Chief Esposito approved the assignment of the particular units to the detail, the tactics to be used, and the preparation – or lack thereof -- of the assigned officers would receive in the form of training.

82.     Defendant Chief Esposito testified that when dealing with a large deployment for an Occupy Wall Street event, he would be briefed on plans for policing the event, including both staffing and tactics, and would approve or modify them before they were finalized.

83.     Chief Esposito, together with Chief Purtell, Chief McNamara and Chief Anger, made the staffing decisions for the 9/17 detail.  The determined which training and tactical instructions to provide the detail.

84.     None of the Defendant POLICE OFFICERS had received training necessary to police a public demonstration without violating the rights of protestors.  For example, none of the Defendant POLICE OFFICERS were trained in the legal principles set forth in paragraph 244 of the Complaint.

85.     The Executive Defendants knew, several days before September 17, 2012, that the other Defendant POLICE OFFICERS would be assigned to the September 17, 2012 detail.

86.     Captain Iocco knew, several days before September 17, 2012, that the other Defendant POLICE OFFICERS would be assigned to the September 17, 2012 detail.

87.     The Executive Defendants and Captain Iocco knew, or should have known, that the other Defendant POLICE OFFICERS had not received the necessary training to perform their duties in the September 17, 2012 detail.

88.     The Executive Defendants and Captain Iocco could have, but did not, provided necessary training or instruction to the other Defendant POLICE OFFICERS.

79.89.  To the contrary, the training or instructions actually provided increased the likelihood that officers would make unlawful arrests violating the rights of protestors such as the plaintiff.  Chief McNamara believed that the only people with legitimate business in the Wall Street area were those whose focus was to "keep their heads down [and] go to work."  For example, Defendant Chief McNamara believed that people affiliated with Occupy Wall Street did not have "legitimate business" being in the Wall Street area. Defendant McNamara believed that their mere presence indicated an intent to disrupt pedestrian traffic.  Chief McNamara, who was directing policing at lower Broadway at the time of the plaintiff's arrest, communicated this belief to his subordinates.

<u>THE PLAINTIFF'S ARREST</u>

90.     All of the individually-named defendants except the Executive Defendants were present at the place of the plaintiff's arrest before, during and after the time that the arrest took place.  All were within 15 feet of the plaintiff, or less, at the time of his arrest.

80.91.  Without warning, Defendant POLICE OFFICERS struck Plaintiff from behind, grasping their batons between both hands and shoving Plaintiff in the back.

81.92.  Defendant CAPTAIN IOCCO grabbed plaintiff by the strap of his messenger bag and dragged him through a crowd of Defendant POLICE OFFICERS.

82.93.  CAPTAIN IOCCO then transferred custody of Plaintiff to NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074), and Defendant SERGEANT CARLETON SUDDLER.

83.94.  The Defendant POLICE OFFICERS including Defendant CAPTAIN IOCCO, Defendant NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074) and SERGEANT CARLETON SUDDLER caused Plaintiff to be arrested.

84.95.  Other Defendant POLICE OFFICERS directly participated in the plaintiff's arrest by grabbing him and/or pushing him, including NYPD OFFICER REGINA VAILES (SHIELD NO. 4132), NYPD OFFICER DAVID SCOTT (SHIELD NO. 8533), NYPD OFFICER HALIMA SMITH (SHIELD NO. 3680), NYPD OFFICER CHAO LI (SHIELD NO. 28060) and SECOND CAPTAIN.  Other Defendant POLICE OFFICERS participated in the arrest by physically limiting plaintiff's freedom of movement.

85.96.  Other Defendant POLICE OFFICERS named herein who were present, and were close enough to intervene in the plaintiff's arrest, and who failed to do so, were the other Defendant POLICE OFFICERS with the exceptions of CHIEF OF PATROL ESPOSITO, CHIEF PURTELL, CHIEF MCNAMARA, AND CHIEF ANGER.

86.97.  Defendant NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074) and/or SERGEANT CARLETON SUDDLER placed plastic flex-cuffs tightly around Plaintiff's wrists, causing pain then numbness to Plaintiff's hands and wrists.

87.98.  Defendants NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074) and SERGEANT CARLETON SUDDLER led Plaintiff onto a police bus with other prisoners.

88.99.  Plaintiff suffered nerve damage in his hands and wrists from a previous incident involving flex-cuffs.

89.100.  Plaintiff requested of Defendant NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074) that his flex-cuffs be loosened, notifying him of current pain then numbness and of Plaintiff's prior injury.

90.101.  NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074) agreed to loosen Plaintiff's flex-cuffs.

91.102.  However, instead NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074) proceeded to load more people onto the police bus with Plaintiff.

92.103.  Plaintiff's flex-cuffs were not loosened until they were removed at the precinct, over one hour after NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074) and/or SERGEANT CARLETON SUDDLER placed them tightly around Plaintiff's wrists.

93.104.  The alleged charge for which the Plaintiff was arrested was disorderly conduct.

94.105.  Plaintiff did not engage in disorderly conduct, or any other violation or crime.

95.106.  Upon information and belief, Defendant CAPTAIN IOCCO ordered the arrest of Plaintiff knowing that the Plaintiff did not commit any violation or offense.

96.107.  Following Plaintiff's unlawful arrest, the Defendant POLICE OFFICERS transported Plaintiff to One Police Plaza.

97.108.      There the Defendant POLICE OFFICERS detained Plaintiff for approximately 13 hours.

98.109.      Upon release from jail, Plaintiff did discover a photograph of his arrest was used on the front page of CNN.com, next to a picture of Mitt Romney.

99.110.      The New York County District Attorney's office declined to prosecute the charges against Plaintiff, thus the charges were dismissed.

FIRST CLAIM FOR RELIEF

DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

100.111.      Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

101.112.      All of the aforementioned acts of the City of New York, the Executive Defendants, and the Defendant POLICE OFFICERS, their agents, servants and employees, were carried out under the color of state law.

102.113.      All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, and Fourteenth Amendments to the Constitution of the United States of America, in violation of 42 U.S.C. § 1983.

103.114.      The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

104.115.      The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the

New York City Police Department, all under the supervision of ranking officers of said department.

105.116.    The ~~Defendant POLICE OFFICERS~~Defendants collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

106.117.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty, and other special damages.

107.118.    As a result of ~~the Defendant POLICE OFFICERS~~the Defendants ' impermissible conduct, the Plaintiff demands judgment against the Defendant~~s POLICE OFFICERS~~ in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

<u>SECOND CLAIM FOR RELIEF</u>

<u>FALSE ARREST</u>

108.119.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

109.120.    Plaintiff was arrested by the Defendant POLICE OFFICERS without probable cause, without a warrant, and without the plaintiff's consent.

110.121.    In particular, the Defendant POLICE OFFICERS including Defendant CAPTAIN IOCCO, Defendant NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074), SERGEANT CARLETON SUDDLER, NYPD OFFICER REGINA VAILES (SHIELD NO. 4132), NYPD OFFICER DAVID SCOTT (SHIELD NO. 8533), NYPD

OFFICER HALIMA SMITH (SHIELD NO. 3680), NYPD OFFICER CHAO LI (SHIELD NO. 28060) and SECOND CAPTAIN seized the plaintiff.

111.122.   As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty, and other special damages.

112.123.   As a result of the Defendant POLICE OFFICERS ' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

THIRD CLAIM FOR RELIEF

EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

113.124.   Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

114.125.   Plaintiff was subjected to excessive and unjustified force in violation of his rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983 by the Defendant POLICE OFFICERS.

115.126.   In particular, the Defendant POLICE OFFICERS including Defendant CAPTAIN IOCCO, Defendant NYPD OFFICER IVAN BAUTISTA (SHIELD NO. 10074), SERGEANT CARLETON SUDDLER, NYPD OFFICER REGINA VAILES (SHIELD NO. 4132), NYPD OFFICER DAVID SCOTT (SHIELD NO. 8533), NYPD OFFICER HALIMA SMITH (SHIELD NO. 3680), NYPD OFFICER CHAO LI (SHIELD NO. 28060) and SECOND CAPTAIN grabbed, pushed, pulled and shoved the plaintiff.

116.127.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty, and other special damages.

117.128.    As a result of the Defendant POLICE OFFICERS ' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

FOURTH CLAIM FOR RELIEF

FAILURE TO INTERVENE

118.129.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

119.130.    The Defendant POLICE OFFICERS had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights.

120.131.    As alleged above, the Defendant POLICE OFFICERS chose not to intervene on Plaintiff 's behalf to prevent the violation of his constitutional rights despite having had realistic opportunities to do so.

121.132.    The Defendant POLICE OFFICERS chose not to intervene on Plaintiff 's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

122.133.    As a result of the aforementioned conduct of the Defendant POLICE OFFICERS, Plaintiff's constitutional rights were violated.

123.134.     As a result of the above constitutionally impermissible conduct,

Plaintiff was caused to suffer personal injuries, violation of his civil rights, loss of liberty,

and other special damages.

124.135.     As a result Defendant POLICE OFFICERS' impermissible conduct,

the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to

be determined at trial, along with punitive damages, together with attorney's fees and costs.

FIFTH CLAIM FOR RELIEF

AGAINST THE CITY OF NEW YORK UNDER MONELL AND AGAINST THE
EXECUTIVE DEFENDANTS

125.136.     Plaintiff repeats, reiterates and re-alleges each and every allegation

contained in the above paragraphs with the same force and effect as if fully set forth herein.

126.137.     On September 17, 2011, the first OWS march occurred in the

Financial District of Manhattan and the protesters were blocked from entering the Wall

Street area by the NYPD, who had set up narrow choke points of ingress and egress.  The

protesters found their way to Zuccotti Park and remained there for almost two months

effectuating their political speech goals of drawing attention and raising awareness to the

many issues of inequity.

127.138.     Occupy Wall Street was an overwhelmingly peaceful movement.

128.139.     Indeed, Defendant Mayor Michael Bloomberg recognized that "the

majority of the protesters have been peaceful and responsible."[1]

129.140.     Occupy Wall Street was met with aggressive and unlawful police

enforcement almost from the beginning of its public presence on city streets.

---

[1] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*,
GUARDIAN (Nov. 15, 2011, 8:39 EST),
http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-

141.   Between September 17, 2011 and September 17, 2012 – in Manhattan alone – 2,644 members of OWS were arrested.

130.142.   Of these, all but 80 were arrests without a warrant.

131.143.   The overwhelming majority of these arrests were for disorderly conduct – a non-criminal violation akin to jaywalking.

132.144.   Of these 2,644 arrests, only 409 resulted in a plea or conviction for any charge.

133.145.   In other words, these arrests led to conviction only 15% of the time.

134.146.   Of these 2,644 arrests, the District Attorney refused to even attempt a conviction in 202 cases, or 7.5% of the time.

135.147.   The rest of the cases – the vast majority – were dismissed.

148.   That is a conversion rate of just over 15% for the thousands of Occupy Wall Street related arrests during the one-year period.

149.   For comparison, the New York State Attorney General's Office studied arrests that arose from Stop Question and Frisk (SQF) encounters.  Like the Occupy Wall Street arrests, these arrests were generally for minor offenses.  The plurality were for offenses like disorderly conduct.  The rate at which these arrests resulted in a conviction or plea was just over 50% -- significantly better than the 15% 2011-2012 OWS arrests.

150.   The NYPD had mechanisms in place to learn details of the low success rate for OWS arrests.

151.   For example, the Criminal Justice Bureau of the NYPD was required, by Patrol Guide policy, to confer with the District Attorney's office regarding arrests which

were declined for prosecution, for the purpose of determining whether better training could address the problems that led to the decline-to-prosecute decision.

152.  The NYPD Criminal Justice Bureau maintains a decline to prosecute database for the purpose of finding patterns in decline to prosecute cases so that NYPD practices can be improved.  It is housed in the Omniform database, and is therefore accessible throughout the NYPD. It was used for OWS arrests that resulted in a decline to prosecute decision.

153.  The NYPD flagged Occupy Wall Street events for special tracking in its Omniform arrest tracking system, beginning on September 24, 2011.

154.  The Criminal Justice Bureau created and circulated spreadsheets of arrests related to Occupy Wall Street.  These spreadsheets were sent to the Chief of Department, Joseph Esposito, and other high level executive officers of the NYPD.  These spreadsheets were circulated within days of the arrests in question.

155.  However, the NYPD never reviewed OWS-related decline to prosecute cases for the purpose of improving training and practices.

156.  Chief James McNamara has stated that he believes that the NYPD has nothing to learn from the fact that arrests made by its officers are dismissed in large numbers.

157.  The NYPD and the City of New York, and the Executive Defendants had the information available at all times to learn of the pattern and practice of wrongfully arresting protestors, and they deliberately chose not to make use of this information.

136.

137.158.        As the record of dismissal of the cases against OWS protestors shows, the majority of the people arrested had not done anything wrong.

138.159.        Yet, the majority of the protestors who were arrested were taken into police custody, whether for hours or for days, rather than simply being given a summons.

139.160.        The NYPD crowd control protocols employed were similarly ineffective and indicative of the poorly tailored policies and procedures employed by the NYPD to handle the peaceful protests of OWS.

140.161.        Unlawful arrests were documented at almost every major Occupy Wall Street event.

141.162.        During this period, the NYPD continually arrested members of OWS for peaceful protest activity.  For example, on September 19, 2011, individuals associated with OWS marched from Zuccotti Park to the financial center area and back to Zuccotti Park.  During this march, NYPD Inspector Edward Winski reached across a police barricade and tried to drag an individual over the barricade.  The New York Times wrote about this arrest and the police statements regarding the conduct underlying this arrest:

> Another man was arrested, and the police initially said he was charged with jumping a police barrier and resisting arrest. But a reporter and a photographer for the [NY T]imes who witnessed and documented the episode between the man in the orange hat and the police did not see him attempting to jump a barrier. Late in the afternoon, the police said the man was charged with committing disorderly conduct by impeding pedestrian traffic, not with jumping a barrier.

163.    Over the course of the following year, numerous similar altercations encounters occurred between the police and OWS, many resulting lawsuits for improper arrests and the improper actions of the police towards protesters, including, among other

things, pepper spraying individuals engaged in expressive speech activities.[2]  Police targeted OWS protestors for arrest for things like using the sidewalk, whether singly or in in groups. when other civilians like businesspeople or tourists in the same locations were not arrested under identical circumstances.

**164.**   There were Occupy Wall Street protests, or other events, in Manhattan at which arrests occurred on the following dates: in **2011**, on the 20, 22, 23, 24, and 28 of September; on the 1, 5, 9, 11, 12, 14, 15, 16, 21, 22, 25, 26, 27, 28, and 30 of October; on the 1, 2, 3, 4, 5, 7, 8, 9, 10, 12, 14, 15, 16, 17, 19, 20, 21, 22, 27, 28, and 30 of November; the 1, 2, 4, 6, 9,12,13, 17, 18, 31 of December; and in **2012** on the 1, 3, 11, 14, 16, 24, 28, and 29 of January; on the 3, 11, 17, 22 and 29 of February; on the 6, 7, 8, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 28, 30 of March; on the 3, 4, 5, 6, 7, 9, 13, 14, 16, 20, 25, 26, 27, and 29 of April; on the 1, 2, 3, 4, 8, 22, 24, and 30 of May; on the 6, 13, 17, and 30 of June; on the 2, 6, 11, 20 and 24 of July; on the 3, 8, 10, 16, 17, 21, and 31 of August; and on the 12, 14, 15, 16 and 17 of September.

**165.**   On September 24, 2011, police arrested civilians in and around an Occupy Wall Street march near Union Square without distinguishing between those who may have committed a violation and those who did not.  Instead, the police arrested people who looked like protestors, at random.  Arrestees included an employee of the Grey Dog café on

---

[2]   Joseph Ax, *NY City To Pay $330,000 To Settle Pepper-Spray Occupy Lawsuits,* Reuters, http://www.reuters.com/article/2015/07/06/us-usa-occupy-lawsuit-idUSKCN0PG2GK20150706; *see also Laugier v. The City of New York, et al.,* 13CV6171 (JMF)(settling lawsuit stemming from OWS protest at Brooklyn Bridge); *Appel v. The City of New York, et al.*, 14CV7992 (KPF)(lawsuit from OWS protest at Foley Square); *Global Revolution TV v. City of New York, et al.*, 12CV5086(GBD)(lawsuit related to property damage from police activity); *Occupy Wall Street, et al. v. City of New York*, 12CV4129(GBD)(same)*.*

University Place who stepped out for a cigarette, and non-marchers who were simply on their way from the nearby farmer's market or the Strand bookstore.  The majority of these arrests were for disorderly conduct.

142.   During this September 24, 2011 incident, amateur video recorded Deputy Inspector Anthony Bologna using pepper spray on five arrestees who were passively awaiting processing.  NYPD spokesman Paul Browne told the press that the police, not the protestors, were the true victims.

166.   On or about October 6, 2011, video posted to YouTube showed an NYPD officer observing a group of Occupy Wall Street protestors and saying: "My nightstick's going to get a workout tonight."  NYPD spokesman Paul Browne told the press, "Those officers have a right to defend themselves."

167.   On October 12, 2011, Congressional Representative Jerrold Nadler called for an investigation of police conduct on September 24, 2011, saying that the police had "staged a little riot of their own, which we are going to have investigated."

168.   On October 30, 2011, the Daily News reported that police were encouraging drunk or disturbed individuals they encountered elsewhere to go to Zuccotti Park, for the purpose of causing problems for the protestors' occupation.  The same reporter wrote that police developed a rehearsed response which they used as a catchphrase when OWS occupiers drew their attention to such individuals: "He's got a right to express himself, you've got a right to express yourself."   The writer said: "I heard three cops repeat [it] in recent days, using nearly identical language, when asked to intervene with troublemakers inside the park, including a clearly disturbed man screaming and singing wildly at 3 a.m. for the second straight night."

143.169.     For example, onOn November 5, 2011, the success of an Occupy supported program, Bank Transfer Day - to have individuals move their savings from institutional banks to community banks - was celebrated with a march from Zuccotti Park to Foley Square.  At the orders of Chief Anger, police suddenly closed the sidewalk in front of 60 Centre Street where the protestors gathered.  They used nightsticks and orange plastic netting to push protestors up and down the sidewalk.  Then they made arrests.  Other than protestors and police there was no-one else in front of the 60 Centre Street courthouse – it was a Saturday.  The protestors caused no problem for other pedestrians, because there were few or none.  The New York Times wrote about the incident that occurred once the marchers reached Foley Square:

> Hundreds of Occupy Wall Street demonstrators streamed into a desolate part of Foley Square on Saturday afternoon, but their slow-moving march turned chaotic as a phalanx of police officers issued orders to vacate the sidewalks — and then swept in to force the issue…. As the confrontation continued, the police kept yelling orders that the sidewalk was closed, or temporarily closed, or had to be closed to keep order. They fanned out in a line, stretching orange mesh netting across the breadth of the sidewalk, and walked along, pushing protesters back and sweeping them away.

> The strategy drew expressions of puzzlement from many in the area.

> "The police warned these people to move because of pedestrian traffic, but this is an empty place," said Robert Rosen, 66. "Who are they talking about?"[3]

170.     There were twenty-one (21) arrests on this date that resulted in fifteen (15) dismissals, ACD's, declined prosecutions and/or acquittals.

---

[3]    Al Baker, *Police Force Wall Street Protesters Off Sidewalks*, NY TIMES, http://cityroom.blogs.nytimes.com/2011/11/05/police-force-wall-street-protesters-off-sidewalks/.

**171.** On or about November 21, 2011, a coalition of media outlets wrote an open letter to the Commissioner Ray Kelly and Deputy Commissioner Paul Browne, concerning systematic interference with credentialed press attempting to cover Occupy Wall Street events, including arrests and violence against members of the press. The letter stated "there have been numerous instances where police officers struck or otherwise intentionally impeded photographers as they were taking photos, keeping them from doing their job and from documenting instances of seeming police aggression." The letter described several incidents, including and attack by police on a photographer who was "photographing a man the police were carrying from somewhere in the park who was covered in blood. The photographer was standing behind a metal barrier 20 to 30 yards from the scene. As he raised his camera to take a picture two other police officers came running toward him, grabbed a metal barrier and forcefully lunged at him striking the photographer in the chest, knees and shin. As they did that they screamed that he was not permitted to be taking pictures on the sidewalk." This letter served not only to place the City of New York on notice of police violations of the rights of the press, but also gave notice of the violations of the rights of protestors which the victimized journalists were trying to document.

**172.** On December 1, 2011, Occupy Wall Street protestors were barricaded into a so-called "frozen zone" on a sidewalk by police and denied the right to leave for several hours.

**173.** On January 1, 2012, police surrounded and arrested approximately 20 protestors who were walking on a sidewalk in the East Village. Fourteen of these arrestees filed a lawsuit, during which senior officers involved admitted that the members of the

group were not committing disorderly conduct before their arrest. The total the City of New York paid to settle the lawsuit exceeded $600,000.00

174.    On February 29, 2012, police arrested eight Occupy Wall Street protestors near Zuccotti Park, in arrests that a journalist for Gothamist described as: "arbitrary and incidental," part of an "strong and often baffling show of force" in which approximately 40 NYPD officers confronted around 30 protesters.

~~144.~~    In April 2012, the New York Civil Liberties Union published a "Free Speech Threat Assessment documenting police abuses of Occupy Wall Street protestors in March and April of that year.  The report described the police using batons to forcefully shove Occupy Wall Street protestors in Zuccotti Park: "Protesters and journalists in the park and those who went on a march afterwards were reportedly shoved and batoned by the NYPD. The shoving was so forceful that protesters reportedly tripped over one another and some were trampled by officers and other protestors trying to evade police batons. Late in the night, multiple people witnessed a person being pushed by the NYPD into a glass window, shattering the glass."

175.    On April 2, 2012, police unlawfully closed the sidewalks surrounding Union Square, for the purpose of preventing approximately 25 Occupy Wall Street protestors from remaining on the sidewalk.

176.    On April 16, 2012 one angry local resident walked through a line of police and assaulted a protester near Federal Hall. The protester was arrested, but officers took no action against the attacker.

177.   On April 20, 2012 a legal observer filmed two officers denying OWS livestreamers and other protesters entry to Wall Street at William Street, while allowing non-protestor pedestrians to pass freely.

178.   On April 20, 2012 a legal observer saw officers clear the entire sidewalk in front of the Federal Hall steps. Officers forcefully pushed protesters east on Wall Street and arrested one person without cause.

179.   On April 28, 2012, Deputy Inspector Johnny Cardona pulled a NYCLU legal observer off the sidewalk and into the street, where she was arrested.  She was held and charged with disorderly conduct and blocking pedestrian traffic before the charges were voided.

180.   Police and Parks officers selectively enforced Parks rules against OWS protestors, including questionable interpretations of those rules. On April 29, 2012 at Union Square, law enforcement officers harassed protesters using a table to hand out free booklets, telling them that tables were not allowed. The officers were apparently referring to a park rule prohibiting "structures" in the park, although this rule is never enforced against non-protestors in the area who use tables, for example those playing chess. After informing protestors that "tables were not allowed," law enforcement immediately began washing the sidewalk, soaking and ruining the protesters' literature.

181.   On or around May 1, 2012, the NYCLU published a second Free Speech threat assessment, which reviewed police conduct towards OWS protestors during the month of April.  The report stated: "The NYPD's approach to public protest from April 11, 2012 to April 28, 2012 was characterized by the excessive use of barricades, continued

selective enforcement of laws, as well as harassment and unjustified arrests, some excessive force, and the disparate treatment of non-credentialed journalists."

**182.**   Legal observers at May 1, 2012 protests reported that NYPD officers would order a sidewalk to be cleared, stating the people were obstructing pedestrian traffic or that the sidewalk was closed, and shoved those assembled there at random. Sometimes protesters were forced to march in one direction only to have other officers order them to turn the march around minutes later. Officers in riot gear locked arms on the sidewalk and shouted "Move! Move! Move!" in unison, prodding protesters down various sidewalks. This occurred repeatedly, including one case where three legal observers and approximately five others were forced to move two blocks away from their chosen protest location to an area where dozens of police awaited the protesters to put them into paddy wagons.

**183.**   On May 23, 2012, a OWS protestor was arrested and taken to a police precinct, where he was interrogated before being released without charges several hours later. While he was in custody, he reported that he saw a large display board covered with pictures of numerous Occupy protestors he personally knew, with black lines connecting certain pictures, suggesting that the NYPD was engaging in surveillance of protestors.

**184.**   On May 30, a group of protesters were not permitted to enter Times Square, and were forcefully pushed back when they repeatedly attempted to cross a street when the walk signal was on, while tourist movement was generally unimpeded.

~~145.~~185.   The arbitrary and unreasonable crowd control measures employed by the NYPD were documented and analyzed in the report *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, by The Global Justice Clinic

(NYU School of Law) and the Walter Leitner International Human Rights Clinic at the

Leitner Center for International Law and Justice (Fordham Law School) ("the *Suppressing*

*Protest* report"):[4]

> The pervasive NYPD practice of frequently "closing" sidewalks and forcibly moving along peacefully assembled individuals violates the freedoms of expression and assembly. There may be circumstances in which the closure of otherwise public space is a proportionate and necessary measure to achieve a legitimate aim, such as public safety. Dispersal and closure may be appropriate where, for example, a protest has taken on a violent character, and the closure is needed to restore public order. But mere assembly on public sidewalks is not just cause to move protesters on, or to "close" a sidewalk. If protesters are in fact actually "blocking" pedestrian traffic, whether intentionally or inadvertently, police should facilitate assembly rights by informing protesters that they are free to protest on sidewalks, and should assist protesters to ensure that building entrances are not blocked and that others may pass.

> The NYPD's frequent practice of "closing" sidewalks during protests also appears to violate U.S. constitutional law, which protects First Amendment activity on public sidewalks. The U.S. Supreme Court has held that:

> [W]hen the use of its public streets and sidewalks is involved….a [government] may not empower its….officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community.

> Many areas of New York City are heavily congested with pedestrian traffic, and the difference in treatment between congested resident or tourist pedestrian traffic and protester pedestrian traffic is at times stark. Lawyers described the police enforcement against protesters of the disorderly conduct statute for blocking pedestrian traffic as a tactic to "stifle political protest" that, when combined with physical force, created "a climate of fear."

186.    The report's authors and researchers included student and faculty researchers at the law schools of NYU, Fordham, Harvard, Stanford, and other top-tier law schools.

---

[4] *Available at* http://chrgj.org/wp-content/uploads/2012/10/suppressingprotest.pdf.

**187.**    While researching the report, the researchers also requested meetings with the mayor, Michael Bloomberg, the department of parks and recreation, the public advocate, and the district attorney's office.  None of these entities or individuals agreed to such meetings.

**188.**    The report was published on July 25, 2012.  The report was provided to the NYPD and the Mayor's office.

**189.**    On July 25, 2012, the Atlantic Monthly published an article about the report, saying: "A collaborative investigation launched by law clinics at four top universities has assembled damning evidence of widespread misconduct" by the NYPD.

**190.**    The New York Times also reported on the report.  The Times reported: "The report also describes instances in which the authors say officers have chilled First Amendment expression through near constant surveillance with video cameras and by sometimes questioning protesters about political activities. The report also described a common practice of preventing protesters from gathering in areas that are open to the public, like parks, plazas and sidewalks.  'Attempts by protesters to understand the basis for the closure, or obtain clear directions from the police are most often ignored or answered perfunctorily,' the report stated. 'Sometimes queries are answered with an arrest threat or an arrest.'"

**191.**    The report's authors said that senior members of the police department cited continuing litigation in declining to talk with them about the report.

~~146.~~192.         Instead of taking necessary steps to curb the number of unlawful arrests of OWS protestors during the year leading up to the plaintiff's arrest, the NYPD made no remedial policy changes during the year that it made the 2,644 arrests.

147.193.    Instead of taking necessary steps to curb the number of unlawful arrests of OWS protestors during the year leading up to the plaintiff's arrest, the NYPD undertook no further training of its officers in protestors' rights during the year that it made the 2,644 arrests.

148.194.    The NYPD made no effort to find out why so many OWS arrests were not prosecuted by the District Attorneys office, or why so many cases were dismissed.

149.195.    The NYPD, in fact, did not care whether its arrests were valid arrests that resulted in convictions or not.

150.196.    As a result, over the first year of the OWS movement, from September 17, 2011 to September 17, 2012, the number of unlawful arrests of OWS protestors numbered in the thousands.

151.197.    Indeed, further proof of the improper policing of members of Occupy Wall Street can be seen by the voluminous litigation that has arisen related to the improper policing of the constitutionally protected expressive speech activity.

152.198.    Since 2011, more than eighty (80) separate litigations have been filed in the Southern District of New York alone.

153.199.    Approximately fifty (50) of these litigations have been settled at a cost in excess of $1,500,000 dollars, not including the defense costs associated with these matters.

154.200.    Seventeen (17) of these litigations were filed before September 17, 2012, and the First Anniversary of OWS.

## POLICE USED FORCE AND INTIMIDATION TO CHILL SPEECH

155.201.        The *Suppressing Protest* report explains that the police use of force, whether applied through plastic netting, the use of batons, or other means, was aggressive towards protestors, and operated to chill their speech:

> [I]n many instances, the police have responded aggressively to nonviolent protest, and have escalated situations—through arbitrary or misapplications of the law, an excessive police presence, or the use of unwarranted force. The police response has thus, in some individual cases and considered cumulatively, undermined basic assembly and expression freedoms. At times, it has itself also presented a threat to the safety of New Yorkers.

202.    For example, on September 24, 2011, near Union Square, Deputy Inspector Anthony Bologna pepper sprayed a small group of OWS protestors who were already in custody, trapped behind netting, and presented no threat or resistance or flight.

203.    On October 5, 2011, a senior NYPD officer entered a crowd of OWS protestors and swung a nightstick repeatedly at members of the crowd, without responding to any specific threat, and without appearing to discriminate as to whom he struck the baton.  Elsewhere a police officer was recorded telling his partner, as they policed an OWS event, that "Nightstick is going to get a workout – hopefully."

204.    On October 14, 2011, Deputy Inspector Johnny Cardona punched an knocked out a non-violent OWS protestor.

205.    On Nov. 5, 2011, in front of 60 Centre Street, the police used orange netting to summarily close the sidewalk and then push the protestors down the block.  Several protestors were knocked to the ground, tackled, and punched.

206.    The November 15, 2011 "clearance" of Zuccotti Park was performed like a military raid at 1:00 AM, with klieg lights, LRAD sound cannons, and the total exclusion of all press from the area.

**207.**   On November 17, 2011, OWS protestor Faith Laugier obeyed an order to exit a crosswalk and enter the sidewalk.   Nevertheless, officers under the personal supervision of defendant Joseph Esposito followed Ms. Laugier onto the sidewalk and tackled her to the ground.  During the arrest, the officers picked her up by her feet and held her upside down.  Her lawsuit against the City settled for $85,000.00.

**208.**   On November 17, 2011, a group of police officers including Chief Thomas Purtell used a metal barricade as a weapon against a group of protestors at approximately 9:03 AM in the vicinity of the intersection of Beaver Street and Broad Street in lower Manhattan.  A group of police officers lifted a metal barricade and used into to push into and down onto a group of protestors who were standing in the street.  Members of the crowd fell, some of them being potentially squashed under the metal barricade as it pressed forward and down on them.  Although the protestors were possibly committing a violation by being in the street, they were not violent, and had done nothing to provoke the attack by the police.

**209.**   On January 1, 2012, police at Zuccotti Park similarly picked up metal barricades and pushed them into and onto a crowd of Occupy Wall Street protestors, while indiscriminately pepper-spraying the entire group.  In a separate incident one of the police officers present attempted to hit a protestor in the fact with a metal barricade.

~~156.~~210.        The Suppressing Protest report documented conduct like that of the officers who arrested the plaintiff in this case, pushing peaceful protestors with their batons on an open sidewalk:

> Police have often been observed holding their batons out while walking alongside or behind Occupy protests. Protesters, journalists, and others reported feeling afraid while walking with a peaceful protest accompanied by officers swinging or holding up their batons. One independent journalist

and teacher described seeing it as "terrifying."  This fear is compounded by the actual use of batons—there are consistent reports of police jabbing, hitting, and swinging batons at protesters, bystanders, legal observers, and members of the press.

157.211.        The chilling effect of such force was also documented:

> Aggressive force by police, whether simply unnecessary but mild, or shockingly excessive, has two clear effects. First, it immediately escalates tensions, inflames negative perceptions of police, and aggravates the risk of further arrests or violence. In this sense, the aggressive police approach radically undermines the stated goals of the police force—i.e., protecting the community. Second, it has a clear chilling impact, and undermines assembly rights by causing individuals to reasonably perceive that they cannot safely protest. Protesters either become constantly on guard for potential arbitrary police force, or decide to leave the assembly. One interviewee summarized a common sentiment: "When the cops do these aggressive arrests, it escalates everything; people have told me they support OWS but don't want to go because of fear of arrest or being hurt."

158.212.        Furthermore, the *Suppressing Protest* report put the City of New York and the Executive Defendants on notice that the police officers working protests were causing unnecessary pain and injury through the use of plastic handcuffs instead of metal ones:

> The vast majority of Occupy Wall Street arrests have been effected through the use of plastic handcuffs, often called "flex cuffs" or "zip-tie cuffs." Flex cuffs have notable advantages for police during mass arrest or protest situations, primarily because their lighter weight means one officer can carry many at once. Officers present at Occupy protests are often observed with numerous white flex cuffs dangling from their uniforms.
>
> The dangers of flex cuffs, however, are well known, and, as described above, if applied too tightly, they have the potential to injure.  Despite these known risks, individuals arrested at Occupy protests have repeatedly reported that flex cuffs have been applied—either intentionally or carelessly—painfully tightly. While a number of witnesses reported that officers immediately or eventually replaced tight handcuffs upon complaint others stated that repeated requests were required before action was taken, or that complaints were ignored and tight handcuffs were left on for extended periods.

**213.**    Medical and forensic journals have also documented these effects.  For example, "Focal Neurological Complications of Handcuff Application," by Patrick Chariot, M.D., et al., published in the Journal of Forensic Science (2001; 46(5): 1124-1125), found that "the application of handcuffs may result in compression neuropathies [i.e., nerve injury] at the wrist."  The particular article found such injuries in 6.3% of cases studied.  A 2000 study concluded that "Our results suggest that handcuff neuropathies may be more common than is generally believed," and could be significantly reduced with better training of officers in application, re-application, and removal of cuffs.  "A prospective Study of Handcuff Neuropathies," Grant, Arthur, C., et al. Muscle Nerve 23: 933–938, 2000.   Other studies have documented such injuries in detail:

- Appel, H., "Handcuff neuropathy," Neurology, 1979 Oct; 29(10): 1434.
- Blitzer, S.A., " Handcuff entrapment," Ann Emerg Med. 1986 Aug;15(8):977.
- Constant, Errikos, et al., "Handcuff neuropathy," Plastic and Reconstructive Surgery, v63 n5 (197905).
- Dorfman, L.J. and A.R. Javaram, "Handcuff neuropathy," JAMA : the journal of the American Medical Association, 1978 Mar 6; 239(10): 957.
- Dorfman, L.J. and A.R. Javaram, "Handcuff-related cheiralgia paresthetica," Neurology. 1979 Jun;29(6):908-9.
- Levin R.A., Felsenthal G., "Handcuff neuropathy: two unusual cases," Arch Phys Med Rehabil. 1984 Jan;65(1):41-3.
- Massey EW & A.B. Pleet, "Handcuffs and cheiralgia paresthetica," Neurology. 1978 Dec;28(12):1312-3.
- Scott, T.F., et al., "Handcuff neuropathy revisited," Muscle & nerve, 1989 Mar; 12(3): 219-20.
- Sheean, G. and J.G. Morris, "Handcuff neuropathy involving the dorsal ulnar cutaneous nerve," Muscle & nerve, 1993 Mar; 16(3): 325.
- Smith, Michael S., "Handcuff neuropathy", Annals of emergency medicine, 1981 Dec; 10(12): 668.
- Stone D.A. & R. Laureno, "Handcuff neuropathies," Neurology. 1991 Jan;41(1):145-7.

214.    While permanent injury occurs in only a minority of cases, short and medium term pain, loss of sensitivity, and impairment of function occur regularly.

## DELIBERATE INDIFFERENCE AND FAILURE TO PROPERLY TRAIN

~~159.~~215.    Before the Plaintiff's arrest, Defendant City of New York and the Executive Defendants knew or should have known that members of its police force would encounter individuals engaged in expressive speech activity, especially after months of continued protests, news stories, and multiple lawsuits alleging unlawful arrests.

~~160.~~216.    Before the Plaintiff's arrest, Defendant City of New York and the Executive Defendants knew or should have known of the past widespread Constitutional violations described herein.

~~161.~~217.    Before the Plaintiff's arrest, Defendant City of New York and the Executive Defendants knew or should have known of the need for more and better training, and other policy changes, in order to avoid further Constitutional violations like those suffered by the Plaintiff.

~~162.~~218.    For example, the *Suppressing Protest* report was published on July 25, 2012.

~~163.~~219.    The City of New York and the Executive Defendants knew, or were on notice of, its contents.

~~164.~~220.    The City of New York and the Executive Defendants took no steps, through training, supervision, or policy, to correct the harmful and unlawful practices detailed therein.

~~165.~~221.    In addition to that report, the City of New York and the Executive defendants knew or should have known from the other facts stated herein that the there was

a need to change NYPD policies and training practices, and that failure to do so would result in violations of Constitutional rights like those suffered by the Plaintiff.

166.222.   Even so, the City of New York and the Executive Defendants failed to provide adequate training to NYPD police officers in the handling of protesters exercising First Amendment rights.

167.223.   For example, Inspector Winski testified in a deposition about the training he has received since becoming a member of the NYPD, including Sergeant training, Lieutenant training, Captain training, Inspector training, lead training, baton training, pepper spray training, and mass formation training, but Inspector Winski could not recall any training pertaining to an individual's constitutional rights and appropriate policing of First Amendment activity.  Nor did Winski recall any training on the First Amendment or its effect on protestor activities prior to the First Anniversary of Occupy Wall Street.

224.   Inspector Winski, however, testified that he believed that the fact that individuals are engaged in First Amendment-protected activity has no effect on the manner with which Penal Law 240 (disorderly conduct) is charged against them, in contravention of established legal precedent.

168.

225.   The City of New York and the Executive Defendants made Deputy Inspector Winski responsible for training "hundreds of officers" concerning how to perform their duties in policing OWS events.

226.    Defendant Chief Anger has given similar testimony, in which he has testified that whether or not conduct occurs in the context of a protest has no relation to whether or not probable cause exists to make and arrest for such conduct.

227.    Thus, both DI Winski and Chief Anger were ignorant of the fact that – for example – the question of whether an order to disperse a crowd of protestors is a lawful order may require consideration of whether there is an adequate alternative forum for the protestors' expression, which is a factor that is absent when First Amendment expression is not involved.

228.    Both DI Winski and Chief Anger are ignorant of the fact that, in the context of a protest, probable cause to arrest for disorderly conduct exists only if there is a "clear and present danger" of an "immediate threat to public safety, peace, or order."

229.    Defendant Chief Anger testified that he was unaware of any requirement that probable cause be particularized or individualized for each person arrested in a mass arrest scenario.  Contrary to clearly established law, he testified that once a group forms, everyone in the group is equally guilty of everything the group does.

230.    Deputy Inspector Frank Tloczkowski was commander of the Manhattan South Task Force ("MSTF") in September 2012.  MSTF is one of several borough task forces.  Borough task forces like MSTF are specialized units that are used – among other things – to police public demonstrations.

231.    MSTF was routinely assigned to police OWS demonstrations.  MSTF was deployed to lower Manhattan on September 17, 2012.  When MSTF was deployed to a demonstrations, its personnel frequently took the lead in determining how to police the demonstration in question.

**232.**     In his career, DI Tloczkowski policed thousands of demonstrations, and approximately 350 OWS protests.

**233.**     DI Tloczkowski never received any training in the rights of individuals in protest settings.

**234.**     DI Tloczkowski also lacked training in police practices which directly related to such rights.  For example, DI Tloczkowski had no training regarding giving dispersal orders or the appropriate civilian response to such orders.

**235.**     DI Tloczkowski was unaware of any written policy of the NYPD regarding policing protests or demonstrations.  DI Tloczkowski believed it was possible there was no such written policy.

**236.**     Deputy Inspector Daniel Mulligan is another high-ranking NYPD officer who was deployed to lower Broadway at around the time and place of the plaintiff's arrest. DI Mulligan gave testimony in a civil case involving an OWS protest reflecting his lack of knowledge of the legal principles relating to disorderly conduct.  Contrary to the Second Circuit's ruling in Papineau v. Parmley, which held that protestors who block the sidewalk forcing other pedestrians into the street did not commit an arrestable offense, DI Mulligan testified that protestors who forced other pedestrians to walk on the **edge** of the sidewalk without stepping into the street committed disorderly conduct.

**237.**     Similarly, Det. Kenneth O'Donnell, a member of the NYPD Legal Bureau frequently assigned to NYPD protests, has testified – contrary to Papineau v. Parmley -- that if a protest causes other pedestrians to step into the street, the protestors are committing an arrestable offense.

**238.** Similarly, testifying on the application of the disorderly conduct statute as applied to OWS protestors on a sidewalk, Defendant Chief Anger testified that if such protestors cause other pedestrians to have to walk around them on a sidewalk, the protestors are committing disorderly conduct.

**239.** The City of New York's failure to train its officers is further shown by the lack of training provided to two officers who were involved in making arrests of protestors on September 17, 2012, near the time and place of the plaintiff's arrest.

**240.** Det. Brian Pastula testified that if an individual protestor stops walking and other people have to walk around him on the sidewalk, that could justify an arrest for disorderly conduct.

**241.** Det. Brian Pastula, an officer who made at least one arrest on lower Broadway on September 17, 2012, testified that his only training in policing protests related to physical tactics for making arrests. He testified that he had no training in the First Amendment rights of protestors, either during or after police academy.

**242.** The City's failure to train is shown by the lack of training of one of the platoon commanders of the First Precinct, which is the precinct which includes the location of the plaintiff's arrest. In 2012, Lt. John Dandola was a platoon commander at the First Precinct. He was deployed to lower Broadway on September 17, 2012, at around the time and place of the plaintiff's arrest, and supervised arrests in that area.

~~169.~~**243.** Lt. Dandola and the officers of the First Precinct lacked proper training in policing demonstrations. For example, Lt. Dandola and the officers under his supervision did not get training in policing public demonstrations or in the First Amendment. Lt. Dandola's instructions or training with respect to policing OWS events

was limited to personal safety.  He was advised, in sum and substance, "large crowds could trample you, be careful."

THE PRINCIPLES OF PROPER POLICING OF EXPRESSIVE SPEECH ACTIVITY

~~170.~~244.     Proper and necessary training would have consisted of clearly established guidelines for police conduct in expressive speech protest situations, including but not limited to these well established legal rights and principles:

♦ Under New York State and federal law, a person cannot be arrested for disorderly conduct for the "mere inconveniencing of pedestrians."

♦ Under New York State and federal law, even if protestors block the entire sidewalk, causing pedestrians to step into the street, such conduct is not enough to justify arrest for disorderly conduct.

♦ Under federal law, when a person is engaged in political or expressive speech activity, the First Amendment of the Constitution requires that the government, including the police, give fair warning to protestors that they must disperse before arresting them.

♦ Under New York State law, if a person's conduct does not cause, or recklessly threaten to cause, a substantial impact on the public at large, such as a breach of the peace, then there is no probable cause for an arrest for disorderly conduct.

♦ Under New York State and federal law, a person may only be subject to arrest if there is individualized probable cause to believe that the particular individual arrested committed an offense. Further, probable cause to make an

arrest does not arise merely because of a person's presence within a group of people, even if some people in that group are committing offenses.

♦ Under New York State and federal law, the police may not disperse a protest without having a lawful reason to do so.

♦ Under New York State and federal law, a civilian breaks no law by refusing to obey an unlawful order to disperse.

♦ Under New York State and federal law, a civilian cannot be arrested for obstructing governmental administration, for refusing to obey an unlawful order to disperse.

♦ Under federal law and the First Amendment, it is unlawful to arrest a protestor for disorderly conduct unless the protestor is creating a "clear and present danger" of breach of the peace.

♦ Under federal law and the First Amendment, where the municipality and/or the police seek to regulate the time, place or manner of public protest, protestors must be provided an adequate forum for their expression.

171.245.    Proper training in these clearly-established principles of lawful police conduct would have prevented unlawful arrests of the plaintiff on September 17, 2012.

172.246.    Furthermore, Inspector Winski, like many NYPD officers, underwent extensive training as he progressed through the ranks of the NYPD and did not receive any ~~additional~~ training on these issues.  Like most NYPD officers[5], Inspector Winski's training on ~~these issues~~concerning the First Amendment and the rights of

---

[5]    Numerous other members of the NYPD also testified in depositions that they received no First Amendment training once they left the Police Academy.

protestors – if any -- only occurred during the brief six-month period spent at the Police Academy, without any subsequent trainings on these issues.

### THE CITY OF NEW YORK AND THE EXECUTIVE DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT POLICE OFFICER TRAINING WAS INSUFFICIENT YET WAS NEEDED FOR THE OWS PROTESTS

173.247.    Even before the Occupy Wall Street movement, from the NYPD's failure to properly police the large protests surrounding the Republican National Convention that cost the City of New York more than thirty million dollars, Defendants understood their officers needed training in policing expressive speech activity.[6]

174.248.    In anticipation of Occupy Wall Street, the City of New York and the Executive Defendants did conduct large-scale training for the NYPD in August 2011 on Randall's Island, but this training did not address First Amendment issues or how this changed the policing methods.  Instead, this training included policing and formations to be used to splinter and control mass protest.  This training included non-verbal commands for disorder control formations such as that holding both arms flat out to each side indicates line formation; and holding both arms extended in a circle above your head is encirclement formation.

175.249.    Importantly, and unfortunately for the innumerable protesters whose rights were violated, the August 2011 training did not include any training about proper policing of expressive speech activity protected by the First Amendment.  Nor did this training include the proper standards for arrest related to disorderly conduct when expressive speech activity was involved.

---

[6]    The City paid approximately $18 million dollars in damages and fees to plaintiffs, and spent $16 million defending the lawsuits to outside counsel and the NYC Law Department. http://www.reuters.com/article/2014/01/15/us-usa-newyork-rnc-settlement-idUSBREA0E1S120140115

~~176.~~250.        Furthermore, the inadequacy of the training was continually highlighted over the following year by the extensive arrests, the exceptional dismissal rate, and the resulting lawsuits.   Additionally, the vehement public reaction and subsequent reports, such as the Suppressing Protest Report which even tried to directly engage with the NYPD, detailed and highlighted the unlawful policies and arrests.[7]

~~177.~~251.        By September 2012, the City of New York was aware that a large amount expressive speech activity would occur within the confines of the First Precinct, and due to this actual knowledge the NYPD prepared the PBMS Detail #FY13-2809.

~~178.~~252.        The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants knew or should have known that in September 2012 members of the NYPD would encounter individuals engaged in expressive speech activity, especially after the two-month occupation of Zuccotti Park and the continual protests arising from the Occupy Wall Street Movement.

~~179.~~253.        The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants knew or should have known that in September 2012 members of the NYPD would encounter individuals engaged in expressive speech activity within the confines of the First Precinct.

~~180.~~254.        Yet, the City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants failed to train the individual street level police officers on the proper treatment of individuals engaged in expressive speech activity.

---

[7]        *See Suppressing Protest* at Appx. II.

181.255.      The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly train the police officers of the First Precinct.

182.256.      The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants showed deliberate indifference to the rights of members of Occupy Wall Street by failing to properly supervise the officers who were assigned to police Occupy Wall Street.

183.257.      The City of New York, Mayor Michael Bloomberg, Commissioner Kelly, and the Chief Defendants, showed deliberate indifference to the unlawful implementation of the policies and practices of the NYPD and failed to properly train the NYPD officers in relation to how the exercise of expressive speech affects the policing of protests, including, among other things, the policing for the offense of disorderly conduct.

184.258.      Instead of taking necessary steps to curb the number of unlawful arrests of OWS protestors during the year leading up to the Plaintiffs' arrests, the NYPD made no policy changes, even though the vast majority of the 2,644 arrests resulted in a form of dismissal.

185.259.      Further, the NYPD and the Chief Defendants made no effort to find out why so many OWS arrests were not prosecuted by the District Attorney's office, or why so many arrests were dismissed.  Nor did the Chief Defendants consider changing the policies or procedures as a result of the dismissal rate.

186.260.      The City of New York, Commissioner Kelly, Mayor Bloomberg, and the Chief Defendants never corrected the implemented policies by training, and never conducted training to prevent or address the problematic policies, and instead in an

exhibition of deliberate indifference and/or deliberate disregard allowed the activity to continue.

187.261.     Almost all of the NYPD police officers had only a cursory training on these issues during the brief (six months) time spent in the police academy.

188.262.     OWS protests were policed not merely by patrol officers, but by high-ranking officers such as the Chief Defendants, among others.

189.263.     These high-ranking officers had the ability to see that NYPD officers were incorrectly understanding and applying the law.

190.264.     These high ranking officers had the ability and the duty to set policies that would prevent NYPD officers from making unlawful arrests because of a failure to understand the law.

191.265.     These high ranking officers had the ability and the duty to ensure that NYPD officers had training that would prevent the officers from making unlawful arrests because of a failure to understand the law.

192.266.     In addition, the City of New York and the Executive Defendants should have, but did not, establish policies and provide training specifically to prevent further arbitrary and unlawful sidewalk closures.

193.267.     In addition, the City of New York and the Executive Defendants should have, but did not, establish policies and provide training specifically to prevent further aggressive use of batons on peaceful protestors.

194.268.     In addition, the City of New York and the Executive Defendants should have, but did not, establish policies and provide training specifically to prevent unnecessary pain and injury from the use of plastic handcuffs.

THE POLICE OFFICERS IN CHARGE ON SEPTEMBER 17, 2012

195.269.     On September 17, 2012, Defendant Police Assistant Chief Thomas Purtell was the member of the NYPD who was the highest uniformed ranking police supervisor assuming command.

196.270.     Chief of Department Joseph Esposito was the second in command to Commissioner Ray Kelly, having command over Patrol Services Bureau, Patrol Borough Manhattan South, Assistant Chief Thomas Purtell, and the officers detailed to the OWS anniversary on September 17, 2012.

197.271.     In 2011 and 2012, Commissioner Kelly, Chief Purtell and Chief Esposito were employees of the NYPD who were identified by the NYPD as having "substantial policy discretion" and were thus policy makers of the NYPD and the City of New York.

198.272.     As the Incident Commander of the Occupy Wall Street event on September 17, 2012, Assistant Chief Purtell was responsible for the overall management of the policing activities concerning the event.

199.273.     As described within Section 213-11 of the NYPD Patrol Guide, *Policing Special Events/Crowd Control,* as the Incident Commander of the Occupy Wall Street event on September 17, 2012, Assistant Chief Purtell was responsible for the command, control and coordination of all incident operations, including the supervision of all police officers there that day.

200.274.     In anticipation of the expected expressive speech activity to occur in downtown Manhattan in the days leading up to and on the day of the anniversary of the first march of Occupy Wall Street, Assistant Chief Purtell, along with his two aides, Chiefs Anger and McNamara, prepared a Patrol Borough Manhattan South Detail, that set out

which supervising officers would be working on September 17, 2012, and the location and basic duties of their tour for the day.

201.275.    In so doing, Chiefs Purtell, Anger and McNamara determined which police units would be deployed to police the Occupy Wall Street events of that day.

202.276.    The majority of the NYPD officers detailed to the First Anniversary of Occupy Wall Street were members of, and supervised by, the Patrol Services Division; in particular, Patrol Borough Manhattan South, which was under the command of Chief Purtell.

203.277.    On September 17, 2012 alone, there were more than 1,300 police officers from the Patrol Services Bureau deployed to the immediate area around Wall Street.  Further, more than 150 additional officers were deployed to Zuccotti Park and 40 mounted police units were deployed.

204.278.    Upon information and belief, Defendant Chief Esposito and the Chief Defendants, were aware of the fact that large numbers of the police officers assigned to police OWS events were not properly trained, and did not have a proper understanding of the law governing lawful arrests at such events.

205.279.    Upon information and belief, Defendant Chief Purtell and the Chief Defendants, took no steps to ensure that the officers assigned to the September 17, 2012 OWS anniversary events consisted of officers who were properly trained and had a proper understanding of the law governing lawful arrests at such events.

206.280.    Upon information and belief, Defendant Chief Purtell and the Chief Defendants, took no steps to ensure that the officers assigned to the September 17, 2012

OWS anniversary events performed their duties on that day with a proper understanding of the law governing lawful arrests at such events.

207.281.     Throughout the period of time from September 17, 2011 and through September 17, 2012, the City of New York and the Executive Defendants were aware of information that placed them on clear notice that officers under their command were pursuing arrest practices that violated the Constitutional rights of OWS protestors.

208.282.     Upon information and belief, throughout the period of time from September 17, 2011 and through September 17, 2012, the City of New York and the Executive Defendants did nothing to impose, develop or modify any policies or practices that would prevent further unlawful arrests.

209.283.     Upon information and belief, City of New York and the Executive Defendants did not train officers assigned to OWS events in how to make lawful arrests, and how to avoid unlawful arrests.

210.284.     Upon information and belief, the City of New York and the Executive Defendants did not assign officers who had proper training to police such arrests.

<u>THE FIRST ANNIVERSARY OF OCCUPY WALL STREET</u>

211.285.     In the run-up to the First Anniversary of OWS, expressive activity increased and on September 15, 2012, twenty-seven (27) individuals were arrested which resulted in thirteen arrests (13) resolved with a dismissal, ACD, decline to prosecute and/or acquittal.

212.286.     On September 16, 2012, fifteen (15) individuals were arrested which resulted in eleven (11) of those arrests resolved with a dismissal, ACD, declined prosecution, and/or acquittal.

213.287.    The September 15, 2012 on the ground events are detailed by the New York Times, which recorded the police failing to allow protestors adequate time to disperse after a dispersal order was given:

> [On September 15th at 8:30 p.m.], near Thames Street, a commander ordered the crowd to disperse, and a moment later officers pushed into the crowd, knocking down some protesters and arresting some.
>
> The police repeated that maneuver a few minutes later, and then pushed a group of protesters against the side of a building. One man objected, and an officer pulled him from the crowd and arrested him. At least two other arrests followed, with officers appearing to grab some people almost at random.
>
> Across Broadway, a commander announced that protesters could not stand on a stretch of sidewalk. A man yelled that he had the right to be there and the commander chased him for several feet before the man scrambled away.
>
> By 9 p.m., almost all of the remaining protesters left the area as a line of officers advanced toward a group standing on the corner of Liberty Street and Broadway while a captain announced through a megaphone that the group was blocking pedestrian traffic.[8]

214.288.    On September 17, 2012, hundreds or thousands of individuals came to New York City to meet downtown and celebrate the First Anniversary of Occupy Wall Street.

215.289.    Nonetheless, the Defendants failed to assign officers to these expressive speech activities who understood the proper policing of constitutionally protected activity.

---

[8]    Colin Moynihan, *Several Arrests at Occupy Wall Street March*, NY TIMES, http://www.nytimes.com/2012/09/16/nyregion/several-arrests-at-occupy-wall-street-march.html.

216.290.        On September 17, 2012, the First Anniversary of Occupy Wall Street was celebrated around the world, including within the confines of the NYPD's First Precinct.

217.291.        According to records provided by the New York County District Attorney's office, a report, under a notation "Happy Birthday OWS", listed on this date over one-hundred and eighty (180+) individuals arrested in relation to OWS anniversary expressive speech activity (of which 88% were resolved with a decline to prosecute, dismissal or ACD).

218.292.        At all relevant times herein, City of New York and the Executive Defendants established and/or followed policies, procedures, customs, and or practices, and those policies were the cause of violation of the Plaintiff's constitutional rights granted pursuant to 42 U.S.C. § 1983, as well as the case of *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), including those under the First, Fourth, and Fourteenth Amendments.

219.293.        All of the aforementioned acts of the City of New York and the Executive Defendants, their agents, servants and employees, were carried out under the color of state law.

220.294.        The City of New York and the Executive Defendants at all times relevant, had a duty to the Plaintiff to make the appropriate choice among many to (1) establish, implement and follow policies, procedures, customs, and or practices which conform to and provide for the protections guaranteed to the Plaintiff under the United States Constitution, including the First, Fourth, and Fourteenth Amendment; (2) select, supervise, train, control, and review the activities of all agents, servants, employees, and

police officers in their employ, and (3) refrain from deliberate indifference to the Constitutional rights of the Plaintiff so as to not cause him injuries and damages alleged herein.

221.295.      The City of New York and the Executive Defendants breached their duties and obligations to the Plaintiff by, making the wrong choice when: (1) failing to establish, implement, and follow the correct Constitutional policies, procedures, customs, and/or practices; (2) failing to properly select, supervise, train, control, and review the activities of their agents, servants, employees, and police officers as to their compliance with Constitutional safeguards; (3) permitting their agents, servants, employees, and police officers to engage in the unlawful and unconstitutional conduct alleged herein; and (4) exercising, at a minimum, deliberate indifference towards the Constitutional protections afforded to the Plaintiff by disregarding the numerous lawsuits, statistical evidence, and reports indicating that the policies, procedures, customs, and/or practices were improper and violated the Plaintiff's Constitutional rights.

222.296.      Furthermore, the members of the NYPD carried out the alleged conduct in their capacities as police officers and under the color of state law, pursuant to the policies, procedures, customs, and/or practices of the Defendant the City of New York and the NYPD, all under the supervision of the Executive Defendants.

223.297.      Defendants knew, or should have known, that by making the wrong choice that it was foreseeable it would and did cause the Plaintiff to be injured and damaged as a result of the constitutionally impermissible conduct undertaken pursuant to the policies, procedures, customs, and/or practices, and that such decisions occurred in contravention of public policy and their legal duties and obligations to the Plaintiff.

~~224.~~298.       The decisions, actions, and inactions, of Defendants and their agents are the legal cause of injuries to the Plaintiff as alleged herein and, as a result, the Plaintiff has sustained general and special damages, as well as incurring attorneys' fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.
[b] Award appropriate compensatory and punitive damages.
[c] Empanel a jury.
[d] Award attorney's fees and costs.
[e] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:    New York, New York
            September 17, 2015

Respectfully submitted,

_____//s//_____
David A. Thompson [dt3991]
STECKLOW COHEN & THOMPSON
ATTORNEYS FOR PLAINTIFF
217 Centre Street, 6th Floor
New York, New York 10013
Phone:        (212) 566-8000
Fax:          (212) 202-4952
DTHOMPSON@WYLIELAW.COM