UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

LUKE RICHARDSON,

                       Plaintiff,                    15-cv-5775 (PKC)

     -against-                         MEMORANDUM
                                                 AND ORDER

THE CITY OF NEW YORK, FORMER NEW
YORK CITY POLICE DEPARTMENT
("NYPD") COMMISIONER RAY KELLY,
FORMER MAYOR MICHAEL BLOOMBERG,
FORMER NYPD CHIEF OF PATROL JOSEPH
ESPOSITO, NYPD ASSISTANT CHIEF
THOMAS P. PURTELL, NYPD DEPUTY
CHIEF STEVEN ANGER, SPYD DEPUTY
CHIEF JAMES MCNAMARA, NYPD
CAPTAIN MARK IOCCO, NYPD OFFICER
IVAN BAUTISTA (SHIELD NO. 10074), NYPD
OFFICER NELSON FRIAS (SHIELD NO.
4054), NYPD OFFICER HALIMA SMITH
(SHIELD NO. 3680), NYPD OFFICER
EVERETT REYES (SHIELD NO. 14434),
NYPD OFFICER DAVID SCOTT (SHIELD NO.
8533), NYPD OFFICER CHARLES CAREY
(SHIELD NO. 1361), NYPD "JOHN DOE"
SQUAD 1 SERGEANT, NYPD OFFICER
RAYMUNDO FLETE (SHIELD NO. 14271),
NYPD OFFICER VALLISON ISAAC (SHIELD
NO. 1647), NYPD OFFICER "JOHN DOE"
SQUAD 1 OFFICER 1, NYPD OFFICER "JOHN
DOE" SQUAD 1 OFFICER 2, NYPD OFFICER
"JOHN DOE" SQUAD 1 OFFICER 3,
SERGEANT CARLETON SUDDLER, NYPD
OFFICER REGINA VAILES (SHIELD NO.
4132), NYPD OFFICER LUVEN GILBERT-
FIGUEROA (SHIELD NO. 9189), NYPD
OFFICER VITO CAMPANELLI (SHIELD NO.
31604), NYPD OFFICER CHAO LI (SHIELD
NO. 28060), NYPD OFFICER "JOHN DOE"
SQUAD 2 OFFICER, NYPD OFFICER "JOHN
DOE" SQUADS LIEUTENANT, NYPD
OFFICER "JOHN DOE" SECOND CAPTAIN,
NYPD OFFICER "JOHN DOE" THIRD
SERGEANT, DET. SOLOMON CHINNERY,
NYPD "JOHN DOE" CAP WEARING
OFFICER,

                       Defendants.

-----------------------------------------------------------x

CASTEL, U.S.D.J.

Plaintiff Luke Richardson brings this action asserting claims under 42 U.S.C §

1983 and the First, Fourth, and Fourteenth Amendments.  Plaintiff claims that, while

participating in a protest marking the one-year anniversary of the Occupy Wall Street ("OWS")

movement he was falsely arrested, subjected to excessive force, prevented from exercising his

First Amendment rights, and denied the protection of the Fourteenth Amendment.  Named as

defendants are the City of New York (the "City"), Mayor Michael Bloomberg, twenty named

individual defendants employed by the New York City Police Department ("NYPD"),

specifically Commissioner Ray Kelly, Chief of Department Joseph Esposito, Assistant Chief

Thomas P. Purtell, Deputy Chief Steven Anger, Deputy Chief James McNamara, Captain Mark

Iocco, Officer Ivan Bautista (Shield No. 10074), Officer Nelson Frias (Shield No. 4054), Officer

Halima Smith (Shield No. 3680), Officer Everett Reyes (Shield No. 14434), Officer David Scott

(Shield No. 8533), Officer Charles Carey (Shield No. 1361), Officer Raymundo Flete (Shield

No. 14271), Officer Vallison Isaac (Shield No. 1647), Sergeant Carleton Suddler, Officer Regina

Vailes (Shield No. 4132), Officer Luven Gilbert-Figueroa (Shield No. 9189), Officer Vito

Campanelli (Shield No. 31604), Officer Chao Li (Shield No. 28060), Detective Solomon

Chinnery, and 9 unnamed individual NYPD officers (Squad 1 Sergeant, Squad 1 Officer 1,

Squad 1 Officer 2, Squad 1 Officer 3, Squad 2 Officer, Squads Lieutenant, Second Captain,

Third Sergeant, and Cap Wearing Officer).

An amended complaint was filed in September 2015 and the defendants now

move to dismiss that First Amended Complaint ("FAC") pursuant to Rule 12(b)(6), Fed. R. Civ.

P.  (Dkt. No. 68.)  After the filing of the motion to dismiss, Richardson expressed a desire to

further amend the complaint, (Dkt. Nos. 72, 75), and at a conference held on February 26, 2016,

the Court invited him to submit a Proposed Amended Complaint ("PAC") along with his

opposition to the motion to dismiss.  (Dkt. No. 78.)  The Court also directed the defendants to

address any arguments against the PAC under the futility doctrine in their reply memorandum in

support of the motion to dismiss.  (Id.)  Because the PAC simply adds factual detail to the

original allegations, the Court will consider the motion to dismiss as addressing the PAC.  For

reasons that will be explained, the motion is granted as to all claims except for Richardson's

false arrest and First Amendment retaliation claims.

THE FACTS ALLEGED

    For the purposes of defendants' motion, all non-conclusory factual allegations set

forth in Richardson's PAC, (Dkt. No. 81 Ex. A), are accepted as true, see Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009), and all reasonable inferences are drawn in favor of the plaintiffs as the

non-movants, see In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

I.  Events of September 17, 2012.

    On September 17, 2012, Richardson alleges that he, along with other OWS

supporters, travelled to the financial district in Manhattan to celebrate the one-year anniversary

of the OWS movement and to call for the "prosecution of financial institutions and their

executives for . . . crimes which caused the financial collapse of 2007-2008."  (PAC ¶¶ 65-66,

68.)  According to the PAC, at around 10 am, Richardson was standing on the sidewalk in front

of 28 Broadway making plans for "protest actions" with other OWS supporters when, without

warning, he was rammed from behind by police officers with batons.  (Id. ¶¶ 2, 69, 91.)

Richardson alleges that he "expressed dissatisfaction with the violent actions" of the police, (id. ¶

2), and that Captain Iocco grabbed him by the strap of his messenger bag and "dragged him

through a crowd" of police officers before handing him over to Officer Bautista and Sergeant

Suddler who handcuffed him using plastic flex-cuffs.  (Id. ¶¶ 92-93, 97.)  He claims that no

dispersal order was ever given and that Captain Iocco ordered his arrest despite knowing that Richardson had not committed any offense.  (Id. ¶¶ 2, 106.)

According to Richardson, a number of other officers were within fifteen feet of him, or less, at the time of his arrest.  (Id. ¶ 90.)  While Richardson specifically alleges that Captain Iocco, Officer Bautista and Sergeant Suddler "caused" his arrest, he claims that many of these other police officers "directly participated."  (Id. ¶¶ 94-95.)  These officers are: Officer Vailes, Officer Scott, Officer Smith, Officer Li and Second Captain – alleged to have participated in the arrest by "grabbing . . . and/or pushing" Richardson – and Officer Frias, Officer Flete, Officer Isaac, Officer Reyes, Officer Gilbert-Figueroa, Officer Campanelli, Detective Chinnery, Officer Carey, Squad 1 Sergeant, Squad 1 Officers 1, 2 and 3, Squad 2 Officer, Squads Lieutenant, Third Sergeant and Cap Wearing Officer[1] – alleged to have participated in the arrest by "physically limiting plaintiff's freedom of movement."  (Id. ¶ 95.) All of the officers who were in the vicinity of Richardson's arrest are also alleged to have been close enough to intervene in the arrest but failed to do so.  (Id. ¶ 96.)

Officer Bautista and Sergeant Suddler put Richardson on a bus with other arrestees in order to transport him to One Police Plaza where he was ultimately detained for about thirteen hours.  (Id. ¶¶ 98, 107-08.)  Richardson claims that the flex-cuffs that Officer Bautista and Sergeant Suddler put on him were too tight, causing him pain and then numbness. (Id. ¶ 97.)  Therefore, Richardson asked Officer Bautista to loosen the flex-cuffs citing his current pain and notifying Officer Bautista of nerve damage that Richardson had suffered from a prior experience with flex-cuffs.  (Id. ¶¶ 99-100.)  According to the PAC, Officer Bautista agreed

---

[1] While the PAC does not specifically identify the officers who limited Richardson's movement, referring only to "Other Defendant POLICE OFFICERS," (PAC ¶ 95), the Court assumes that this group is meant to include all of the individual defendants alleged to have been in the area during Richardson's arrest who are not specifically named in paragraphs 94 and 95 of the PAC.

to the loosen the cuffs but first proceeded to load more arrestees onto the police bus such that Richardson's flex-cuffs remained tight until they were ultimately removed at the precinct over an hour later.  (Id. ¶¶ 101-03.)  Richardson was charged with disorderly conduct but the charges were dismissed after the New York County District Attorney's Office declined to prosecute the case.  (Id. ¶¶ 104, 110.)  Richardson maintains that he did not engage in disorderly conduct or any other offense on September 17, 2012.  (Id. ¶ 105.)

II.     The City and the Executive Defendants.

Richardson further alleges that his unlawful treatment by the NYPD on September 17, 2012 occurred because the City and the "Executive Defendants" (Mayor Bloomberg, Commissioner Kelly, Chief Esposito, Assistant Chief Purtell, Deputy Chief Anger, and Deputy Chief McNamara) were deliberately indifferent to the rights of protestors like Richardson by failing to make remedial policy changes despite information that NYPD officers routinely "violated the Constitutional rights of OWS protestors."  (Id. ¶¶ 281-82.)  Additionally, Richardson claims that the NYPD and the Executive Defendants failed to adequately train officers on the "proper treatment of individuals engaged in expressive speech activity," (id. ¶ 254), resulting in the unlawful arrests of protestors, including Richardson.

According to the PAC, in the time between the first OWS protests in September 2011 and Richardson's arrest one year later, over two thousand OWS protestors were arrested.  (Id. ¶ 141.)  Most of these arrests were for minor offenses, such as disorderly conduct, and were made without a warrant.  (Id. ¶¶ 142-43.)  However, despite the large number of arrests, only a small number resulted in pleas or convictions.  (Id. ¶¶ 144-45.)  In many instances, the charges were dismissed and/or the District Attorney's office declined to pursue the case.  (Id. ¶¶ 146-47.)  Richardson alleges that the fact that so few of these arrests led to convictions indicates that a

majority of the people who had been arrested had done nothing wrong.  (Id. ¶ 158.)  According to the PAC, this low "conversion rate" highlighted the officers' lack of training, (id. ¶ 250), and a pattern of unlawfully arresting OWS protestors.  (Id. ¶ 158.)  The PAC describes a number of OWS events between September 2011 and September 2012 at which Richardson claims many OWS protestors were unlawfully arrested while engaging in "peaceful protest activity."  (Id. ¶¶ 162, 165, 169.)  In addition to these unlawful arrests, the PAC claims that protestors were routinely met with aggressive force which operated to chill their speech.  (Id. ¶¶ 202-09.)  In support of his claims, Richardson cites several reports prepared by the New York Civil Liberties Union ("NYCLU") and clinics at the New York University School of Law ("NYU") and Fordham Law School, (id. ¶¶ 174, 181, 185), as well as various news articles documenting alleged police misconduct at OWS events.  (See e.g., id. ¶ 169.)  According to the PAC, these reports and the statistics regarding the low conversion rate were made available to the NYPD and the Executive Defendants.  (Id. ¶¶ 154, 219.)  However, the NYPD did nothing to "impose, develop or modify any policies or practices that would [have] prevent[ed] further unlawful arrests" in the first year of the OWS movement.  (Id. ¶ 282.)

Richardson also claims that the City and the Executive Defendants failed to adequately train NYPD officers on the "handling of protestors exercising First Amendment rights," despite knowing that many NYPD officers would be called on to police OWS protests between 2011 and 2012.  (Id. ¶¶ 215-22.)  According to the PAC, appropriate training would have included instruction on legal principles such as the fact that "[u]nder New York State and federal law, a person cannot be arrested for disorderly conduct for the 'mere inconveniencing of pedestrians,'" and that "it is unlawful to arrest a protestor for disorderly conduct unless the protestor is creating a 'clear and present danger' of breach of the peace."  (Id. ¶ 244.)  Instead,

the City conducted a large scale training ahead of anticipated OWS protests that focused on

formations used to "splinter and control mass protest," rather than instruction on "proper policing

of expressive speech activity protected by the First Amendment." (Id. ¶¶ 248-49.)  The PAC

alleges that the inadequacy of this training program was made all the more apparent by the

"extensive arrests, the exceptional dismissal rate, and the resulting lawsuits" that occurred over

the course of the first year of OWS.  (Id. ¶ 250.)  Despite these warning signs, the City failed to

train its officers on the "proper treatment of individuals engaged in expressive speech activity,"

(id. ¶ 254); training which, Richardson alleges, would have prevented his unlawful arrest.  (Id. ¶

245.)

DISCUSSION

  I.      Legal Standard.

          "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S.

at 678 (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  Id.  "The plausibility standard

. . . asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.  Legal

conclusions and "[t]hreadbare recitals of the elements of a cause of action," are not entitled to

any presumption of truth.  Id.

  II.     Richardson's Section 1983 Claims.

          To state a claim under section 1983, a plaintiff must allege that state officials,

acting under color of state law, deprived him of a right guaranteed to him by the Constitution or

federal law.  42 U.S.C. § 1983; see Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  Here,

Richardson's claims are predicated on allegations that he was: (a) falsely arrested, (b) subjected to excessive force, and (c) deprived of his rights under the First and Fourteenth Amendments. Richardson also alleges that certain individual defendants failed to intervene to prevent the deprivation of his rights, see Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994), and that the City is liable for his alleged constitutional violations, see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 696 (1978). The Court will examine each of these claims in turn.

    A.  False Arrest Claim.

            Claims for false arrest brought under section 1983 "are 'substantially the same' as claims for false arrest . . . under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). "To state a claim for false arrest under New York law, plaintiffs must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). Defendants argue that the fourth element is not satisfied, because there was probable cause to arrest Richardson. If probable cause exists, it presents an "absolute defense" to a claim of false arrest. Stansbury v. Wertman, 721 F.3d 84, 89 (2d Cir. 2013) (citing Torraco v. Port Auth. of N.Y. & N.J., 615 F.3d 129, 139 (2d Cir. 2010)). Probable cause exists when an officer has "'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime.'" Id. (quoting Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006)) (ellipsis omitted). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers . . . ." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).

The PAC alleges that Richardson was arrested for disorderly conduct.  (PAC ¶ 104.)  Under N.Y. Penal Law § 240.20(6),[2] "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."  To show that there was probable cause to arrest for a violation of N.Y. Penal Law § 240.20(6), four elements must be established: "(1) defendant congregated with other persons in a public place; (2) was given a lawful order of the police to disperse; (3) refused to comply with that order; and (4) acted 'with intent to cause public inconvenience, annoyance or alarm' or with recklessness to the 'risk thereof.'"  United States v. Nelson, 10 Cr. 414 (PKC), 2011 WL 1327332, at *3 (S.D.N.Y. Mar. 31, 2011) (quoting N.Y. Pen. L. § 240.20(6)), aff'd, 500 F. App'x 90 (2d Cir. 2012); cf. Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001).

With regard to the second element, Richardson alleges that no order to disperse was ever given.  (PAC ¶ 2.)  Instead, he claims he was arrested entirely "without warning" and without probable cause.  (Id. ¶¶ 91, 120.)  Defendants argue that because the PAC states that dispersal orders were given at other OWS events, (id. ¶ 287), and that police officers "ramm[ed]" Richardson with batons before arresting him, (id. ¶¶ 2, 91), the more likely situation is that a dispersal order was given prior to his arrest, which Richardson ignored, thereby providing officers with probable cause to arrest him.  (See Defs.' Reply Mem. 3-4.)  Drawing all reasonable inferences in plaintiff's favor, the PAC plausibly alleges that there was no probable

---

[2] While the PAC does not specifically allege which portion of the disorderly conduct statute Richardson was charged with, the Court analyzes N.Y. Penal Law § 240.20(6) because it is most consistent with the facts alleged.  It is possible that Richardson may have been charged with N.Y. Penal Law § 240.20(5) which states "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e obstructs vehicular or pedestrian traffic."  The PAC does not contain facts that support an inference that Richardson was obstructing pedestrian traffic at the time of his arrest.  Therefore, the Court cannot conclude that defendants had probable cause to arrest Richardson for a violation of section 240.20(5) either.

cause for the arrest.  The case may look different after discovery, but at this point, Richardson

has plausibly alleged a lack of probable cause to arrest him for a violation of section 240.20(6).

Finally, defendants assert that Richardson's false arrest claim should be dismissed

because the PAC fails to adequately plead the personal involvement of each officer in the arrest.

(Defs.' Mem. 5-6; Defs.' Reply Mem. 4-5.)  It is well established that the personal involvement

of each defendant in the alleged constitutional deprivations is a prerequisite to an award of

damages under § 1983.  See Iqbal, 556 U.S. at 676 (discussing liability of supervisors).

Richardson claims that the defendants were personally involved in the arrest in a variety of ways.

According to the PAC, Captain Iocco grabbed him, pulled him through a crowd of

police officers and ordered that he be arrested.  (PAC ¶¶ 92-94, 106.)  Officer Bautista and

Sergeant Suddler were given custody of Richardson, handcuffed him, and placed him on a bus

with other arrestees.  (Id. ¶¶ 93-94, 97-98.)  These allegations are sufficient, at this stage, to

support claims that Captain Iocco, Officer Bautista and Sergeant Suddler "directly participated"

in Richardson's allegedly false arrest.

"Direct participation" means "intentional participation in the conduct

constituting a violation of the victim's rights by one who knew of the facts rendering it illegal."

Provost, 262 F.3d at 155.  First, Captain Iocco, Officer Bautista and Sergeant Suddler

intentionally participated in Richardson's arrest by grabbing him, pulling him through a crowd of

police officers, and handcuffing him.  Second, there is a plausible basis to infer that Captain

Iocco, Officer Bautista and Sergeant Suddler knew that the arrest was unlawful because they

knew that Richardson had not been given an order to disperse.  Therefore, Richardson has

adequately alleged that Captain Iocco, Officer Bautista and Sergeant Suddler were personally

involved in his arrest and his false arrest claim against all three survives the motion to dismiss.

The PAC also alleges that Officer Vailes, Officer Scott, Officer Smith, Officer Li, and Second Captain "directly participated" in the arrest by "grabbing . . . and/or pushing" Richardson, and that the other defendant police officers on the scene, Officer Frias, Officer Flete, Officer Isaac, Officer Reyes, Officer Gilbert-Figueroa, Officer Campanelli, Detective Chinnery, Officer Carey, Squad 1 Sergeant, Squad 1 Officer 1, Squad 1 Officer 2, Squad 1 Officer 3, Squad 2 Officer, Squads Lieutenant, Third Sergeant, and Cap Wearing Officer, participated in the arrest by "limiting plaintiff's freedom of movement." (PAC ¶ 95.) In context, these allegations of "direct participation" are conclusory, and inconsistent with the allegation that Captain Iocco caused Richardson to be arrested and that Officer Bautista and Sergeant Suddler handcuffed him and placed him on the bus. (Id. ¶¶ 92-94, 97-98, 106.) Without any description of the specific actions taken by each officer, the claim that sixteen officers "limit[ed] [Richardson's] freedom of movement," (id. ¶ 95), is vague and conclusory, and Richardson has failed to show how, in this context, "grabbing . . . and/or pushing" amounted to arrest. (Id.) While Richardson does not need to prove his case entirely at the pleading stage, he does need to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. These general allegations are not individually tailored enough to support a claim of direct participation.

B.  Excessive Force Claim.

A claim of excessive use of force during an arrest is analyzed under Fourth Amendment principles. Graham v. Connor, 490 U.S. 386, 394 (1989). To prevail, a plaintiff must show that the defendants' use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. Richardson alleges that officers shoved him from behind with batons, (PAC ¶ 91),

dragged him through a crowd of officers by the strap of his messenger bag, (id. ¶ 92), and "grabbed, pushed, pulled and shoved him," (id. ¶ 126), resulting in otherwise unspecified "personal injuries."  (Id. ¶¶ 117, 127.)  Richardson also alleges that he was handcuffed tightly for over an hour, (id. ¶¶ 97, 103), causing him pain and numbness in his hands and wrists. (Id. ¶ 97.)

"Although handcuffs must be reasonably tight to be effective, [], overly tight handcuffing can constitute excessive force."  Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (internal citation omitted).  "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists*."  Id. (quoting Esmont v. City of New York, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005)) (emphasis in original).  "Courts in this Circuit have generally found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising."  Omor v. City of New York, 13 cv 2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015); see also Lynch, 567 F. Supp. 2d at 468-69 (collecting cases).

The PAC alleges that Richardson was handcuffed tightly for "over and hour," and that his initial request to have the handcuffs loosened was ignored, (PAC ¶¶ 97, 100-03), but there are no allegations that he experienced any injuries because of the handcuffs besides temporary pain and numbness.  (Id. ¶ 97.)  Although Richardson notes that he had suffered nerve damage from a previous experience with flex-cuffs, (id. ¶ 99), he makes no allegations that this arrest aggravated or worsened that injury in any way.  Courts in this district have dismissed excessive force claims alleging more lasting injury and much longer periods of tight handcuffing. See, e.g., Bender v. City of N.Y., 09 cv 3286 (BSJ), 2011 WL 4344203, at *6 (S.D.N.Y. Sept.

14, 2011) (fourteen hours of tight handcuffing that left marks on plaintiff's arms for six hours insufficient to constitute a claim for excessive force); Sachs v. Cantwell, 10 cv 1663 (JPO), 2012 WL 3822220, at *15 (S.D.N.Y. Sept. 4, 2012) (tight handcuffing resulting in twenty four hours of wrist swelling insufficient to state a claim for excessive force); Hollins v. City of New York, 10 cv 1650 (LGS), 2014 WL 836950, at *2, *9 (S.D.N.Y. Mar. 3, 2014) (three to four hours of tight handcuffs that caused pain and bruising lasting only one day did not state a claim for excessive force). Richardson's allegation that he was simply tightly handcuffed for one hour without any lasting effects fails to state a plausible claim of excessive force. See Hamlett v. Town of Greenburgh, 05 cv 3215 (MDF), 2007 WL 119291, at *3 (S.D.N.Y. Jan. 17, 2007) (brief numbness in the hands due to tight handcuffing "does not rise to the level of force required to sustain an excessive force claim").

Turning to Richardson's remaining allegations of excessive force, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' [], violates the Fourth Amendment." Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (internal citation omitted). Courts in this district have regularly held that a plaintiff must have sustained some injury to maintain a claim of excessive force. See, e.g., Acosta v. City of New York, 11 cv 856 (KBF), 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012); Wims v. New York City Police Dep't, 10 cv 6128 (PKC), 2011 WL 2946369, at *4-5 (S.D.N.Y. July 20, 2011). While a plaintiff's pain or injury is not the only factor courts take into account when evaluating an excessive force claim, see Graham, 490 U.S. at 396 (describing multiple other factors to be considered), the extent to which a plaintiff is injured can be useful in assessing whether the use

of force could plausibly have been considered necessary in a particular situation.  Hudson v. McMillian, 503 U.S. 1, 7 (1992); Gonzalez v. City of New York, 14 cv 7721 (LGS), 2015 WL 6873451, at *8 (S.D.N.Y. Nov. 9, 2015).  And when a complaint alleges that a minimal use of force caused no, or only *de minimis*, injuries, courts in this Circuit have routinely found that the plaintiff has failed to state a plausible claim of excessive force.  See e.g., Acosta, 2012 WL 1506954, at *10-11; Pesola v. City of New York, 15 cv 1917 (PKC) (SN), 2016 WL 1267797, at *7 (S.D.N.Y. Mar. 30, 2016).

       Richardson's complaint fails to state a claim for excessive force.  He alleges only that he was pulled through a crowd of officers, pushed and pulled, and shoved from behind with batons in connection with his arrest.  (PAC ¶¶ 91-92, 126.)  The PAC does not allege that Richardson suffered any injuries as a result of the arrest.  Even after construing all reasonable inferences in Richardson's favor, the Court cannot plausibly infer this minimal amount of force was excessive in the absence of any alleged injury.  See, e.g., Bender, 2011 WL 4344203, at *6 (allegations that plaintiff was turned upside down, handcuffed multiple times, and physically assaulted insufficient to state a claim of excessive force without more detail as to the harm suffered or the circumstances of the alleged assault); Wims, 2011 WL 2946369 at *5 (dismissing excessive force claim where plaintiff alleged officers threw him to the ground on his face, but did not allege any "specific or identifiable physical or mental injury and harm" as a result).

       In sum, Richardson has failed to plausibly allege a claim of excessive force and this claim must be dismissed.

C.  First Amendment Retaliation Claim.

       At the outset the Court notes that because Captain Iocco, Officer Bautista and Sergeant Suddler are the only three who are plausibly alleged to have participated in

Richardson's arrest, see Part A, supra, the Court will consider Richardson's First Amendment retaliation claim as being only against these three officers.

In order to state a claim for First Amendment retaliation, "a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [plaintiff's] exercise of that right; and (3) the defendant's actions caused him some injury." Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015) (quoting Dorsett v. Cty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013)). To satisfy the first element, Richardson must allege that he was engaged in speech protected by the First Amendment. Defendants argue he has failed to do so because he alleges only that he was standing on the sidewalk with others "commemorating" the anniversary of OWS and making plans outside of 28 Broadway.

"It is well established that '[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.'" Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004) (quoting Virginia v. Black, 538 U.S. 343, 358 (2003)). The test for determining whether conduct is sufficiently expressive to implicate the First Amendment is whether "'an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.'" Id. (quoting Texas v. Johnson, 491 U.S. 397, 404 (1989)) (internal alterations omitted). "The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies [] and that party must advance more than a mere 'plausible contention' that its conduct is expressive." Id. (internal citation omitted).

Richardson alleges that he was in the Financial District in order to commemorate the one-year anniversary of the OWS movement, (PAC ¶ 2), and to plan protest activities with other OWS supporters. (Id. ¶ 69.) It is plausible to infer from the PAC that Richardson thereby

intended to "convey a particularized message" of political support for OWS, Johnson, 491 U.S. at 404, by gathering with other OWS supporters in the financial district to mark the occasion of the movement's anniversary.  This message would have been sufficiently clear to any observer, even if Richardson was not chanting or holding a sign.  See Fifth Ave. Presbyterian Church v. City of New York, 01 cv 11493 (LMM), 2004 WL 2471406, at *10 (S.D.N.Y. Oct. 29, 2004) (noting that "indicia of protest," such as signs and literature, is not a requirement of expressive conduct), aff'd but criticized on other grounds, 177 F. App'x 198 (2d Cir. 2006).  Richardson has plausibly alleged that he was engaging in First Amendment expressive conduct when he gathered with other OWS supporters near the site of the original encampment in Zuccotti Park to mark the first anniversary of OWS.  See Marom v. City of New York, 15 cv 2017 (PKC), 2016 WL 916424, at *10 (S.D.N.Y. Mar. 7, 2016); Gersbacher v. City of New York, 14 cv 7600 (GHW), 2015 WL 5692178, at *8 (S.D.N.Y. Sept. 25, 2015); Meyers v. City of New York, 14 cv 9142 (ALC), 2015 WL 6503825, at *14 (S.D.N.Y. Oct. 27, 2015).

Regarding the requirement that plaintiffs allege a retaliatory motive, Richardson alleges that he was on the sidewalk in the financial district commemorating the one-year anniversary of the OWS movement, (PAC ¶ 2), and planning further protest activity with other OWS supporters, (id. ¶ 69), when he was "ramm[ed]" by police officers with batons.  (Id. ¶ 2.) He claims that he was then arrested "in retaliation for [his] protected activity" after he "expressed dissatisfaction" with the "violent actions" of these police officers.  (Id.)  These allegations adequately plead the second element of a retaliation claim.  "Circumstantial evidence of retaliatory intent may supply the causal connection between a plaintiff's protected speech and a defendant's adverse action."  Berg v. Kelly, 12 cv 3391 (TPG), 2016 WL 4257525, at *4 (S.D.N.Y. Aug. 10, 2016) (citing Gronowski v. Spencer, 424 F.3d 285, 293 (2d Cir. 2005)).

Finally, plaintiffs claiming First Amendment retaliation must plausibly allege that defendants' actions caused them some injury.  This injury can be shown through allegations that either "[plaintiff's] speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm."  <u>Dorsett</u>, 732 F.3d at 160.  Richardson has adequately alleged such an injury by claiming that he was arrested on the morning of September 17, 2012, (PAC ¶ 2), subjecting him to criminal charges for disorderly conduct, (<u>id.</u> ¶ 104), and preventing him from participating in the rest of the day's protests.  <u>See</u> <u>Smith</u>, 782 F.3d at 100 (holding that the "issuance of [traffic] tickets was an injury in that it subjected [plaintiff] to a state action requiring that she either appear in court, pay a fine, or both"); <u>Gonzalez</u>, 2015 WL 6873451, at *6 (plaintiff who was arrested for participating in demonstrations stated a First Amendment claim).  Richardson has satisfied the third element of his First Amendment claim and accordingly, he has plausibly stated a claim for First Amendment retaliation.

D.  Fourteenth Amendment Claim.

While Richardson's first claim for relief cites constitutional deprivations under the Fourteenth Amendment, (PAC ¶ 113), defendants argue that these claims are vague and undefined and should be dismissed.  (Defs.' Mem. 14.)  In his opposition, Richardson makes no attempt to respond to this argument and has therefore abandoned his claims under the Fourteenth Amendment.  <u>See</u> <u>Robinson v. Fischer</u>, 09 cv 8882 (LAK) (AJP), 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (report and recommendation) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim."); <u>Lipton v. Cty. of Orange</u>, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that

the claim should be dismissed."); Martinez v. City of New York, 11 cv 7461 (JMF), 2012 WL 6062551, at *1 (S.D.N.Y. Dec. 6, 2012) (dismissing claims as abandoned where plaintiff failed to respond to defendant's arguments for dismissal in her opposition); Wright v. Brae Burn Country Club, Inc., 08 cv 3172 (DC), 2009 WL 725012, at *5 (S.D.N.Y. Mar. 20, 2009) ("When one party fails to respond to an opposing party's arguments that its claim must be dismissed, the claim may be deemed abandoned.").  In any event, the PAC is devoid of any allegations that would support Richardson's claims that defendants violated his Fourteenth Amendment rights. Therefore, these claims must be dismissed.

E.   Qualified Immunity.

1.   False Arrest.

Officer Bautista and Sergeant Suddler argue that, even if there was no probable cause to arrest Richardson, there was nevertheless "arguable probable cause" to arrest him, and they are thus entitled to qualified immunity on Richardson's false arrest claim.  See Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2014), as amended (Feb. 23, 2015).  "'Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'"  Id.  (quoting Zalaski v. City of Hartford, 723 F.3d 382, 390 (2d Cir. 2013)). However, at the motion to dismiss stage, a qualified immunity defense based on arguable probable cause "'faces a formidable hurdle . . .' and is usually not successful."  Field Day, LLC v. Cty. of Suffolk, 463 F.3d 167, 191-92 (2d Cir. 2006) (quoting McKenna v. Wright, 386 F.3d 432, 434 (2d Cir. 2004)).  In support of their argument, Officer Bautista and Sergeant Suddler contend that they did not have reason to believe that the arrest was unlawful, and because

Captain Iocco was the ranking officer on the scene, all of the other officers were entitled to rely on his determination that probable cause existed.  (Defs.' Mem. 6-7; Defs.' Reply Mem. 5-6.)

However, taking the allegations of the PAC as true, Officer Bautista and Sergeant Suddler were close to Richardson at the time of the arrest and participated directly in that arrest.  (PAC ¶¶ 90, 93-94.)  The two primary cases defendants cite in support of their position are not helpful.  In both <u>Askins v. City of New York</u>, 2012 U.S. Dist. LEXIS 19940 (S.D.N.Y. Feb. 14, 2012), <u>aff'd in relevant part</u>, 727 F.3d 248 (2d Cir. 2013), and <u>Phelps v. City of New York</u>, 04 cv 8570 (DLC), 2006 WL 1749528 (S.D.N.Y. June 27, 2006), the defendant police officers were not present for, and had no knowledge of, the events purportedly giving rise to probable cause for the plaintiff's arrest, and were therefore entitled to rely on the probable cause determinations of their colleagues.  <u>See</u> <u>Phelps</u>, 2006 WL 1749528 at *3; <u>Askins</u>, 2012 U.S. Dist. LEXIS 19940 at 13-15.  This is quite different from the situation presented here in which Officer Bautista and Sergeant Suddler are alleged to have played a critical role in Richardson's arrest.  (PAC ¶¶ 93-94.)  It may well be that the facts ultimately show that only Captain Iocco witnessed the events that gave rise to Richardson's arrest, and that Officer Bautista and Sergeant Suddler reasonably relied on his probable cause determination, but this is an issue that is best decided at the summary judgment stage.  Based on the allegations in the PAC, the Court cannot conclude as a matter of law that defendants are entitled to the protections of qualified immunity for false arrest.

2.   First Amendment Retaliation.

In support of their motion to dismiss Richardson's claim for First Amendment retaliation, defendants contend that they are entitled to qualified immunity because "Plaintiff's act of standing in front of a building, with his back turned to officers was not clearly established to be expressive conduct and reasonable officers could differ as to whether this act was protected

under the First Amendment." (Defs.' Reply Mem. 3.)  Qualified immunity "operates 'to ensure

that before they are subjected to suit, officers are on notice their conduct is unlawful.'"  Hope v.

Pelzer, 536 U.S. 730, 739 (2002) (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001)).

Therefore, it protects public officials if "(a) the defendant's action did not violate clearly

established law, or (b) it was objectively reasonable for the defendant to believe that his action

did not violate such law."  Santulli v. Russello, 519 F. App'x 706, 708 (2d Cir. 2013) (quoting

Russo v. City of Bridgeport, 479 F.3d 196, 211 (2d Cir. 2007)).

        Defendants are correct that there was likely no clearly established First

Amendment right to stand on the sidewalk with one's back turned to police officers, however

this is not all that the PAC alleges.  Richardson claims that he was standing on the sidewalk, with

other OWS supporters, in order to commemorate the anniversary of the OWS movement and

plan protest activity.  (PAC ¶¶ 2, 66, 69.)  These allegations raise First Amendment claims based

on the right to participate in political protests, a right that is clearly established.  See Jones v.

Parmley, 465 F.3d 46, 56 (2d Cir. 2006) (describing political protest and demonstrations "as at

the heart of what the Bill of Rights was designed to safeguard"); Santulli, 519 F. App'x at 708–

09 ("It is clearly established that a person has the right to be free from retaliation for an exercise

of First Amendment rights . . . ."); Gonzalez, 2015 WL 6873451, at *6 ("Individuals have an

established First Amendment right to engage in protests activities.").

        On the facts as alleged in the PAC, the defendants are not entitled to qualified

immunity at the pleading stage.

F.   Personal Involvement of the Executive Defendants.

        It is well settled that supervisors cannot be held liable in a Section 1983 suit

solely on a theory of *respondeat superior*.  See Iqbal, 556 U.S. at 676; Richardson v. Goord, 347

F.3d 431, 435 (2d Cir. 2003).  Instead, a plaintiff must show that each defendant was personally involved in the alleged constitutional deprivations.  See Iqbal, 556 U.S. at 676-77.  Richardson's remaining claims are his false arrest and First Amendment retaliation claims.  If the PAC fails to plausibly allege the personal involvement of the Executive Defendants in each of those claims, the respective claims must be dismissed as to those particular defendants.

To the extent that Richardson brings claims against the Executive Defendants in their official capacities, those claims are the equivalent of bringing suit against the City itself and will be considered along with Richardson's Monell claims against the City of New York.  See Jackler v. Byrne, 658 F.3d 225, 244 (2d Cir. 2011) ("a claim asserted against a government official in his official capacity is essentially a claim against the governmental entity itself").  However, Richardson also brings claims against the Executive Defendants in their individual capacities under a theory of supervisory liability and it these claims which will be discussed below.

Prior to the Supreme Court's decision in Iqbal, supervisory officials could be held liable for constitutional deprivations in five particular situations.  See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  Specifically, the Circuit held that personal involvement of a supervisor may be established by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

Id.  In emphasizing that vicarious liability was inapplicable to section 1983 suits, and that a supervisory official could only be held liable for a constitutional deprivation on the basis of "his or her own misconduct," Iqbal, 556 U.S. at 676-77, Iqbal called into question the continued relevance of the Colon factors, "at least where the *mens rea* element of the underlying constitutional tort is more demanding than the *mens rea* element of the Colon factor on which [a] plaintiff hopes to rely."  Powell v. City of New York, 14 cv 09937 (PAC) (BCM), 2016 WL 4159897, at *9 (S.D.N.Y. July 14, 2016), report and recommendation adopted, 14 cv 9937 (PAC) (BCM), 2016 WL 4147203 (S.D.N.Y. Aug. 3, 2016).

The Second Circuit has not yet addressed whether Iqbal has effectively "heightened the requirements" for pleading the personal involvement of supervisory officials. Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013); see Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (casting doubt on the Colon test); Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test . . . after Iqbal.").  Therefore, in the wake of Iqbal, district courts in this Circuit have taken varying approaches.  While all of the courts agree that the first and third Colon factors continue to be applicable, some courts hold that these are the *only* two factors that survive Iqbal. See, e.g., Bellamy v. Mount Vernon Hosp., 07 cv 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009), aff'd, 387 F. App'x 55 (2d Cir. 2010); Rivera v. Metro. Transit Auth., 750 F. Supp. 2d 456, 462–63 (S.D.N.Y. 2010) (agreeing with Bellamy).  Other courts, including this one, have found that, absent further direction from the Second Circuit, the second, fourth, and fifth Colon factors remain viable depending on the elements of the underlying constitutional claim.  See, e.g., Marom, 2016 WL 916424, at *15 ("Iqbal does not insulate supervisors from liability for any act or omission that on its own satisfies 'each element of the underlying

constitutional tort.'") (quoting Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015)); Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in Colon v. Coughlin may still apply."); Delgado v. Bezio, 09 cv 6899 (LTS), 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) ("[W]here the claim does not require a showing of discriminatory intent, the Colon analysis should still apply, insofar as it is consistent with the particular constitutional provision alleged to have been violated") (internal quotation marks omitted).

Importantly, even if Richardson did establish that the actions of the Executive Defendants fit within one of the applicable Colon categories of liability, he "must also establish that the supervisor's actions were the proximate cause of [his] constitutional deprivation." Littlejohn v. City of New York, 795 F.3d 297, 314 (2d Cir. 2015). This translates to a "requirement that there be some direct relation between the injury asserted and the injurious conduct alleged." Bogart v. City of New York, 13 cv 1017 (NRB), 2015 WL 5036963, at *5 (S.D.N.Y. Aug. 26, 2015) (quoting Legal Aid Soc'y v. City of New York, 114 F. Supp. 2d 204, 215 (S.D.N.Y. 2000)). Thus, the constitutional deprivation at issue must have been a foreseeable consequence of the alleged policy or custom, in order to state a claim for supervisory liability. See Victory v. Pataki, 814 F.3d 47, 69 (2d Cir. 2016), as amended (Feb. 24, 2016) (affirming dismissal of claims against Governor Pataki for lack of personal involvement where plaintiff only alleged that Governor Pataki had a blanket policy of opposing parole to violent offenders, but did not allege that that policy led the Governor's staff "to intervene in parole decisions" or to ratify "the rescission procedures employed by the Board of Parole").

1.  False Arrest.

Richardson claims that all of the named Executive Defendants—Mayor
Bloomberg, NYPD Commissioner Kelly, Chief of Department Esposito, Assistant Chief Purtell,
Deputy Chief Anger, and Deputy Chief McNamara—were personally involved in his false arrest.

Because a claim of false arrest does not include any intent requirement and relies
instead on a standard of objective unreasonableness, the second, fourth, and fifth Colon factors
remain viable bases for supervisory liability.  However, Richardson has not plausibly alleged that
any of the Executive Defendants "participated directly" in his arrest, or that any of the Executive
Defendants were informed about his arrest and "failed to remedy the wrong."  Colon, 58 F.3d at
873.  Nor does the PAC allege that any of the Executive Defendants were grossly negligent in
their supervision of the arresting officers.  See id.  Therefore, only the third and fifth Colon
factors may be analyzed as potential basis of liability on the false arrest claim.

First, Richardson alleges that the Executive Defendants "created a policy or
custom under which unconstitutional practices occurred, or allowed the continuance of such a
policy or custom."  Id.  The PAC begins with vague and conclusory allegations about the general
supervisory responsibilities of the Executive Defendants which cannot in themselves create a
basis for supervisory liability.  See Gusler v. City of Long Beach, 823 F. Supp. 2d 98, 139
(E.D.N.Y. 2011) (quoting Al–Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir.
1989)) ("The fact that [a defendant] was in a high position of authority is an insufficient basis for
the imposition of personal liability."); Vogelfang v. Capra, 889 F. Supp. 2d 489, 502 (S.D.N.Y.
2012) (quoting Styles v. Goord, 431 F. App'x 31, 33 (2d Cir. 2011) (summary order)) ("the mere
fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for
failure to supervise under § 1983.").  Richardson alleges that in the year leading up to his arrest,

all of the Executive Defendants were responsible for the "policy, practice, supervision, implementation, and conduct" of NYPD matters and as well as the "appointment, training, supervision, and conduct" of NYPD service members.  (PAC ¶¶ 10-15.)  In addition, Assistant Chief Purtell was the Incident Commander for the OWS event on September 17, 2012, (id. ¶ 13), giving him overall responsibility for the "command, control, and coordination" of the policing activities for the anniversary protests.  (Id. ¶¶ 272-73.)  According to the PAC, Deputy Chief Anger and Deputy Chief McNamara served as Assistant Chief Purtell's aides at the OWS anniversary event.  (Id. ¶¶ 14-15.)  Mayor Bloomberg is alleged to have been a "policy-maker with respect to the decisions on training and supervision of police officers in relation to Occupy Wall Street," (id. ¶ 10), and Commissioner Kelly, Chief Esposito, and Assistant Chief Purtell are alleged to have had "substantial policy discretion" at the NYPD in the 2011-2012 time frame. (Id. ¶ 271.)

While the PAC alleges that Chief Esposito, Assistant Chief Purtell, Deputy Chief Anger and Deputy Chief McNamara were involved in designing and approving plans for policing the OWS protest on September 17, 2012, (id. ¶¶ 81-83, 274-75), the PAC does not allege that these defendants actually created a policy under which violations of Richardson's constitutional rights occurred.  At best, the PAC appears to allege that the Executive Defendants perpetuated a custom under which constitutional violations, specifically the unlawful arrests of protestors, were tolerated.  However, aside from Richardson's allegations that the Executive Defendants were deliberately indifferent to the rights of protestors by failing to update NYPD policies and train officers, (id. ¶¶ 255-58), the PAC fails to include any factual support for the claim that the Executive Defendants tacitly approved of the alleged unconstitutional actions of their subordinates.  Richardson does not claim that allegations of police misconduct routinely

went un-investigated, or that officers who were found to have unlawfully arrested OWS

protestors were not disciplined.  Instead Richardson's allegations can be summed up as follows:

the Executive Defendants were in charge of the NYPD during the year leading up to

Richardson's arrest and were aware that during that year many OWS protestors were arrested but

not convicted.  These claims fail to establish that an unconstitutional policy existed or that the

Executive Defendants deliberately turned a blind eye to the misconduct of their subordinates.

Second, Richardson advances a deliberate indifference theory of supervisory

liability.  "[S]upervisory liability may be imposed when an official has actual or constructive

notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference

by failing to act."  Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989) (internal

quotation marks omitted).  Richardson alleges that the Executive Defendants exhibited deliberate

indifference to his rights and to the rights of other OWS protestors by failing to train police

officers on the "proper treatment of individuals engaged in expressive speech activity," (PAC ¶

254), "failing to properly supervise the officers who were assigned to police [OWS]" events, (id.

¶ 256), and failing to make policy changes necessary to "curb the number of unlawful arrests of

OWS protestors," (id. ¶ 258), despite having access to information indicating that such training

and policy changes were needed to avoid constitutional violations.  (Id. ¶ 217.)

In order to show that the Executive Defendants had notice of a pattern of unlawful

arrests and the need for more training, supervision, and policy changes, Richardson points to four

main sources of information which he claims were available to the Executive Defendants in the

year leading up to his arrest.  These include (1) statistics regarding the low number of OWS

arrests that led to pleas or convictions, which were allegedly sent to Esposito and "other high

level executive officers of the NYPD," (id. ¶ 154), (2) articles in national publications reporting

on claims of police misconduct at OWS events, (id. ¶¶ 161-63, 165-66, 168-69, 174, 190, 201, 210, 212, 287), (3) third party reports describing police misconduct, one of which was allegedly provided to the Mayor's office and to the NYPD, (id. ¶ 188), and (4) lawsuits brought by OWS protestors against the City of New York.  (Id. ¶¶ 163, 173, 197-200.)  However, these allegations are not sufficient to "nudge []" plaintiff's claim of notice "across the line from conceivable to plausible."  Iqbal, 556 U.S. at 680 (citing Twombly, 550 U.S. at 570).

   The statistics that Richardson cites did not plausibly put the Executive Defendants on notice of an ongoing pattern of unlawful arrests.  These statistics simply showed that many arrests made at OWS protests did not ultimately result in a conviction or a plea and that in some percentage of cases the District Attorney's office declined to prosecute the case.  (PAC ¶¶ 144-48.)  There are any number of reasons that charges may be dismissed or a prosecutor may decide not to pursue a case, many of which have nothing to do with the lawfulness of the original arrest. The fact that an arrest does not ultimately result in a conviction is not proof that the arrest was violative of the arrestee's constitutional rights, and the PAC fails to allege any reason why the Executive Defendants should have understood these arrest statistics to be evidence of a widespread pattern of unconstitutional arrests.  Cf. Higginbotham v. City of New York, 105 F. Supp. 3d 369, 383 (S.D.N.Y. 2015) (allegations regarding "high percentage of dismissals and declinations of prosecution" insufficient for Monell claim).  Additionally, although Richardson alleges that most of these arrests were for disorderly conduct, (PAC ¶ 143), there is no allegation that the statistics were broken out by offense such that the Executive Defendants would have seen a pattern of unconstitutional disorderly conduct arrests, the specific misconduct challenged here.

Richardson also cites several news articles, two reports published by the NYCLU, and a joint report by The Global Justice Clinic at NYU School of Law and the Walter Leitner International Human Rights Clinic at Fordham Law School.  However, these too fail to plausibly allege a pattern of police misconduct.  The content of news articles is not entitled to any presumption of truth, see Marom, 2016 WL 916424 at *22, and many of the articles cited in the PAC have nothing to do with the alleged pattern of questionable arrests for disorderly conduct.  (PAC ¶¶ 166, 168, 171, 287.)  As described by the PAC, the first NYCLU report discusses only allegations of physical force against protestors rather than unlawful arrests, (id. ¶ 174), and the second report contains allegations that are far too general to have put any officials on notice of a concrete pattern of unconstitutional conduct.  (Id. ¶ 181.)  The portions of the joint NYU and Fordham report quoted in the PAC similarly contain only general allegations of misconduct rather than any specific examples of documented police abuse.  (Id. ¶¶ 185, 201, 210-12.)  In addition, this Court recently found that the same joint NYU and Fordham report was not sufficient to place the NYPD and the City on notice of a pattern and practice of constitutional violations in the context of a Monell failure-to-train claim.  See Marom, 2016 WL 916424 at *22.  The report is similarly insufficient in the present case.

Finally, the PAC cites the "voluminous litigation" that came out of the OWS protests as proof of the "improper policing of members of Occupy Wall Street."  (PAC ¶ 197.)  However, this too does not plausibly allege that the Executive Defendants were on notice of widespread constitutional violations.  The PAC does not explain whether any of the lawsuits cited resulted in findings of liability against the City or any members of the NYPD, nor does the PAC include any details about the facts and circumstances underlying these lawsuits.  The PAC simply alleges that "more than eighty (80) separate litigations have been filed in the Southern

District of New York" since 2011, and "approximately fifty (50) of these litigations have been settled." (Id. ¶¶ 198-99.)  Not only are these allegations devoid of any factual information about the lawsuits that might evidence some pattern of misconduct, the simple fact that cases were filed against the City and that a number of them settled does not suggest wrongdoing on the part of anyone involved.  See Calderon v. City of New York, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015).  Richardson's claim that the Executive Defendants were on notice of city-wide constitutional violations before his arrest is further weakened by the fact that the PAC goes on to allege that only seventeen of these cases were filed before September 17, 2012.  (PAC ¶ 200.)  Elsewhere, the PAC cites four specific OWS-related lawsuits, yet two of the four post-date Richardson's arrest, and again, no information is provided about the alleged misconduct or any findings of liability.  (Id. ¶ 163.)  Richardson does describe one suit, which was ultimately settled, in which fourteen OWS protestors were arrested while walking on the sidewalk in the East Village and where "senior officers involved [later] admitted that the members of the group were not committing disorderly conduct before their arrest."  (Id. ¶ 173.)  That case parallels, in some respects, the allegations of false arrest for disorderly conduct in the present case, however the PAC does not indicate whether this suit was filed before or after Richardson's arrest.  In any event, one lawsuit in which NYPD officials admitted that plaintiffs were not engaged in disorderly conduct is not sufficient to plausibly allege that the Executive Defendants were aware of a large-scale pattern of constitutional violations like those Richardson alleges.

Even if Richardson had plausibly alleged notice, to succeed on his claim of supervisory liability, he must also show that the Executive Defendants exhibited "deliberate indifference by failing to act."  Meriwether, 879 F.2d at 1048.  The PAC includes only general allegations that the Executive Defendants "took no steps, through training, supervision, or policy,

to correct the harmful and unlawful practices detailed [in the PAC]." (PAC ¶ 220.) The PAC does not claim that allegations of misconduct were not investigated or that officers found to have committed violations were not disciplined. Richardson faults the City and the Executive Defendants for failing to make "remedial policy changes" in the year following the first OWS protests, (id. ¶ 192), without any indication of which existing policies needed to be changed, how they should have been changed, or how they would have prevented his arrest. In support of his claim that the Executive Defendants failed to act, Richardson essentially alleges that between September 17, 2011 and September 17, 2012, OWS protestors continued to be arrested, but not ultimately convicted. (See e.g., id. ¶¶ 141-47, 285-86.) The PAC does include fairly specific allegations regarding topics that should have been included in the officers' training but were allegedly left out, (id. ¶ 244), however, these allegations are not enough to save the claim. Despite the considerable length of the PAC, Richardson fails to plausibly allege that the Executive Defendants willfully chose to ignore a widespread practice of unconstitutional arrests and were deliberately indifferent to his constitutional rights.

In sum, Richardson's claims that Mayor Bloomberg, Commissioner Kelly, Chief Esposito, Assistant Chief Purtell, Deputy Chief Anger, and Deputy Chief McNamara were personally involved in his false arrest do not survive the motion to dismiss.

   2.   First Amendment Retaliation.

As explained above, the second, fourth, and fifth Colon factors cannot be used to hold the Executive Defendants liable for Richardson's First Amendment retaliation claim because that claim requires a showing of retaliatory intent. See Dorsett, 732 F.3d at 160 (holding that on a claim for First Amendment retaliation, plaintiffs must show that a "defendant's actions were motivated or substantially caused by [the] exercise of [plaintiff's First Amendment

rights]"); <u>Olutosin v. Lee</u>, 14 cv 685 (NSR), 2016 WL 2899275, at \*14 (S.D.N.Y. May 16, 2016); <u>see also</u> <u>Powell</u>, 2016 WL 4159897 at \*9.  In addition, Richardson has not plausibly alleged that any of the Executive Defendants "participated directly" in his arrest and retaliation. <u>Colon</u>, 58 F.3d at 873.  Therefore, only the third <u>Colon</u> factor, that defendants created a policy or custom under which constitutional violations occurred, or were allowed to occur, may be used to hold the Executive Defendants liable for First Amendment retaliation.

The alleged basis for the personal involvement of the Executive Defendants in this First Amendment claim is functionally identical to that of the false arrest claim.  Support for an alleged retaliatory motive comes from the temporal proximity between the arrest and Richardson's protest activity.  Both claims arise from the same factual allegations— that Richardson was unlawfully arrested for disorderly conduct because he was involved in the September 17, 2012 OWS anniversary celebration— and Richardson makes identical contentions regarding how the Executive Defendants "created a policy or custom" under which First Amendment rights were violated, "or allowed the continuance of such a policy or custom."  <u>Id.</u> On that basis, the Court's analysis regarding the applicability of the third <u>Colon</u> factor is the same for this claim as it was for the false arrest claim.

Therefore, just as Richardson has failed to adequately allege that Mayor Bloomberg, Commissioner Kelly, Chief Esposito, Assistant Chief Purtell, Deputy Chief Anger, and Deputy Chief McNamara were personally involved in his false arrest, his First Amendment retaliation claim against these defendants does not survive the motion to dismiss.

G.  Failure to Intervene Claim.

Richardson also alleges that the defendant police officers other than Chief Esposito, Assistant Chief Purtell, Deputy Chief Anger, and Deputy Chief McNamara, failed to

intervene to protect him from constitutional violations.  (PAC ¶ 96.)  Because "failure to intervene claims are 'contingent upon the disposition of the primary claims underlying the failure to intervene,'" Usavage v. Port Auth. of N.Y. & N.J., 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013) (quoting Matthews v. City of New York, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012)), Richardson's failure to intervene claims are assessed only as they relate his claims for false arrest and First Amendment retaliation.

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson, 17 F.3d at 557.  "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [] (2) that a citizen has been unjustifiably arrested [] or (3) that any constitutional violation has been committed by a law enforcement official []." Id.  However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." Id.

1.  False Arrest.

As an initial matter, because Richardson has plausibly alleged that Captain Iocco, Officer Bautista and Sergeant Suddler were personally involved in his false arrest, see Part A, supra, he cannot also sustain a claim that those three defendants failed to intervene in the arrest. See Sanabria v. Tezlof, 11 cv 6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016) ("Where the officer is a direct participant in the allegedly unlawful conduct, the failure to intervene theory of liability is inapplicable.").  However, Richardson has also failed to plausibly allege that the other defendant police officers who were in the area failed to intervene in an unlawful arrest.

Although Richardson has alleged that all of the defendant officers, aside from Chief Esposito, Assistant Chief Purtell, Deputy Chief Anger, and Deputy Chief McNamara, were within fifteen feet of him at the time of his arrest, (PAC ¶ 90), the PAC does not include any further allegations that plausibly suggest that all twenty-one of these officers observed the circumstances giving rise to the arrest such that each officer knew that probable cause was lacking.  Richardson does not provide any detail about what each officer was doing when Richardson was arrested or what each officer actually observed prior to the arrest.  The PAC does not plausibly allege how these other officers would know what Captain Iocco, Officer Bautista, and Sergeant Suddler did or did not observe that may or may not have amounted to probable cause.  These vague and generalized allegations do not plausibly allege individual liability on the part of each of the twenty-one officers named in this claim.  On this basis, Richardson has failed to plausibly allege that Officer Vailes, Officer Scott, Officer Smith, Officer Li, Officer Frias, Officer Flete, Officer Isaac, Officer Reyes, Officer Gilbert-Figueroa, Officer Campanelli, Detective Chinnery, and Officer Carey as well as Second Captain, Squad 1 Sergeant, Squad 1 Officer 1, Squad 1 Officer 2, Squad 1 Officer 3, Squad 2 Officer, Squads Lieutenant, Third Sergeant and Cap Wearing Officer observed the constitutional violation and had a realistic opportunity to intervene in his false arrest.

Additionally, because the Court finds that Richardson has not adequately plead his failure to intervene in the false arrest claim, the Court need not address the defendants' claims of qualified immunity.

2.  First Amendment Retaliation.

As previously explained, Richardson's claim for First Amendment retaliation arises out of the same factual allegations as his false arrest claim.  Therefore, the allegation that

officers failed to intervene to prevent a violation of Richardson's First Amendment rights, and the Court's analysis of the plausibility of that allegation, are the same as for his false arrest claim.  Richardson has not plausibly alleged that Officer Vailes, Officer Scott, Officer Smith, Officer Li, Officer Frias, Officer Flete, Officer Isaac, Officer Reyes, Officer Gilbert-Figueroa, Officer Campanelli, Detective Chinnery, and Officer Carey as well as Second Captain, Squad 1 Sergeant, Squad 1 Officer 1, Squad 1 Officer 2, Squad 1 Officer 3, Squad 2 Officer, Squads Lieutenant, Third Sergeant and Cap Wearing Officer are liable for failing to intervene to prevent his retaliatory arrest.  Similarly, the Court does not reach the issue of qualified immunity for this claim.

H.  <u>Monell</u> Claims.

Finally, Richardson asserts that the City of New York is liable for the constitutional violations he suffered.  A municipality may not be held liable on section 1983 claims solely "by application of the doctrine of *respondeat superior*."  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 478 (1986).  Instead, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  <u>Wray v. City of New York</u>, 490 F.3d 189, 195 (2d Cir. 2007) (quoting <u>Batista v. Rodriguez</u>, 702 F.2d 393, 397 (2d Cir. 1983)) (internal quotation marks omitted).  The four ways in which a plaintiff can plead the first element of a <u>Monell</u> claim are by alleging (1) "a particular municipal action *itself* violates federal law, or directs an employee to do so," <u>Bd. of Cty. Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. 397, 404 (1997) (emphasis in original), (2) an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right," <u>id.</u> at 405, (3) unconstitutional "practices [are] so persistent and widespread as to practically have the force of law," <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011), and (4) a

municipality's failure to train its employees about their legal duty to avoid violating a citizen's rights amounts to "deliberate indifference." Id.  Under any of the four theories of liability, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bryan Cty., 520 U.S. at 404.

The PAC bases its claim of municipal liability on the third and fourth theories of liability described above.  First Richardson alleges a widespread practice of unlawful arrests of OWS protestors.  (See e.g., PAC ¶¶ 141-48, 161, 196.)  Second, he claims that the City failed to properly train its police officers on First Amendment principles and their effect on arrests in protest situations, and specifically on disorderly conduct arrests.  (Id. ¶¶ 222, 249, 254, 257.)  The Court will first address the unconstitutional pattern and practice claim and then the failure to train theory.

1.   Municipal Policy and Practice.

When alleging a Monell claim based on the existence of a municipal policy or practice, plaintiffs must show that the practice causing the deprivation of federal rights is "so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61.  In other words, the policy complained of must be a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989).  "Therefore, a plaintiff may establish municipal liability by demonstrating that a municipality indirectly caused the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy." Tieman v. City of Newburgh, 13 cv 4178 (KMK), 2015 WL 1379652, at *16 (S.D.N.Y. Mar. 26, 2015) (internal citations and quotations omitted).  However,

"the mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (alterations omitted) (quoting Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993)).

        For the same reasons that the PAC does not sufficiently allege that the Executive Defendants had notice of a pattern of constitutional violations in the supervisory liability context, see Part F, supra.  Richardson fails to allege sufficient facts allowing for the plausible inference of a custom that was "so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61.  Richardson alleges that the city had a "persistent and widespread" custom of arresting OWS protestors without probable cause, on the basis of statistics regarding the number of arrests that resulted in convictions or pleas, news articles, academic reports, and lawsuits.  (PAC ¶¶ 154, 161-63, 165-66, 168-69, 173-74, 188, 190, 197-201, 210, 212, 287.)  As was discussed earlier, the fact that the charges against OWS protestors were often dismissed does not indicate the existence of a persistent custom of unlawful arrests.  The portions of the academic reports cited by the PAC contain only general claims of misconduct, and many of the news articles cited do not relate to the specific unconstitutional custom alleged here.  In addition, while the PAC alleges that many lawsuits were filed by OWS arrestees, the PAC includes little to no detail about any of the lawsuits and fails to assert which, if any, led to findings of liability against the City for false arrest or First Amendment retaliation.  On this basis, the PAC lacks sufficient facts to support an inference of a widespread custom responsible for Richardson's constitutional violations.  See e.g., Tieman, 2015 WL 1379652 at *17 ("Simply put, the fact that there were allegations of thirteen instances of excessive force during arrests over four years (none of which involved findings or admissions of culpability) during which hundreds, if not

- 36 -

thousands, of arrests were made does not plausibly demonstrate that the use of excessive force during arrest was so frequent and pervasive to constitute a custom."); Calderon, 138 F. Supp. 3d at 612-13 (sixteen lawsuits over twelve years, none of which implicated the specific unlawful conduct challenged or resulted in an adjudication or admission of liability, insufficient to demonstrate a municipal custom of false statements in warrant applications).

  2. Failure to Train.

   Richardson's second theory of Monell liability is based on the City's failure to train its police officers on First Amendment principles and proper policing of protests.  He alleges that the City, through its agents at the NYPD, knew or should have known that many of the police officers assigned to police OWS events had not received specialized training on policing First Amendment protest activity, and that many OWS protestors had been unlawfully arrested in the year between the first OWS protest and the one-year anniversary.  (PAC ¶¶ 154, 196, 278.)  Therefore Richardson claims that the City exhibited deliberate indifference to the rights of those protestors by failing to provide this training to its police force.  (Id. ¶ 255.)

   "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61.  Plaintiffs must show that a municipality's failure to train its employees amounted to "deliberate indifference."  Id.  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Id. (quoting Bryan Cty., 520 U.S. at 410).  Generally, "[a] pattern of similar constitutional violations by untrained employees is [] necessary to demonstrate deliberate indifference for purposes of failure to train."  Id. at 62 (internal quotation marks omitted).  A plaintiff must also "demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence."  Cash v. Cty. of Erie, 654

F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted).  Under this theory, "a city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality . . . can be found deliberately indifferent to the need." Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007) (citing City of Canton v. Harris, 489 U.S. 378, 390 (1989)).

At the motion to dismiss stage, the Second Circuit utilizes a three-prong test to determine whether plaintiffs have demonstrated "deliberate indifference" in the context of a failure to train claim.  Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992).  "First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation."  Id. at 297 (internal quotation marks omitted).  "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation."  Id.  And, third, "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  Id. at 298.

In addition, a plaintiff alleging a failure to train must plead a specific deficiency in the City's training program.  Calderon, 138 F. Supp. 3d at 613; Tieman, 2015 WL 1379652 at *22.  Prior to the Supreme Court's decisions in Iqbal and Twombly, the Second Circuit had noted that because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about a cause of the misconduct at the pleading stage," a plaintiff "need only plead that the city's failure to train caused the constitutional violation."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130 n.10 (2d Cir. 2004).  However, following Iqbal and

Twombly, the Second Circuit has suggested that plaintiffs must include "*some* non-conclusory allegation as to the deficient training programs" in order to survive a motion to dismiss. Calderon, 138 F. Supp. 3d at 613 (citing Simms v. City of New York, 480 F. App'x 627, 631 n.4 (2d Cir. 2012) (summary order) ("While it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery, [] this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim.") (internal citation omitted)); see also Triano v. Town of Harrison, 895 F. Supp. 2d 526, 539-40 (S.D.N.Y. 2012).

Richardson identifies several specific deficiencies in the NYPD training program. He alleges that NYPD officers should have been, but were not, trained on ten particular principles including (1) "[u]nder New York State and federal law, a person cannot be arrested for disorderly conduct for the mere inconveniencing of pedestrians," (2) "[u]nder New York State and federal law, even if protestors block the entire sidewalk, causing pedestrians to step into the street, such conduct is not enough to justify arrest for disorderly conduct," and (3) "[u]nder federal law, when a person is engaged in political or expressive speech activity, the First Amendment of the Constitution requires that the government, including the police, give fair warning to protestors that they must disperse before arresting them." (PAC ¶ 244) (internal quotation marks omitted).

Assuming for the sake of argument that Richardson has adequately plead specific deficiencies in the City's training programs, he has failed to satisfy the rest of the Second Circuit requirements for a failure to train Monell claim. The PAC plausibly alleges, and it is matter of general common sense, that NYPD officials are aware that their officers, at some point, will police protests and may need to arrest individuals participating in those protests, (id. ¶ 215), and that NYPD officers mishandling these arrests could cause constitutional deprivations, (id. ¶ 221).

However, Richardson does not allege facts to explain how policing OWS protests "presents [NYPD officers] with a difficult choice of the sort that training or supervision will make less difficult." Walker, 974 F.2d at 297. Nor has Richardson plausibly alleged that there is a history of the NYPD "mishandling" protestor arrests on a scale that could support a Monell claim. Id.

        The Court has already described how the PAC fails to allege facts that would support the inference of a "history of [NYPD] employees mishandling the situation," id., or a "pattern of similar constitutional violations," Connick, 563 U.S. at 62, such that the City was aware of a widespread lack of training. See Parts F, H.1., supra. However, in addition to the sources analyzed in Part F above, Richardson also points to statements made by NYPD officers in support of his argument that the need for more training was obvious. See Reynolds, 506 F.3d at 192. According to the PAC, several officers testified that they "believed that the fact that individuals are engaged in First Amendment-protected activity has no effect on the manner with which Penal Law 240 (disorderly conduct) is charged against them." (PAC ¶¶ 224, 226.) Other officers are described as testifying that "protestors who force[] other pedestrians to walk on the edge of the sidewalk," "around [the protestor] on the sidewalk," or into the street, are committing an arrestable offense. (Id. ¶¶ 236-37, 238, 240.) These statements demonstrate what Richardson alleges are incorrect understandings of the law. (Id. ¶¶ 224, 227-28, 236-37.) However, even if the Court were to accept Richardson's explanation of the law of disorderly conduct as correct, these allegations amount to no more than anecdotal evidence that a handful of NYPD officers arguably misunderstood the law. The statements of these officers do not create the required "history" or "pattern" of constitutional abuse. Walker, 974 F.2d at 298; Connick, 563 U.S. at 62.

        The fact that Inspector Winski and one of the Executive Defendants, Deputy Chief Anger, are alleged to have given testimony reflecting a misunderstanding of the legal

principles regarding policing protest activity, (PAC ¶¶ 224-29, 238), does not materially change

the plausibility of Richardson's failure to train claim.  Deputy Chief Anger is not alleged to have

been directly involved in NYPD training programs and was just one of many officers at the OWS

anniversary event who is alleged to have had supervisory responsibilities.  His alleged

misunderstanding of the law is not plausibly tied to Captain Iocco's arrest of Richardson, nor is it

reflective of a widespread need for more training.  Similarly, although Inspector Winski is

alleged to have been given responsibility for training "hundreds of officers" regarding their

duties at OWS events, (id. ¶ 225), the PAC does not allege that the City knew about his allegedly

mistaken understanding of the law, or that he included his mistaken beliefs into his training

curriculum.  Additionally, there is no allegation that he trained any of the officers who ultimately

arrested Richardson.

    In his opposition, Richardson relies on Connick v. Thompson to argue that the

need for more training was obvious because unlike attorneys, "in the absence of training, there is

no way for novice [police] officers to obtain the legal knowledge they require."  (Pl.'s Mem. 24.)

(quoting Connick, 563 U.S. at 64).  In Connick, the Supreme Court was discussing the possibility

left open by City of Canton v. Harris, that in some small percentage of cases, a pattern of similar

constitutional violations may not be necessary to show deliberate indifference.  See Connick, 563

U.S. at 63 (citing Bryan Cty., 520 U.S. at 409).  As explained in Connick, the Canton Court

raised a hypothetical situation in which a municipality provided its police officers with firearms

and deployed those armed officers to capture felons, without providing any training on the

constitutional limits on the use of deadly force.  Id. (citing Canton, 489 U.S. at 390).  Because

"[t]here is no reason to assume that police academy applicants are familiar with the constitutional

constraints on the use of deadly force," the need for training in this instance might be so obvious

that a city could be liable for a failure to train even without any proof of a history of similar constitutional violations.  Id. at 64.

The circumstances alleged here are not analogous to the restraints on the use of deadly force.  The hypothetical posed in Canton and discussed in Connick envisioned a situation in which officers were given no training at all, see Connick, 563 U.S. at 67, whereas the PAC concedes that most NYPD officers had at least some "cursory training" on policing protest activity at the police academy.  (PAC ¶ 261.)  Richardson claims that whatever training these police officers received was inadequate and that the City should be held liable for failing to provide subsequent, more in depth training on the rights of protestors in the year before his arrest.  (Id. ¶¶ 193, 246.)  However, allegations that a training program is "something less than perfect," Boddie v. City of New York, 15 cv 4275 (GHW), 2016 WL 1466555, at *5 (S.D.N.Y. Apr. 13, 2016), or that "additional training would have been helpful," Connick, 563 U.S. at 68, does not establish Monell liability.  See id. ("Proving that an injury or accident could have been avoided if an employee had had better or more training . . . will not suffice" to establish municipal liability) (citing Canton, 489 U.S. at 391) (internal quotation marks omitted); Reynolds, 506 F.3d at 193 ("A training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing.") (internal citations omitted) (quoting Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 27 (1st Cir. 2005)).

Finally, Richardson has failed to show a "direct causal link between the municipal action and the deprivation of federal rights" at issue.  Bryan Cty., 520 U.S. at 404; see also Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006) ("Monell does not provide a

separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train . . . led to an independent constitutional violation.").  While the PAC includes claims that several NYPD officers allegedly misunderstood aspects of the disorderly conduct statute, (PAC ¶¶ 224, 227-28, 236-38), there is no allegation that the three officers who arrested Richardson – Captain Iocco, Officer Bautista, and Sergeant Suddler – were mistaken about their ability to arrest protestors for disorderly conduct, nor does the PAC claim that these specific officers never received any instruction on appropriate policing of protest activity.  On the facts as set out in the PAC, the Court cannot conclude that Richardson's arrest was directly caused by an allegedly deficient training program.

CONCLUSION

Defendants' motion to dismiss, (Dkt. No. 68), is granted in part and denied in part.  Specifically, all claims are dismissed except for Richardson's false arrest and First Amendment retaliation claims against defendants Captain Iocco, Officer Bautista, and Sergeant Suddler.  Richardson's motion to amend is also denied in part and granted in part.  The PAC is deemed filed, asserting claims by Richardson for false arrest and First Amendment retaliation against Captain Iocco, Officer Bautista, and Sergeant Suddler.  All claims against the City of New York, Mayor Bloomberg, NYPD Commissioner Kelly, Chief of Department Esposito, Assistant Chief Purtell, Deputy Chief Anger, Deputy Chief McNamara, Officer Vailes, Officer Scott, Officer Smith, Officer Li, Officer Frias, Officer Flete, Officer Isaac, Officer Reyes, Officer Gilbert-Figueroa, Officer Campanelli, Detective Chinnery, Officer Carey, Second Captain, Squad 1 Sergeant, Squad 1 Officer 1, Squad 1 Officer 2, Squad 1 Officer 3, Squad 2

Officer, Squads Lieutenant, Third Sergeant and Cap Wearing Officer are dismissed and they are no longer parties to this action.

        SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       September 30, 2016