IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
———————————————————————

LUKE RICHARDSON,

Index No. 15-cv-05775-PKC

PLAINTIFF,

vs.

Memorandum of Law
in Support of Motion to
Reconsider

THE CITY OF NEW YORK, a municipal entity,
et al.,

DEFENDANTS.

———————————————————————

# **Table of Contents**

I.  Preliminary Statement ------------------------------------------------------------------- 1

II.  This Court Should Reconsider Dismissal of the Failure to Intervene Claims ---------- 1

III. This Court Should Reconsider Dismissal of the *Monell* Claim -------------------------- 5

    A.   The Pattern of Dismissed Charges is a Strong Indication of Systematic Unlawful Arrests ..................................................................................................................7

    B.   The *Suppressing Protest* Report Provides Notice of Systematic Violations By the NYPD ...................................................................................................................10

    C.   Facts Cited to Newspaper Reports Should Not Be Discounted ...........................12

    D.   Prior Litigation Provides Notice to the Municipality ...........................................14

    E.   Litigation Evidences a Pattern ..............................................................................15

    F.   Delegating Training to Winski Makes Him a *Monell* Policymaker With Respect to Training .................................................................................................................16

    G.   *Monell* Litigation Concerning Police Practices Has Value .................................16

    H.   The Ruling in this Case Will Encourage the Municipality to Ignore Constitutional Violations ..............................................................................................................17

IV. Conclusion ------------------------------------------------------------------------------- 19

## I.  Preliminary Statement

This Court should reconsider the dismissal of the claims for failure to intervene, because the complaint alleged the defendants' knowledge that the plaintiff's arrest occurring in their presence was unlawful.

This Court should reconsider its dismissal of the plaintiff's *Monell* claim because the facts pled plausibly allege an unlawful municipal practice, and, independently, a failure by the NYPD to train its officers to follow lawful police practices.

The plaintiff respectfully requests modification of the Court's Memorandum and Order.

## II. This Court Should Reconsider Dismissal of the Failure to Intervene Claims

The plaintiff respectfully requests that the Court reconsider its dismissal of the plaintiff's claims for failure to intervene.  Respectfully, the Court overlooked allegations of the complaint which were material to the Court's decision, and which justify modification of the decision.

The Court held that the PAC failed to "plausibly suggest that all twenty-one of these officers observed the circumstances giving rise to the arrest such that each officer knew that probable cause was lacking. Richardson does not provide any detail about what each officer was doing when Richardson was arrested or what each officer actually observed prior to the arrest."  (Decision p. 33).

The PAC alleges: "At or around 10 AM Plaintiff was standing on the sidewalk at or near 28 Broadway making plans with others from OWS he had reunited with."   (PAC ¶ 69).  The PAC goes on to allege that, with no intervening incidents or activity, "[w]ithout warning, Defendant POLICE OFFICERS struck Plaintiff from behind,

1

grasping their batons between both hands and shoving Plaintiff in the back." (PAC ¶ 91).

The police officers who did this included: "NYPD OFFICER REGINA VAILES

(SHIELD NO. 4132), NYPD OFFICER DAVID SCOTT (SHIELD NO. 8533), NYPD

OFFICER HALIMA SMITH (SHIELD NO. 3680, NYPD OFFICER CHAO LI

(SHIELD NO. 28060) and SECOND CAPTAIN." (PAC ¶ 95).  The PAC alleges that,

with no intervening incidents or activity, "Defendant CAPTAIN IOCCO grabbed

plaintiff by the strap of his messenger bag and dragged him through a crowd of

Defendant POLICE OFFICERS."  (PAC ¶ 92).  The plaintiff was thus placed under

arrest by defendants Iocco, Bautista, and Suddler.  (PAC ¶ 93-94).  The PAC pleads that

the other defendants were "present at the place of the plaintiff's arrest before, during and

after the time that the arrest took place, [a]ll were within 15 feet of the plaintiff, or less, at

the time of his arrest," and all "were close enough to intervene in the plaintiff's arrest."

(PAC ¶ 90, 96).

    Thus, the PAC sets forth a very simple fact pattern.  The plaintiff was on a

sidewalk, doing nothing unlawful, when he pushed, grabbed, and then arrested by police.

(PAC ¶¶ 2, 69, 90-95).  This is not a case where, in order to understand the existence or

non-existence of probable cause, a person would have to witness and understand a long

sequence of events, or evaluate evidence.  A person would simply have to witness Mr.

Richardson standing on the sidewalk (a lawful activity), and then being arrested.

    For quite some time, it has been clearly established New York law that police

cannot simply grab and arrest civilians on the sidewalk.  For example, the New York

State Court of Appeals vacated a conviction for 240.20(5) [disorderly conduct –

obstructing pedestrian traffic], where the arresting officer alleged: "he observed

defendant along with a number of other individuals standing around at the above location, to wit a public sidewalk, not moving, and that as a result of defendants' [sic] behavior, numerous pedestrians in the area had to walk around defendants [sic]." *People v. Jones*, 9 N.Y.3d 259, 260-261 (2007). Vacating the conviction, the Court of Appeals explained:

> To meet the jurisdictional requisite to prosecute defendant for disorderly conduct under Penal Law § 240.20 (5), the People were obliged to set forth a prima facie case that defendant "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . obstruct[ed] vehicular or pedestrian traffic."

> The allegations in the information do not meet this burden. Nothing in the information indicates how defendant, when he stood in the middle of a sidewalk at 2:01 A.M., had the intent to or recklessly created a risk of causing "public inconvenience, annoyance or alarm." The conduct sought to be deterred under the statute is "considerably more serious than the apparently innocent" conduct of defendant here. Something more than a mere inconvenience of pedestrians is required to support the charge. Otherwise, any person who happens to stop on a sidewalk--whether to greet another, to seek directions or simply to regain one's bearings--would be subject to prosecution under this statute. *Id.* at 262 (quoting 240.20(5) and *People v Carcel*, 3 NY2d 327, 331 (1957)).

The PAC alleged conduct by Mr. Richardson which was identical to that described in *Jones* ("standing around at the above location, to wit a public sidewalk, not moving"), except that, unlike *Jones*, there is no allegation that "numerous pedestrians in the area had to walk around" him.

The Court appears to have overlooked the allegations in paragraph 95. The defendant officers identified in paragraph 95, defendants Vailes, Scott, Smith, Li, and Second Captain, who are alleged to have participated in pushing Mr. Richardson as he stood on the sidewalk **must** have seen the plaintiff standing immediately before they began pushing him. Pursuant to binding New York Court of Appeals precedent, the conduct these defendants observed, Mr. Richardson standing on the sidewalk, is lawful behavior. The PAC makes clear that these defendants were pushing the plaintiff

**immediately** before he was seized and arrested by the arresting officers.  Thus, these defendants knew that, between their contact with Mr. Richardson, shoving him, and the arrest, Mr. Richardson did not engage in any conduct other than standing on the sidewalk. These officers accordingly knew that the arrest was unlawful.

The liability of these officers is plausible, unless one infers additional facts that are not stated in the complaint (and which did not occur), such as the existence of significant time or incidents between the moment these officers began shoving Mr. Richardson on the sidewalk, and his arrest.  *Iqbal* has not changed the principle, however, that if the Court draws inferences from the allegations of the complaint, the Court has the "obligation to draw reasonable inferences in favor of the **sufficiency** of the complaint." *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. N.Y. 2016) (emphasis added).

As to the other (non-Executive) officers, the complaint pleads that all were and part of group of officers deployed to work together at the place and time of the plaintiff's arrest.  (PAC ¶¶ 70-78).  The PAC pleads that all of them were "present at the place of the plaintiff's arrest before, during and after the time that the arrest took place," and that "[a]ll were within 15 feet of the plaintiff, or less, at the time of his arrest."  (PAC ¶ 90). The Court drew the inference that, notwithstanding their close proximity before, during, and after the arrest, these officers did not witness enough of the circumstances to be on notice that the arrest was unlawful.  However, it could equally be inferred that these officers did, in fact, witness the events occurring right in front of them, given how simple the circumstances were.  Even "[i]f a fact is susceptible to two or more competing inferences …the Court must, as a matter of law, draw the inference that favors the plaintiff so long as it is reasonable." *Iron Gate Sec., Inc. v. Lowe's Cos.*, 2016 U.S. Dist.

LEXIS 101796 (S.D.N.Y. Aug. 3, 2016) (citing *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013)).  It is not necessary that the plaintiff's assertion of liability be the "most plausible" inference, so long as it is plausible.  *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. N.Y. 2016).  It is plausible that these officers, deployed and on duty, trained to be alert and observant of their surroundings, saw what there was to be seen within the 15 feet or less that separated them from the plaintiff.  What there was to be seen was the plaintiff lawfully standing, and then being arrested.  While it is possible that some officers did not see what there was to be seen in front of them, the Court should not infer that they did not.  This Court's inferences should be drawn in favor to, and not contrary to, the plaintiff.

The parties certainly may wish to find a way to reduce the number of defendants, and this can no doubt be accomplished, possibly by staying claims against certain officers whose sole potential liability is failure to intervene (especially such officers who had no physical contact with the plaintiff).  However, this Court should carefully consider the effect that the precedent of such a narrow construction of this claim for failure to intervene might have in other cases.

For all the foregoing reasons, the Court's dismissal of these claims ought to be reconsidered.

## III.   This Court Should Reconsider Dismissal of the *Monell* Claim

This Court summarized the plaintiff's *Monell* claim as follows: "Richardson points to four main sources of information which he claims were available to the Executive Defendants in the year leading up to his arrest. These include (1) statistics regarding the low number of OWS arrests that led to pleas or convictions, which were

allegedly sent to Esposito and "other high level executive officers of the NYPD," (id. ¶ 154), (2) articles in national publications reporting on claims of police misconduct at OWS events, (id. ¶¶ 161-63, 165-66, 168-69, 174, 190, 201, 210, 212, 287), (3) third party reports describing police misconduct, one of which was allegedly provided to the Mayor's office and to the NYPD, (id. ¶ 188), and (4) lawsuits brought by OWS protestors against the City of New York. (Id. ¶¶ 163, 173, 197-200.)." The PAC also alleged that the executive defendants were present at OWS demonstrations prior to the plaintiff's arrest. (PAC ¶¶ 262-263). Nevertheless, the Court found that the PAC fails to plausibly allege "a history of the NYPD 'mishandling' protestor arrests on a scale that could support a Monell claim."

This Court's decision forecloses the use of **any** of the sources of information normally available to a litigant at the pleading stage, and even some forms of information which might not be available to most litigants, but were available in this case. This Court has held that none of this information, considered either separately or collectively, is sufficient to state a "plausible" *Monell* claim of a *de facto* custom of unlawful arrests and/or failure to train. Make no mistake: the Court's holding means that there will be no future *Monell* claims relating to false arrest.

This Court has crafted a rule for *Monell* pleading, hereinafter to be referred to as the "Richardson Rule." The Richardson Rule provides that neither statistics of outcomes of arrests, nor articles in mainstream news publications, nor third party reports of police misconduct, nor lawsuits stating similar allegations, are sufficient, either separately or together, to provide a plausible factual basis for a *Monell* claim. In other words, the Richardson Rule identifies each of the primary means by which a pattern of false arrests

6

or a need for training might become known to those outside the government itself, and systematically eliminates **all** of them as a basis for *Monell* pleading.

The Richardson Rule – if applied to other cases – will have the effect of making a *Monell* claim for a false arrest case effectively impossible to plead.  Absent a public official municipal announcement that an unlawful custom exists, there will be no possibility of pleading *Monell* claim relating to a false arrest.

The Second Circuit has warned against imposing burdens of pleading on plaintiffs which would "render *Monell* a nullity," as the Richardson Rule does for *Monell* false arrest claims.  *Matusick v. Erie County Water Auth.*, 739 F.3d 51, 83 (2d Cir. N.Y. 2014). *Accord Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir. Conn. 1980) (same).  *See also Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2463 (2014) (declining to adopt a "defense-friendly" rule of law that would render a kind of ERISA complaint effectively impossible).  This Court should reconsider its decision.

### A.  The Pattern of Dismissed Charges is a Strong Indication of Systematic Unlawful Arrests

This Court held that, as a matter of law, a pattern of criminal cases that are dismissed or not prosecuted can never provide any basis for a *Monell* allegation of a pattern of unlawful arrests.  The Court reasoned that because, with respect to any one particular defendant, one can't know for certain that dismissal occurred because the original arrest lacked probable cause, then two thousand such dismissals provide no basis to conclude that **any** arrests lacked probable cause.  This reasoning has both logical and legal flaws, and ought to be reconsidered.

A protestor arrest which is dismissed is more likely to have lacked probable cause than most other types of crimes or offenses.  The vast majority of protestor arrests are for

obstruction of vehicular or pedestrian traffic (Penal Law 240.20(5)), or failure to disperse (Penal Law 240.20(6), but sometimes charged as 195.05).  These charges involve no complaining witness, and no physical evidence – they are therefore immune to many of the pitfalls that may result in dismissal of a charge of – for example -- larceny or drug possession.  If the police officer had probable cause for the arrest, the officer's own testimony will be sufficient to state a *prima facie* case at arraignment and at trial. Conversely, of course, if the police officer lacked probable cause at the time of the arrest, there is usually little that can be done to acquire further evidence to bring about a conviction.  For these reasons, therefore, a declination to prosecute of a disorderly conduct charge is tantamount to a finding that probable cause was lacking when the arrest was made.  A dismissal (even absent the binding legal presumptions which will be discussed below) raises a strong inference that the elements of the offense were never present.

Protest arrest cases are procedurally simple, lacking most excuses for motion practice, and the District Attorney has the option to avoid a jury trial simply by charging violations (Penal Law § 240.20) rather than misdemeanors (Penal Law § 195.05).  There is no reason why meritorious cases could not be brought to trial in every case where the accused did not plead guilty.  If the District Attorney's office does not prosecute or agrees to dismissal, it is more likely because of a substantive problem with the case than a procedural one.

This Court overlooked controlling New York State Law, which raises the presumption that each and every arrest which is not made pursuant to a warrant is unlawful.  "Whenever there has been an arrest and imprisonment without a warrant, the

officer has acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful." *Broughton v State of New York*, 37 NY2d 451, 458 (1975), *cert denied* 423 US 929 (1975)).  *See also, e.g., Ahmad v City of New York*, 129 A.D.3d 443, 444 (N.Y. App. Div. 1st Dep't 2015) ("the fact that the arrest was made without a warrant raises a presumption of a lack of probable cause"); *Lawson v City of New York*, 83 A.D.3d 609 (N.Y. App. Div. 1st Dep't 2011) ("the lack of a warrant raised a presumption of a lack of probable cause").  There is no presumption of probable cause arising from "after the fact judicial participation."  *Diederich v. Nyack Hosp.*, 49 A.D.3d 491, 493 (N.Y. App. Div. 2d Dep't 2008) (quoting *Broughton*, 37 NY2d at 458).  Thus, as a matter of law, the presumption of lack of probable cause which arises for each warrantless arrest is certain to continue in existence unless and until the defendant is found or pleads guilty, regardless of what other post-arrest proceedings may have been held.

There is no reason to believe that this presumption operates only to the benefit of the particular person arrested.  Rather, the *Broughton* presumption arises because the law of New York State views decisions made by police as inherently less reliable than those made by a warrant-issuing magistrate. When the New York Court of Appeals stated the rule in *Broughton*, the court spoke in terms of general principles applicable to all criminal proceedings: "[T]his rule recognizes the *prima facie* validity of actions where there has been a judicial evaluation. Accordingly, the Magistrate's consideration of the arrest warrant application will generate a presumption that the arrest was issued on probable cause. However, this reasoning is not applicable where the arrest is made without a warrant." *Broughton*, 37 N.Y.2d at 458.  The particularities relating to the person

arrested, or to the interaction between the arrestee and the arresting officer, are no part of the basis for this presumption.  Therefore, it applies universally.

With respect to State law, federal courts are **obliged** to follow the interpretations of the New York courts.  *See United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 369 (1971) ("we lack jurisdiction authoritatively to construe state legislation.").  This Court, then, should have recognized the presumptive invalidity of the all the arrests which did not result in a guilty plea or conviction.  This is state law which this federal Court lacks jurisdiction to modify.  Pursuant to *Broughton*, an allegation that more than 2,000 arrests did not result in a plea or conviction is, as a matter of law, a presumptively true allegation that those arrests lacked probable cause *ab initio*.

### B.  The *Suppressing Protest* Report Provides Notice of Systematic Violations By the NYPD

The PAC cited a third party report, a study called Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street (July 25, 2015),[1] drafted by law clinics at NYU, Fordham, Harvard, and Stanford.  The report assembled information from a variety of sources, including first hand testimony.  It concluded that the NYPD engaged in a variety of unconstitutional practices in policing protests, including closing sidewalks to prevent lawful protests, and making unlawful disorderly conduct arrests.  *See id*. pp. 110-120.  This report was published and delivered to the Police Commissioner and the mayor more than a month before the plaintiff's arrest.

Such a report is not admissible evidence.  But a pleading does not need to plead evidence.  Neither *Twombly* nor *Iqbal* "require the pleading of specific evidence." *Arista*

---

[1]     Produced by The Global Justice Clinic at NYU Law School and the Walter Leitner International Human Rights Clinic at Fordham Law School, published July 25, 2012, available at: http://chrgj.org/wp-content/uploads/2012/10/suppressingprotest.pdf.

*Records LLC v. Doe*, 604 F.3d 110, 120-21 (2d Cir. 2010). "Plaintiff may meet his initial pleading burden through the use of hearsay evidence. …[N]either *Twombly* nor *Iqbal* altered the rule that a plaintiff need not plead specific, admissible evidence in support of a claim, and a contrary rule would confuse the principles applicable to a motion to dismiss with those governing a motion for summary judgment." *Sletten v. LiquidHub, Inc.*, 2014 U.S. Dist. LEXIS 94697, 30-31 (S.D.N.Y. July 10, 2014) (quoting *Campanella v. Cnty. of Monroe*, 853 F. Supp. 2d 364, 378 (W.D.N.Y. 2012)). *See also Arista Records*, 604 F.3d at 119.

As a practical matter, studies such as this one play an important role in informing both the municipality and the public of systemic problems which might otherwise go unknown and uncorrected. As an example, two studies documented an informal policy within the NYPD, in which police officers would perform a *Terry* stop, and tell the stopped civilian that, if they had any marijuana in their possession, it would be 'better for them' if they took it out and gave it to the officer. If the person followed the police instruction, however, they would be arrested for the misdemeanor offense of having marijuana in "plain view." Possession of a small quantity of marijuana **not** in plain view is a non-criminal violation. By issuing the order to take the marijuana out, and by then pretending that the order had never been given, the officers would convert a non-criminal violation into a criminal misdemeanor. (One study concluded that police valued making marijuana arrests because they were easy to do, the arrestees were compliant and non-violent, and the arrests counted to so-called "productivity goals," or quotas). One study, published in 2008, was conducted by a sociology professor at Queens College and the

director of think tank on drug policy, on behalf of the New York Civil Liberties Union.[2]
Another study published in 2010 by researchers at Columbia University, documented the
same tactic.[3]

As a result of these studies and press stories inspired by them, the Police
Commissioner took notice of the practice, and issued an order instructing his officers to
stop doing it, as the Daily News headline reported: 'Tricking people in pot busts is no-no,
NYPD Commissioner Ray Kelly reminds officers."[4]  This is an object lesson that 3rd
party reports are taken seriously by the NYPD (and give notice to them), and should also
be taken seriously, for pleading purposes, by federal courts.

A serious, well-researched report that studies police practices has a real-world
value both in documenting the police practices and in providing notice to the police that
such practices are occurring.  A *per se* rule that such reports have no value for pleading
purposes ignores this real-world value.  The Court should not discount allegations simply
because they are cited to an academic report.  *See Collins v. City of New York*, 923 F.
Supp. 2d 462, 479 (S.D.N.Y. 2013) ("Of course, the Report's findings are not conclusive.
*But they at least make plausible* that the type of misconduct that led to [plaintiff's] arrest
and prosecution was endemic within the NYPD.").

**C.  Facts Cited to Newspaper Reports Should Not Be Discounted**

The prong of the Richardson Rule which states that newspaper reports are of zero
value from a pleading perspective is at odds with one of the most fundamental concepts

---

[2]	Levine, Harry G. and Deborah Peterson Small, "Marijuana Arrest Crusade: Racial Bias and Police Policy 1997-2007," The New York Civil Liberties union, April 2008.
[3]	Geller, Amanda and Jeffrey Fagan, "Pot as Pretext: Marijuana, Race, and the New Disorder in New York City Street Policing," Colmbia University, February 26, 2010.
[4]	Kappstatter, Bob, "Tricking people in pot busts is no-no, NYPD Commissioner Ray Kelly reminds officers," The Daily News, September 28, 2011.

of our ancient democracy: that the people will, and should, rely on a free press to provide the information needed by the people to govern themselves.

"A free press stands as one of the great interpreters between the government and the people." *Pittsburgh Press Co. v. Pittsburgh Com. on Human Relations*, 413 U.S. 376, 382 (1973) (*Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936)). "The business of the press … is the promotion of truth regarding public matters by furnishing the basis for an understanding of them." *Associated Press v. United States*, 326 U.S. 1, 28 (1945) (Douglas and Frankfurter, concurring). "The press was protected [by the First Amendment] so that it could bare the secrets of government and inform the people." *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black and Douglass, concurring).

To hold that any fact alleged in a pleading which is traceable to the press is to be disregarded is to assign zero value to the press, in the inverse of what the Framers believed and the Supreme Court has always held. That an allegation "upon information and belief" asserted by the most disreputable ambulance-chaser is presumed true, while an allegation which references factual reporting in a mainstream publication is not, flies in the face of all that experience teaches us about the relative reliability of attorneys and journalists.

In particular cases, it might well be that certain journalism-sourced allegations should be discounted for various reasons. The particular source might be untrustworthy, or the article's assertions might be evidently speculative. A blanket rule that journalism-sourced allegations are non-facts, however, goes too far.

An allegation sourced to a press report can also show notice to the municipality, even if the Court were to deny the presumption of substantive truth to the allegation itself.  Experience teaches us that the government is generally aware of what mainstream press reports say about government activities.  Individual governmental officers often spend significant time in liaison with the press.  Press relations is an important governmental function which is usually assigned to dedicated staff who have access to the highest decision makers.  The fact that newspapers report on police conduct raises the strong presumption that the municipality – at the policy-making level – is aware of that police conduct.

### D.  Prior Litigation Provides Notice to the Municipality

As a matter of practical fact, if not as a matter of law, lawsuits provide notice to the public and the municipality alike that a problem exists.  This is an opinion shared by mainstream journalists,[5] and by the United States Department of Justice.  The United States of America, in its intervenor complaint against The City of New York in *Nuñez v. The City of New York*, 11 Civ. 5845 (LTS)(JCF), Docket No. 178 ("USA Nuñez Complaint") cited prior litigations as placing the City of New York "on notice" of problems.  The cases were class actions, but none was litigated to a final judgment. (USA Nuñez Complaint ¶ 57).[6]

The Courts are not obliged to adopt each and every position taken by the Justice Department (or the New York Times), but the Department's position is a practical and

---

[5]    *See, e.g.,* Weiser, Benjamin,  *"Lawsuits Suggest Pattern of Rikers Guards Looking Other Way,"* The New York Times, February 3, 2009, available at http://www.nytimes.com/2009/02/04/nyregion/04rikers.html.

[6]    The Complaint cited a 18 criminal prosecutions against Riker's staff.  However, all but four of the cited cases were merely indictments.  (USA Nuñez Complaint ¶¶ 58-62).  In the opinion of the Justice Department, these litigations and criminal charges provided notice to the municipality that raised a duty to investigate further.  (The Nuñez case resulted in a consent decree).

realistic one.  The filing of a lawsuit guarantees that municipal employees (both in the City Law Department and in the subject agency) will examine the facts and circumstances of the lawsuit.  Where, as alleged in this case, the City paid $30 million to settle litigations alleging wrongful arrests of protestors in the years leading up to the incident in this case, it is a practical certainty that municipal decision makers at the highest level reviewed the facts and circumstances of the litigations in question, and the practices which led to them.  To adopt a *per se* rule that lawsuits have no significance defies these practical realities.

This Court is certainly correct that, for purposes of notice, lawsuits filed **after** the plaintiff's arrest have no relevance.  However, the filing of 18 Occupy Wall Street lawsuits prior to Sept. 17, 2012, and the lawsuits which resulted in the $30 million dollars in settlements relating to the arrests of protestors at the Republican National Convention are, as a practical matter, highly relevant to notice.

### E. Litigation Evidences a Pattern

Lawsuits filed **both** before and after the plaintiff's arrest, because they related to incidents which occurred prior to the arrest, can help show a pattern of unconstitutional conduct.  This too, is a practical reality which ought to be reflected in Courts' approach to this issue.  Lawsuits are not a fail-safe indicator of misconduct, but they are a useful indicator.  For example, in 2014, the Daily News reported on a police officer who had been sued 18 times in the past eight years, with $884,000 paid out to settle those cases.[7] The Daily News reported the official position of the Bloomberg administration, which "routinely dismissed the relevance of civil suits against the NYPD."  As a practical

---

[7]     Paddock, Barry, et al., "Detective is NYPD's most sued cop, with 28 lawsuits filed against him since 2006," The Daily News, February 16, 2014.

matter, however, no police executive could view this officer's record of litigations as anyting other than evidence that the officer was engaging in a practice of unlawful behavior.

While it is obvious that a settled case does not involve any findings of fact or liability, and that a significant proportion of lawsuits filed lack merit, as a practical matter, when lawsuits and settlements accumulate, it really is evidence of an underlying problem.  A *per se* rule that litigations should be disregarded in pleading ignores this real-world principle.

### F.   Delegating Training to Winski Makes Him a *Monell* Policymaker With Respect to Training

As this Court once wrote, "Monell liability is not predicated on whether a given official is a policymaker, but rather, whether the official has been delegated authority in a manner that his or her decision may be 'fairly attributable to the municipality.'" *Martinez v. Port Auth.*, 2005 U.S. Dist. LEXIS 19141 (S.D.N.Y. Sept. 2, 2005) (citing *Rookard v. Health & Hosp. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)).  The PAC alleges that training the police officers who policed Occupy Wall Street events was delegated to Deputy Inspector Winski.  (PAC ¶ 225).  The PAC alleged that Winksi "could not recall any training [that he received] pertaining to an individual's constitutional rights and appropriate policing of First Amendment activity."  (PAC 223).  Thus, the City of New York delegated training to an individual who had not, himself, been trained.  This is a policy "fairly attributable" to the City of New York not to train the officers policing Occupy Wall Street events in relation to an "individual's constitutional rights and appropriate policing of First Amendment activity."

### G.   *Monell* Litigation Concerning Police Practices Has Value

It was through a *Monell* litigation (actually, through a sequence of *Monell*

litigations), that we learned that the NYPD's program of mass stop-and-frisk was not

necessary to the maintenance of a low crime rate.[8]  As the Civil Rights Division of the

United States Department of Justice wrote of the *Floyd* case, the litigation: "present[ed]

two questions of critical public importance: whether the stop-and-frisk practices of the

New York City Police Department ("NYPD") violate the Fourth or Fourteenth

Amendments to the United States Constitution and, if so, what remedial measures are

needed to bring NYPD's conduct into constitutional compliance."  *See* Statement of

Interest of the United States of America, *Floyd, et al. v. The City of New York, et al.,* 08-

cv-01034-SAS-HBP Docket No. 365, p. 1.  That litigation would have been dismissed on

the pleadings applying the Richardson Rule.  The litigation which preceded *Floyd*,

*Daniels v. The City of New York*, and which caused the NYPD to begin keeping statistics

on stop-and-frisk, would have been dismissed on the pleadings applying the Richardson

Rule.

It is understandable that courts do not wish to indulge every *pro forma* 10-

paragraph *Monell*  pleading.  However, to demand trial-ready evidence at the pleading

stage kills the cause of action, and with it, destroys the benefits that meritorious claims

may bring.

### H.  The Ruling in this Case Will Encourage the Municipality to Ignore Constitutional Violations

One can easily anticipate the effect the Richardson Rule will have on executive-

level officers henceforth.  Imagine that the Commissioner learned that, of 3,000 of a

particular category of arrests over the course of one year, 100% of those arrests were

---

[8]        Cullen, James, "Ending New York's Stop-and-Frisk Did Not Increase Crime," The Brennan
Center for Justice, April 11, 2016.

dismissed or declined to prosecute.  The Commissioner's attorney would advise him:

"Don't worry about it.  As a matter of law, this 100% dismissal rate does not show a

pattern of unlawful arrests, and does not put you on notice of a pattern of unlawful

arrests.  You have no potential liability.  The City has no potential liability.  You can

ignore it."  If the Commissioner read a 10 part New York Times exposé of an unlawful

police practice, the Commissioner would be advised: "Don't worry about it.  There is a

*per se* rule that press reports have no legal significance of any kind.  As a matter of law,

you are not even on notice of this problem – it's as if you never read the articles.  You

have no potential liability.  The City has no potential liability.  You can ignore it."  If the

Commissioner became aware of ten, twenty or one hundred lawsuits alleging false arrests

in similar circumstances, the Commissioner would receive similar advice.  "Don't worry

about it, as a matter of law, you are not even on notice that these events may have

happened."  If Columbia and NYU delivered a hundred-page report detailing unlawful

police practice, the advice would be the same: "Don't worry about it: as a matter of law,

you're not even on notice of a possible problem."  If the Commissioner received all of

this information at the same time, the advice would be the same: 'Don't worry about it.

As a matter of law, you are not even on notice of a problem.  Go ahead and ignore it."

> If this seems unduly cynical, the Court should remember that the NYPD has been
found to engage in long-standing and widespread constitutional violations even when
under the supervision of a federal court.  It is far from unlikely that a police
Commissioner or Chief of Department would – once made aware that he and the City are
free from potential liability – ignore widespread constitutional violations that they
became aware of.  *See Casale v. Kelly*, 710 F. Supp. 2d 347 (S.D.N.Y. 2010).

## IV.    Conclusion

For all the foregoing reasons, this Court should reconsider and modify its decision

dismissing the plaintiff's *Monell* claim and claims for failure to intervene.

Dated:          New York, N.Y.
                October 14, 2016


                                        _____//s//_____
                                        David Thompson [dt3991]
                                        Stecklow & Thompson
                                        217 Centre Street, 6th Floor
                                        New York, NY 10013
                                        Phone:  (212) 566-8000
                                        Fax:      (212) 202-4952
                                        Email: dave@sctlaw.nyc

TO:      Hon. P. Kevin Castel
         United States District Judge
         Daniel Patrick Moynihan
         United States Courthouse
         500 Pearl St.
         New York, NY 10007-1312

         Andrew Joseph Lucas
         NYC Law Department, Office of the Corporation Counsel (NYC)
         100 Church Street
         New York, NY 10007